IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS
IN KANSAS CITY, KANSAS

FILED
MAY 14 2018
TIMOTHY M. O'BRIEN CLERK
By YDM Deputy

GWENDOLYN G. CARANCHINI, a/k/a GWEN CARANCHINI,
1203 West 62nd Street
Kansas City, Missouri 64113

Plaintiff,

vs.

CASE NO. 18-2249-CM-GLR

LOLA PECK and RICK PECK IV, a/k/a RICK PECK, collectively; and LOLA PECK, individually
32640 WEST 207th Street
Edgerton, Kansas 66021

CALVIN HAYDEN, SHERIFF OF THE JOHNSON COUNTY SHERIFF'S OFFICE in OLATHE, KANSAS;

CORIZON,
Operator of the Johnson County Jail Medical Services

THE OFFICE OF THE DISTRICT ATTORNEY for the STATE OF KANSAS, COUNTY OF JOHNSON, and more particularly the following individuals: JOHN FRITZ, and MICHAEL McELHINNEY, Assistant District Attorneys,

THE HONORABLE DAN VOKINS and THE HONORABLE JAMES E. PHELAN
Johnson County Magistrate Court Judges
Johnson County, Kansas

Defendants.

**GWEN CARANCHINI'S**
**COMPLAINT UNDER FEDERAL LAW and KANSAS STATE LAW**

**AGAINST**

**LOLA PECK and RICK PECK (JOINTLY COUNT I) and LPECK (COUNT II AND III)**

**LOLA PECK AND ADA FRITZ (COUNT IV AND V)**

**THE JOHNSON COUNTY JAIL IN OLATHE, KANSAS AS SUPERVISED BY CALVIN HAYDEN AND CORIZON, THE MEDICAL GROUP PROVIDING MEDICAL SERVICES TO THE SAID JAIL AND ASSISTANT DISTRICT ATTORNEYS JOHN FRITZ AND MICHAEL McELHINNEY OF THE JOHNSON COUNTY DISTRICT ATTORNEY'S OFFICE (COUNT VI)**

**THE JOHNSON COUNTY JAIL IN OLATHE, KANSAS AS SUPERVISED BY CALVIN HAYDEN AND CORIZON, THE MEDICAL GROUP PROVIDING MEDICAL SERVICES TO THE JAIL (COUNT VII)**

**AND THE HONORABLE DAN VOKINS AND JAMES E. PHELAN OF THE JOHNSON COUNTY DISTRICT COUNT (COUNT VIII)**

Comes now Gwendolyn G. Caranchini, hereinafter referred to as "Caranchini", Plaintiff herein, and makes the following claims against Lola Peck, hereinafter referred to as LPeck, individually; and Rick Peck IV, hereinafter referred to as RPeck, and LPeck and RPeck collectively, hereinafter referred to as "the Pecks" Collectively; against Calvin Hayden, the Sheriff of Johnson County, Kansas, hereinafter referred to as Hayden; the titular head of the Johnson County Jail facility located in downtown Olathe, Kansas, hereinafter referred to as "the Jail", against CORIZON, the entity which purportedly provides medical services to those incarcerated at "the Jail"; against the Assistant District Attorneys John Fritz and Michael McElhinney, hereinafter referred to as ADA Fritz and ADA McElhinney, and the Judges involved in Caranchini's wrongful incarceration, The Honorable Dan Vokins, hereinafter referred to as

"Judge Vokins"; and The Honorable Judge James E. Phelan, hereinafter referred to as "Judge Phelan, and collectvely referred to as "the Judges".

**DIRECTORY TO PORTIONS OF LAWSUIT**

**Directory to Brief**........ 3

**Parties to Lawsuit**........ 4

**Jurisdiction Statement**........ 10

**Venue Statement**........ 31

**Attempts to Settle/Mediate to Date**........ 31

**Statement of Facts Regarding Claims against Defendants**........ 34 -77

**Caranchini Summary Statement of the Case**........ 79

**Claims Against Defendants**........

**Count I against Pecks Jointly and against LPeck individually**........ 80

**Count II against LPeck individually for Libel/Slander**........ 86

**Count III against LPeck individually for Harassment**........ 90

**Count IV against LPeck and ADA Fritz**........ 95

**Count V against LPeck and ADA Fritz for Libel/Slander**........ 106

**Count VI against ADAs and McElhinney, Sheriff Hayden/Jail and Corizon, Healthcare for Jai**........ 108

**Count VII against Hayden/Sheriff of the Jail and Corizon**........ 123

**Count VIII against Judges Vokin and Phelan**........ 124

**Injunctive Relief against Defendants**

**Against LPeck individually**........ 130

**Against RPeck individually**........ 130

**Against District Attorney and Assistant District Attorneys**........ 134

**Against Calvin Hayden and the JOCO JAIL**........ 134

**Against CORIZON**........ 141

**Against Calvin Hayden/JOCO Jail and CORIZON**........ 142

**Against Judges Vokin and Phelan**........ 144

**Request for Trial by Jury**........ 145

## PARTIES TO THE LAWSUIT AND CONFLICTS

1. "Caranchini" is the sole plaintiff in this lawsuit. She is currently a resident of Kansas City, Jackson County, Missouri, and at all times referenced in this lawsuit was a resident of Kansas City, Jackson County, Missouri. She is 69 years of age at the time of this filing. She is a widow since 2003 from her husband of 32 years, Dennis and from her fiancé Hugh in 2006. She is a single woman who was admitted to practice law in 1978 and practiced in multiple jurisdictions until 2000 at which time she was disbarred in all jurisdictions in which she had practiced except the Tenth Circuit; she currently represents federal government employees against government agencies for whistle blowing lawsuits in federal administrative agencies and also government employees who have discrimination lawsuits before the EEOC, both of which she may do despite her disbarment. She was admitted to practice law in 1978 in Missouri trial and appellate courts and subsequently the federal courts in Missouri and Kansas, the appellate courts in the Eighth, Ninth and Tenth Circuit Courts of Appeal and the United States Supreme Court and occasionally with local counsel pursued cases in the State of Kansas. Two federal judges: The Honorable D. Brook Bartlett, now deceased, and the Honorable Dean Whipple, currently a Senior Federal Judge in the Western District of Missouri, sought her disbarment sometime in 1991; but it was not "finalized" resulting in Caranchini actually "loosing" her license until November 1997, just days after Caranchini had won a jury trial in Federal Court in the Western District of Missouri against the Kansas City, Missouri Fire Department. Because of the number of licenses that Caranchini held in various jurisdictions, her

"disbarment" needed to be pursued in each jurisdiction in which she held a license. It was, therefore, not until approximately 2000 that she was disbarred in all jurisdictions in which she held licenses and her disbarment was pursued. (Caranchini believes the Tenth Circuit never sought her disbarment). For example, she was practicing in the Western District of Missouri Federal Court and was trying a case which she had won against Blue Springs. The Trial Judge made the defendants mediate that case as the disbarment was pending THAT DAY effective midnight. It was settled for a substantial sum less than two hours before the undersigned's disbarment was effective. Caranchini's disbarment was disputed not only by numerous lawyers but several federal judges who were in the minority on the bench in the jurisdiction in which the disbarment was sought by other judges. Caranchini's attempts to get reinstated were fruitless over the years as they were opposed by a majority of Judges in the Missouri Supreme Court but not all according to information Caranchini obtained.

2. LPeck, is believed to be an individual resident of Johnson County, Kansas at all times relevant hereto; she was married to RPeck at the time Caranchini met RPeck in approximately 2007. RPeck informed Caranchini upon Caranchini and RPeck's initial meeting that his and LPeck's Minister had recently, after two years of "counseling", declared their marriage "null and void" for LPeck's failure to engage in marital relations with RPeck for almost two years. RPeck, however, had "emotional trouble" with filing for divorce after the meetings with the Minister. He never filed for divorce from LPeck, however, and LPeck never filed for divorce from RPeck until

August of 2016 and then, allegedly because of RPeck's relationship with Caranchini, according to RPeck, which LPeck claimed she did not know about prior to the time she filed for divorce. That divorce was finalized December 14, 2016 according to RPeck. It is unknown whether LPeck is currently again married to RPeck as RPeck said he would never "marry" anyone after his divorce from LPeck. RPeck and LPeck were wearing "matching wedding rings" when Caranchini saw them at the first setting of the Temporary Restraining Order. LPeck is divorced from her first husband with whom she had two children, one of which, Caranchini believes, is currently a Johnson County Sheriff or other "law enforcement" officer in Johnson County. It is unknown whether he is at all involved in this matter.

3. Rick Peck IV, herein referred to as RPeck, is believed to be an individual resident of Johnson County, Kansas although it is unknown whether he currently resides with LPeck in the house in which she lives as he gave up all interest in that home, according to RPeck, when the divorce was finalized December 14, 2016 which he was supposed to move out by December 31 at 11:45 p.m. It is also unknown whether he is currently (re)married to LPeck as he informed Caranchini after December 14, 2016 that he was never getting married again. He was moving temporarily into Caranchini's home while he searched for a home as he had been unable to find some place he could afford despite Caranchini trying to find something for him. However, given what has transpired, Caranchini believes that LPeck required that RPeck and LPeck wear matching "wedding rings", whether or not they were remarried, when they appeared for the Temporary Restraining Order

(TRO) hearing to demonstrate that they were "married"--a fact that is yet to be established, as well as the timing of that marriage, and whether it was in fact totally "consensual" or was done for "other reasons" or was demanded by LPeck. RPeck is divorced from his first wife with whom he had one child, and he never had children with his second wife, LPeck, or with any other woman according to RPeck. Also, RPeck never informed Caranchini or told Caranchini that he was RPeck the "IV" although this appeared after his name in the TRO document.

4. The Johnson County "jail" was, and to the best of Caranchini's knowledge is, currently, owned and operated by Johnson County, Kansas. It is not known whether "the jail", is a separate "entity" apart from "Johnson County", Kansas, owned and operated by a third party, or whether it is a part of Johnson County separately operated by the Sheriff of Johnson County, currently Calvin Hayden. This is the facility in which Caranchini was incarcerated on February 9, 2017 at the end of the hearing on the TRO and from which she was released February 10, 2017.

5. The Johnson County Jail has apparently retained the services of CORIZON for health services for said jail. At the time Caranchini was brought to the jail and was told to disrobe "entirely" to be searched she provided the jail personnel two pieces of paper from her wallet: one is a list of her 12 drugs, including insulin, with doses and timing of the drugs—essentially 4x a day; and the second list has all emergency numbers, doctors names, faxes, telephone numbers, what they prescribed, and also drug allergies Caranchini had at the time. Caranchini immediately explained the necessity that she get her drugs on time and in the doses prescribed with the other

medications prescribed with them without variation because of extreme drug allergies she has and previous emergencies where she was taken by ambulance to hospitals because of drug interactions; nothing was said by the intake officers regarding the lists or the information on the lists.

6. ADA John Fritz, hereinafter referred to as ADA Fritz in the District Attorney's office (hereinafter referred to as the "DA's office), penned the charges articulated by LPeck[1] to the ADA's offices against Caranchini when their Municipal Charge was filed January 23, 2017. It is interesting that ADA Fritz included LPeck on the claim even though it was NOT LPeck's telephone which ADA Fritz should have queried LPeck about unless he already knew it was not LPeck's phone. The Pecks were not accompanied by a lawyer to his office. LPeck made RPeck sign the document and he signed the document as she told him to do. It was filed at the same time as the TRO which LPeck also orchestrated and which she required RPeck to sign. RPeck did not understand that Caranchini could be placed in jail as a result of loosing this claim according to his statement in the courtroom as Caranchini was "led away" as he had made it very clear at the time it was drafted to LPeck that he did not want

[1] The charge against Caranchini was apparently for making approximately 12/13 telephone calls and approximately 30 texts to RPeck's telephone between December 24, 2017 (after Peck left Caranchini at approximately 10:45 in the morning after meeting with her) and December 29, 2017. Caranchini never made any calls to LPeck's telephone as she never had LPeck's telephone number that Caranchini was aware of. December 24 was the day RPeck gave Caranchini diamond earrings; as he gave them to Caranchini, he told her as he cried, "you will never know how much I love you". He also said to her I want you to have these even though I "have to leave you". He then said he was going to have to break off their relationship but could not explain why. It was the day he was to move into Caranchini's home. This statement was made in Caranchini's car in Brookside the morning of the 24th of December. (This is enlarged upon hereinbelow)

Caranchini to go to jail on any claim and it was his understanding that Caranchini was not going to go to jail on either (the TRO or Municipal) claim when they were in the ADA Fritz's office.

7. ADA Michael McElhinney, hereinafter referred to as ADA McElhinney, is the ADA that was in charge of the Pecks' Municipal case against Caranchini AFTER ADA Fritz penned and filed it, and after Caranchini was released from jail, ***pursued it for some nine months*** and who then dismissed the charge on the the answers to discovery were due. He never gave a reason for doing so.

8. The Honorable Daniel W. Vokins, hereinafter referred to as Judge Vokins, is a Magistrate Judge in the Johnson County District Court and is located in the Johnson County District Courthouse at 111 Cherry Street, Olathe, Kansas; he is one of two Judges involved in Caranchini's "case"; he failed to have Caranchini appear before him after she was brought to jail so that Caranchini could be made aware of the charge(s) against her; he also failed to advise of her of the bail needed to leave the jail.

9. The Honorable James Phelan, hereinafter referred to as Judge Phelan, is a Magistrate Judge in the Johnson County District Court and is located in the Johnson County District Courthouse at 111 Cherry Street, Olathe, Kansas; he is the "Judge" who has "heard" the various matters regarding the charges brought against Caranchini until the matter was dismissed with prejudice on October 10, 2017 at the request of the ADA Michael McElhinney.

# JURISDICTION

## INTRODUCTION

The below facts set forth the facts to establish "jurisdiction" for Caranchini's claims.

1) Against LPeck, and the Pecks under Paragraph A;
2) Against Calvin Hayden, the Sheriff of the Johnson County Jail under Paragraph C,
3) Against CORIZON the Healthcare provider for the Johnson County Jail under Paragraph D;
4) Against John Fritz and Michael McElhinney, the Assistant District Attorneys, under Paragraph E;
5) Against Judges Vokins and Phelan who were involved at the jail or hearing on the jail charges under Paragraph F

To establish "jurisdiction" for each of the parties named above in this litigation, with the exception of the "Pecks", for whom jurisdiction is based solely upon "diversity of jurisdiction" and Kansas state law between Caranchini and the Pecks, and all of those claims are "common law torts" recognized in the State of Kansas and for which the statute of limitations has not expired, the remaining Defendants are being sued under 42 U.S.C. Sec 1982 et seq. and those claims have not expired at this time. Although the remaining Defendants (with the exception of Calvin Hayden, the Sheriff and CORIZON, the Health Care provider) were previously sued, and raised issues beyond the issue of the matter being filed in Missouri, rather than Kansas, the Missouri Federal Court did not address any of those issues. The Missouri Court merely

dismissed the case on the ground that it found that the case should have been filed in Kansas.[2] Since this case is now filed in Kansas, and the lawsuit has been differently "framed", as well as three more Defendants added, the Defendants should, if they choose to file a Motion to Dismiss, which undoubtedly they will, file a NEW Motion rather than merely seeking to re-file their previously filed Motion which would clearly be inappropriate. Of course, Caranchini is alleging that LPeck and ADA Fritz colluded to have Caranchini arrested in the Courtroom and ultimately put in jail. These are clearly new claims.

Additionally, Caranchini believes, based upon the facts set forth below, many of the (state) defendants do NOT have the protection of having acted "within the (normal) scope of their employment"; that is, ADA Fritz; Sheriffs/employees in the jail interacting with Caranchini; an employee of CORIZON, (the health care provider "allegedly" providing 'health service' to Caranchini in the jail), Judges Vokins and Phelan, all do NOT have the "protection" normally provided" given their actions towards Caranchini as in this case they acted intentionally "outside" the scope of their employment to intentionally harm Caranchini physically, mentally and also her reputation by the manner in which she was "jailed" and her "jailing" was handled by Johnson County as set forth below in this litigation. Therefore, several of the defendants will need "separate counsel" as they clearly have conflicts with other State employees acting "within" the scope of their employment—an example being ADA McElhinney. Additionally, it is very clear that LPeck manipulated RPeck by her threats against Caranchini and, RPeck fearing for Caranchini's safety, did what LPeck demanded of him. Caranchini provided a detailed letter

[2] If this Court wishes to be provided a copy of the prior lawsuit and a copy of the Order by the Court on that lawsuit, please advise the undersigned and it will be provided the Court forthwith.

outlining most, if not all, of her claims against the defendants, and the factual issues to be included in the lawsuit to all the defendants known counsel[3] prior to the actual filing of THIS litigation for two reasons:

***First***, in the hope that it could be settled in whole or in part;

***Second***, it is clear that in the lawsuit filed in Missouri several defendants were represented by "one attorney"—both the Pecks (by Linus Baker), and the Kansas DA/ADAs and Judges (by Steve---). That will not be possible in this newly written lawsuit (in Caranchini's opinion); the Pecks clearly have a conflict between themselves; and the two ADAs (Fritz and McElhinney) have a conflict between themselves as well as the Judges in the new lawsuit. These conflicts should be resolved at the earliest possible time. Likewise, "waiver" of conflicts should not be an option for anyone, especially between the Pecks and the two ADAs. LBaker who previously represented both the Pecks, clearly never explained to RPeck the conflict he, (RPeck), had with LPeck, and Caranchini now has figured out why—he was colluding with LPeck and ADA Fritz to harm Caranchini who RPeck was deeply in love with at the time. It's not Caranchini's place, but a lawyer reading the new fact situation and the old fact situation will clearly see LBaker probably cannot represent anyone, and separate attorneys need to represent LPeck and RPeck, separately, as LBaker may become a party in this litigation. RPeck definitely does not understand—and never did understand—that there was a conflict between him being represented by the same lawyer as LPeck. That is why, in part, he was so

---

[3] Caranchini at the time of sending the letter and "factual excerpts" had not been able to determine the law firm representing "CORIZON" but is continuing to look.

"frightened". That is also why he is not with Caranchini—as he believes he must protect Caranchini from LPeck. See footnote "4" below.

**FACTUAL BASIS FOR JURISDICTION**

A. Caranchini states she has the following claim[4] against the Pecks jointly, and LPeck individually, arising out of the common law of the States of Kansas (and alternatively Missouri) based upon the following facts (in part, as more may arise) as follows. Caranchini is NOT pursuing any claims at this time **solely** against RPeck. It is unlikely she will, as with the passage of time it becomes more and more clear to Caranchini that RPeck was forced by LPeck, LBaker and ADA Fritz to pursue Caranchini by their threats. The initial claim may also be dismissed against RPeck individually, but at this time will be pursued against the Pecks jointly until Caranchini has had an opportunity to conduct discovery, including, but not limited to, RPeck and LPeck's depositions, to assess more

[4] With the passage of time, and Caranchini's attempts to "bring together" all the facts of the case, as well as her ongoing "psychiatric care", (which no doubt will be the subject of discovery) she has questioned whether or not RPeck was a "willing" participant in the actions brought against Caranchini (the TRO and Municipal Charge) or whether he was "forced", and continues to be, by LPeck into "joining with LPeck" in the filing of the TRO and Municipal Charge and other actions taken and continued to be taken by LPeck against Caranchini. There is also an issue whether RPeck believes he must stay with LPeck to protect Caranchini from her as RPeck made reference to LPeck harming Caranchini numerous times after LPeck filed for divorce. There are too many questions that have been raised in the last year with the passage of time and "reflection". Caranchini as she is preparing the last draft of this lawsuit has come to realize that LBaker was not representing the interests of both the Pecks, but merely LPeck and that this further caused problems for RPeck. In fact, in Caranchini's opinion, the more she looks at the facts, it is probably ADA Fritz who set up LPeck with LBaker as an attorney "for BOTH the Pecks" to keep RPeck "in line" while he and LPeck took their "revenge" on Caranchini. ADA Fritz knew that RPeck required separate counsel but he also knew that he needed to be controlled to keep him away from Caranchini. LBaker played this part on a daily basis as he was very controlling while he played the "lawyer role" against Caranchini.

fully some facts. However, as Caranchini has prepared this initial filing of this suit in Kansas Federal District Court, it is less and less likely she will file additional claims against RPeck as it appears he, as well as the undersigned, were "duped" by LPeck, and "others"; but it is more and more likely that there will be additional claims against LPeck and "others" upon additional discovery will be filed. The remaining current claims involve LPeck, individually or jointly, in some instances with other party(s) defendant. Caranchini throughout the nine years of her relationship with RPeck, and since December 24, 2016, was at all times a resident of Kansas City, Jackson County, Missouri and remains so; and Caranchini believes the Pecks were or became residents of Edgerton/Gardner, Johnson County, Kansas sometime in 2008/9 and currently remain so.

There is complete diversity of citizenship between Caranchini and the Pecks jointly, **or solely against LPeck,** on any one or more of the following factual situations. All of the facts occurred in Kansas by Kansas residents and at all times Caranchini was a Missouri resident. The following facts are those upon which Caranchini bases jurisdiction of diversity which arise from her relationship with the Pecks jointly or individually.

1. Against the Pecks, jointly, in Count I, for **filing** against Caranchini a completely false Temporary Restraining Order/Restraining Order against Caranchini and pursuing that Temporary Restraining Order before Judge Trigg, which was denied by Judge Trigg the afternoon of February 9, 2017. The Transcript is available but not attached to this lawsuit. Judge Trigg found

that RPeck had lied[5] during the hearing and found against him and the TRO was denied; and,

2. Against LPeck for having ADA Fritz prepare and file a Municipal Charge against Caranchini based upon false statements by both RPeck and LPeck for pursuit by the DA's office complaining of alleged "harassing telephone calls and texts" by Caranchini—between December 24 and December 29, 2016 for which Caranchini was arrested in Judge Trigg's courtroom after winning the TRO claim against RPeck, on or about February 9, 2017, put in Johnson County jail that same afternoon, and bailed out of late on the evening of February 10, 2017; LPeck "forced" RPeck to join with her in the filing of this "Charge" against Caranchini and therefore he is not a "willing" cosigner to this claim and he is not sued by Caranchini;
3. Against LPeck for making numerous false statements on paper with the help of Johnson County ADA Fritz against Caranchini, and to verbally make complaints to the Johnson County Police Department on "tapes" of said communications with the Police regarding Caranchini; .
4. for LPeck, NOT RPeck, alledgedly sending three false, long emails to Caranchini between the end of December and late January which were over his name and sent from his email address to Caranchini's email address, but

[5] Although this claim was found for RPeck and LPeck even though she was absent but was a party in this claim and had not withdrawn at the time of hearing and RPeck's attorney had not in any way dismissed her claim at the time of the hearing.

were in fact written by LPeck distorting statements made by RPeck to Caranchini "in a loving manner";

5. for threats of physical harm by LPeck to Caranchini that RPeck communicated on numerous occasions to Caranchini at the time of the initiation of the divorce by LPeck in August 2016 and which he repeatedly stated to Caranchini throughout the divorce and after the divorce was finalized;
6. for LPeck following Caranchini in her car repeatedly while her divorce was pending as well as after the divorce was finalized;
7. for LPeck leaving multiple beer bottles on Caranchini's property necessitating the installation of a $2,000.00 plus camera system to protect Caranchini and her home from LPeck after the bond was in place;
8. for LPeck leaving condoms by Caranchini's driver's car door when Caranchini was at her physical therapist's office at Olathe South and while she was at her Church answering the telephone Friday afternoons where RPeck called her most Fridays;
9. for LPeck during the fall of 2016 and winter of 2017 writing letters in the name of RPeck and emailing them to Caranchini intending to psychologically harm Caranchini by "taking back" statements RPeck had made to Caranchini;
10. for LPeck continuing to threaten to hurt Caranchini to RPeck and making it clear to RPeck that he cannot return to Caranchini or LPeck will harm her as she has blocked his telephone so that Caranchini cannot speak to RPeck and

RPeck cannot speak to Caranchini without LPeck having knowledge of such calls;

11. By requiring RPeck to testify against Caranchini in the TRO hearing while LPeck did not even appear for the hearing though she had instigated the filing;

12. By requiring RPeck to use lawyers that LPeck chose to use for him so that RPeck would testify as she wanted him to testify;

13. By requiring RPeck to use an attorney that LPeck knew and ADA Fritz knew thatnjunctin with LPeck and the ADA would harm Caranchini unless he stayed with LPeck and at all times learned as much as he could to protect Caranchini as LPeck would not tolerate RPeck leaving her to return to Caranchini.

B. Caranchini seeks to file claims against Calvin Hayden, the Sheriff of the Johnson County jail facility and the jail itself as well as its personnel, for the following actions and inactions of the "jail staff" which establish grounds for violation of Caranchini's constitutional rights under 42 U.S.C. 1982 et seq. the specifics of which are set forth hereinbelow in the claims against the Sheriff's "jail staff"; the below are set forth to establish jurisdiction for violation of her rights under 42 U.S.C. 1982 et seq. This claim is being made against the "Sheriff of Johnson County" in his capacity as "Sheriff" and not in his individual capacity as a citizen of Johnson County, Kansas; it is also being made against the "individual sheriffs and staff working for him in the jail" where Caranchini was held between the afternoon of February 9, 2017 and the evening of February 10,

2017; the "sheriffs and staff" with whom Caranchini was engaged were not "working within the scope of their employment" for Johnson County, and therefore Caranchini will seek damages for their conduct outside the scope of their normal employment including punitive damages;

1) For requiring Caranchini to give up her purse, briefcase, clothes, jewelry (some of it family owned for 75 years) before she was charged or made aware in any way why she was at the jail in violation of her Federal Constitutional right to have foreknowledge of why she was being incarcerated and her belongings were being taken from her by the County "jail staff";
2) For the "jail staff" requiring Caranchini to undress less than 20 feet from "men" in a large room allegedly "surrounded" by three to four women one of whom was photographing Caranchini while she undressed down to her "panties" and removed her "bra" in the presence of these women (and men) again all without being charged with any violation of any statute of any kind whatsoever and again without allowing Caranchini to plea in response to whatever she was charged with or being held on, make a telephone call and post bail, all in violation of her Constitutional rights; at no time was Caranchini given the right to make a telephone call to her attorney to advise him/her that she was incarcerated so that bail could be arranged;
3) For placing Caranchini in a jail cell again without Caranchini being charged with any violation of any state or municipal code and telling her when Caranchini asked repeatedly why she was being held: "when we get to you, we get to you"

and not advising her why she was incarcerated thereby violating her Federal Constitutional rights to have knowledge of why she was incarcerated so that she could plea and post bond;

4) For denying Caranchini at least two dozen times the right to make a telephone call when she asked to do so of multiple different Sheriffs all in violation of her Constitutional rights;

5) For denying Caranchini the opportunity to make bail by the actions of its Sheriffs although Caranchini on numerous occasions asked to make bail and bond out all in violation of her Constitutional rights;

6) For denying Caranchini the right to be given her medications even though she made the jail aware of the 20 pills she must take daily, the three insulin shots she must take of two different types of insulin, the names thereof, the doses and the names of the physicians ordering them, their telephone numbers and fax numbers, all of which were on two sheets of paper she referred to in her wallet at the time she was taken to jail and told to give up her purse all in violation of her Constitutional rights;

7) For denying Caranchini the right to see a doctor or a registered nurse given her several diagnoses which required that she see a doctor when the Jail staff refused to give Caranchini her medication(s) which Caranchini made them aware of when they took her purse and wallet which contained the names, telephone numbers, faxes of her doctors, their diagnoses and their prescribed drugs all in violation of her Constitutional rights;

8) For placing Caranchini in a cell with exceedingly bright lights which intensify Caranchini's daily migraines and caused Caranchini's migraines to intensify for months after her release all in violation of Caranchini's Constitutional rights;

9) For denying Caranchini any food she could eat on her restricted diet even though her dietary restrictions were given to them at the time she came to the jail all in violation of Caranchini's Constitutional rights;

10) For denying Caranchini water while she was in the last cell for approximately ten hours which caused her intense thirst to intensify even more given the drugs she was on and the denial of the drugs she was supposed to be on all in violation of Caranchini's Constitutional rights;

11) For continuing to deny Caranchini any medical care or her drugs (with the exception of one pill of the wrong 'name' and dosage which Caranchini refused to take) throughout the time she was in jail causing her numerous medical problems for days on end after Caranchini was released from jail; all in violation of Caranchini's Constitutional rights;

12) For having an alleged psychologist[6] come to Caranchini's cell because the Sheriffs thought Caranchini was "crazy" by her "yelling"[7] and allegedly removing her

---

"9 Caranchini is not "sure' that the woman who presented herself at Caranchini's cell door was in fact a "psychologist", but she was some type of "medical care person" or therapist who was "on staff" and who was actually trying to "help" Caranchini. It is also not cleaer whether she was an employee of the "Jail" or of "Corizon".

7 The Sherriffs did not describe the "yelling", but Caranchini was allegedly "yelling" about not getting her medications, at all let alone at the time she was supposed to get them the entire 36 hours she was in jail and that jail personnel made no effort whatsoever to get her to see a doctor or a nurse who would get her the drugs listed in her wallet and referenced by doctor

pants, which Caranchini denies ever doing voluntarily, when in fact she was seeking her medications and her right to make bail and contact her attorney all in violation of Caranchini's Constitutional rights;

C. Caranchini seeks to file claims against CORIZON, the Health Care Provider for the days of February 9 and 10, 2017, for the following actions-- as well as inactions-- of the said health care providers, which establish grounds for violation of Caranchini's rights under 42 U.S.C. 1982 et seq. the specifics of which are set forth hereinbelow in the factual part of this lawsuit to establish jurisdiction over the health care provider for the Johnson County jail under 42 U.S.C. 1982 et seq. This claim is being made against the "health care providers" in their capacity as "individual citizens of the State of Kansas or other state"; their lack of care throughout the time that Caranchini was incarcerated was "intentional", especially since they had access to Caranchini's medications and physicians, and they should be held to the standard of an intentional tort, and not to a standard of negligence, given Caranchini's interaction with the alleged nurse and the paperwork provided them.

1) Caranchini at the time she was "checked into the jail" by several Sheriffs showed such staff two pieces of paper from her wallet which contained detailed information on her doctors (their names, telephone and fax numbers and medications they prescribed), Caranchini's multiple allergies to drugs, timing of drugs, which had all the information necessary to give

---

(with telephone and fax numbers) throughout the entire time or let her make a telephone call to her lawyer or let her seek to bond out.

Caranchini her medication(s) and contact her physicians, none of which was

followed by the nurse or doctor on staff;[8]

2) Caranchini repeatedly asked more and more loudly[9] for her medications as

the time progressed that she was in jail as she was supposed to take

medications at 6:30 am, 12:30 p.m.,  5:30 and 8:30 p.m. with day time shots

of insulin at 12:30 and 5:30 p.m. which was a 'normal acting insulin' and then

8:30p.m. for a different long term acting insulin; none of this was done or

provided her although Caranchini kept asking the staff to see a health care

person to get her medications and to get her shots and all she was told was

"they would get to her when they got to her".   Caranchini did not see any

nurse or doctor, except one—see below-- to give her any of her meds

between late Thursday afternoon of February 9 through the evening and

throughout the day of February 10 until she was released the evening of

---

[8] Such documents are not attached as they include personal information and will be provided
this Court after a Judge is appointed and such can be provided "in camera" to the Court so the
Court may see the names of the doctors and the names of the medications and the doses but
only upon specifically advising the defendants they may not reveal this information to any third
party.  Caranchini revises theses documents each time a new drug is given or an old drug is
changed or removed, but she has retained the documents of that time period for this lawsuit as
it was clear from the outset of the time that Caranchini was incarcerated that a lawsuit would
be necessary given the manner in which Caranchini was treated "intentionally" and not
"accidentally".

[9] The Sheriffs contended Caranchini was "screaming" and had removed her pants according to
the person who came to her third cell. This was not true.  Caranchini loudly requested her drugs
and insulin after she asked "quietly for them for several hours" and was given neither at any
time she was in jail. This was always the subject of Caranchini's requests to the Sheriffs which
were NEVER answered at all.  In Caranchini's opinion this was the reason a very high amount of
bail ($4,000) was set for 12 telephone calls and approximately 30 texts over five days as a result
of the Sheriffs' refusal to bring Caranchini before the Judge and explain to the Judge what had
occurred.  When you do not provide medications and/or food as required by the law, yes,
Caranchini will allegedly "scream" as her rights are being violated.

February 10. This amounted to five missed shots of insulin, and five to six rounds of drugs which Caranchini never got although she kept asking, louder and louder, to see a nurse or doctor.[10]

3) Although Caranchini could not tell what time it was, she knew it was the morning when food came and she got none of her drugs, again she was asking to see a nurse or doctor and no one would get one although Caranchini loudly asked for one over and over;

4) Caranchini was due for lunch medications including an insulin shot and never was given the medications or the insulin shot on February 10; no nurse or doctor came to Caranchini either; by this time Caranchini had been transferred to another cell and was asking for her medications more loudly and they never came;

5) Another shot of insulin and more pills were due late in the day of February 10 and never were given although asked for; sometime around this time the "psychologist" came and Caranchini believes she told her she had never gotten any of her medications whatsoever or any food she could eat or anything to drink in the current cell. The "psychologist" told her the staff kept saying she was loudly asking for things and they thought she was crazy. The "psychologist" told her she would get her out of jail as she recognized that Caranchini had missed numerous drug doses and she was not "crazy".

[10] See footnote 9.

6) The continuing refusal of the alleged health care provider to come to Caranchini's cell and speak to her, take her vitals and provide medication intensified Caranchini's migraines and when combined with the very bright cell lights made it unbearable for Caranchini to get any sleep and is a violation of 42 U.S.C. Sec 1982 et seq and a denial of due process under the 14th Amendment to the Constitution;

D. Caranchini seeks to file claims against ADAs John Fritz and Michael McElhinney, hereinafter referred to as ADAs Fritz and McElhinney, in their official positions in Johnson County as Assistant District Attorneys which violated 42 U.S.C. Sec. 1982. et seq. and against John Fritz also outside of his official position because his actions were clearly intentional and meant to harm Caranchini and he was colluding with LPeck to achieve that end making THOSE actions outside of his protected status as he is being joined with LPeck in a common law claim of conspiracy to harm Caranchini separate and apart from his actions as an ADA for Johnson County;

1) ADA Fritz colluded with LPeck, without the knowledge of RPeck, but possibly with the knowledge of LPeck's attorney for RPeck) on the TRO, and also possibly with LPeck's attorney (LBaker)[11] to not serve Caranchini on the Municipal Charge which was simultaneously pursued at the time of the filing of the TRO; additionally, ADA Fritz, waited until Caranchini was in the courtroom with RPeck and had won the TRO matter and then arranged to

---

[11] Both HStuart and L Baker have been advised of this "reference" in this Complaint prior to the filing. Their depositions will be taken during the lawsuit to determine what part they played in arranging with ADA Fritz to have have Caranchini not served with the Municipal charge prior to the TRO hearing and instead jailed at the end of the TRO hearing.

have two Sheriffs come into the Courtroom and handcuff Caranchini and bring her to jail without advising Caranchini of what she was charged and why she was being brought to jail without allowing her to post bond; that ADA Fritz then permitted Caranchini to be held and continued to refuse to tell her what bond she could post to get out of jail; essentially "lost" her in the system and never permitted her to bond out for almost 36 hours! This was an intentional act on the part of ADA Fritz in collusion with LPeck and her attorney to harm Caranchini, as well as RPeck, who LPeck demanded break up with Caranchini less than a month previously; such actions are a violation of 42 U.S.C. Sec. 1982 et seq and also of the common law of Kansas for conspiring with LPeck to intentionally harm Caranchini emotionally and physically by having Caranchini arrested in open court at the conclusion of the TRO hearing in the presence of RPeck and denying Caranchini's rights to know the charges with which she is charged, be informed of the bond so that she could post bond and put in jail without doing either;

2) Caranchini makes claims against ADAs  Fritz and McElhinney for actions they took as ADAs in Johnson County against Caranchini in their official capacity; such actions were in violation of Caranchini's rights under 42 U.S.C. Sec 1982 et seq by failing to properly charge her and the manner in which they pursued her for over nine months in pursuing the Municipal charge against her after she was released from jail and maintaining her guilt when ADA Fritz knew from his interaction with LPeck that Caranchini was not guilty of any

municipal law but that LPeck was merely "using the law" to punish Caranchini for what LPeck believed was a wrongful affair with RPeck; and, ADA McElhinney failed to do any adequate investigation to determine whether Caranchini was in fact in violation of the statute as charged by ADA Fritz and merely pursued it based upon the filing made by ADA Fritz;

3) The actions done in the scope of authority as an attorney for Johnson County, Kansas, (perhaps) protect ADA McElhinney from personal liability; however, the acts of ADA Fritz as set forth above and below, which were clearly **intentionally outside** "protected activity", do not protect him from personal liability as more fully set forth above and below. These acts were done intentionally and his actions are not protected from individual liability and he will be pursued personally for his actions both above and hereinbelow under the common law with LPeck as well as 42 U.S.C. Sec 1982 et seq. Further investigation will determine who colluded with ADA Fritz to ensure that Judge Trigg would NOT have both cases and therefore would ensure that Caranchini was treated in the manner in which she was and "locked up" in the manner she was. This is for further investigation and may result in complaint before the Kansas Bar, in addition to suit before this Court.

4) That ADA McElhinney's dismissal of all charges against Caranchini some ten to eleven months after her "jailing" supports Caranchini's position his reason for doing so was because he had become aware ADA Fritz had colluded with

LPeck to have Caranchini handcuffed and jailed in the presence of RPeck at the conclusion of the TRO hearing because he had arranged for Caranchini not to be properly served prior to the conclusion of the TRO hearing where she could have avoided jail by posting a bond and held off her "handcuffing" untile she was in the courtroom at the conclusion of the TRO hearing in the presence of RPeck. LPeck got the "enjoyment" of "seeing" both RPeck and Caranchini "suffer from this incident; what ADA Fritz "got" out of this is yet to be seen. These acts violated Caranchini's constitutional rights guaranteed by 42 U.S.C 1982 et.seq

E. Caranchini seeks to file claims against The Honorable Daniel W. Vokins and the Honorable James Phelan, hereinafter referred to as Judge Vokins, and Judge Phelan, Magistrate Judges in Johnson County, Kansas involved in the handling of the Municipal case ultimately dismissed by ADA McElhinney involving Caranchini in Johnson County, Kansas. The below facts are set forth to establish jurisdiction over these Magistrate Judges who have conducted themselves in such manner that they have violated Caranchini rights which are protected under 42 U.S.C. 1982 et seq. and their actions may subject themselves to violation of Judicial Canon of Ethics. Caranchini specifically states the actions of these Judges were done"intentionally" against Caranchini as many of their statements against Caranchini in their Courtrooms are "not protected" as well as their actions of "contempt" for Caranchini who wished to act "pro se". The Judges felt it was insufficient that Caranchini had held licenses in Missouri State and appellate Courts, Federal Appellate Courts in both Missouri and Kansas, the United States

Supreme Court, the Eighth, Ninth and Tenth Circuit Court of Appeals, and that she

currently had the right to appear before the EEOC and OSC for federal government

employees, and instead essentially ridiculed her throughout proceedings in their

presence. Although the claims are made against them in their capacity as "Magistrate

Judges" and not as "individual citizens" of Johnson County, Kansas, with the taking of

depositions in this case, that may change as every effort was made to avoid the "rules"

in this case and harm Caranchini. Caranchini wishes to state that she has never at any

time sued a "judge" of any "kind" in any court in any jurisdiction as she takes this very

seriously, but the actions in this case are such that there is a "first" for everything and

this may be that "first" for Caranchini --suing "judges"-- given what Caranchini has been

subjected to in this case by these "Judges actions". Several of the actions set forth

below are clearly outside the scope of their activity as "judges" of the Court in which

they "preside" and therefore are not "protected" activities.

1)  Judge Vokins is the Judge who oversaw actions taken while Caranchini was
    illegally held in the Johnson County "jail" and Judge Phelan was the Judge
    who oversaw the proceedings in which Caranchini was required to appear in
    Court also illegally as she was never properly served with the paperwork for
    the lawsuit;

2)  Caranchini contends both Judges violated her basic constitutional rights
    under 42 U.S.C. 1982 et seq. by the manner in which she was treated by
    them while she was incarcerated and after she was released from the jail and

subsequently treated in their Courtroom in violation of her constitutional liberties as guaranteed by 42 U.S.C. Sec 1982 et seq

3) That Judge Vokins failed to determine whether Caranchini had been properly charged prior to the time she was incarcerated in violation of 42 U.S.C. Sec. 1982. et seq. and failed to remedy such failure;

4) That Judge Vokins failed to determine whether Caranchini had been properly advised of her rights at the time she was brought to the jail and was incarcerated and why she was held without being given the opportunity to plea, to make a telephone call to her attorney, or to bail out in violation of 42 U.S.C. Sec. 1982 et seq.

5) That Judge Vokins failed to determine and ensure that Caranchini was receiving the medical care and food that Caranchini was claiming she needed; as she had given the intake staff a list of her doctors with the drugs and timing of the drugs when she came to jail but never received her medications as required which was in violation of 42 U.S.C. Sec. 1982 et seq.

6) That Judges Vokins/Phelan continued to fail to call up Caranchini's case and address the issue of her initial bond requirement during the 36 hours she was held in violation of Caranchini's rights and violate 42 U.S.C. Sec. 1982 et. Seq.

7) This violation of Caranchini's constitutional rights continued in jail as set forth hereinabove. ADA Fritz continued to have the Judges overseeing Caranchini's case in jail as he had colluded with LPeck to do, and to also deny Caranchini an opportunity to appear before the Magistrate Judges and post

and required her to post an exceedingly large bail ($4,000.00) for making 12/13 telephone calls and approximately 30 texts in five days to her ex boyfriend commencing the day (December 24, 2016) he was to move into her home, which made no sense whatsoever, all in violation of 42 U.S.C. Sec 1982 et seq.

8) That subsequently after Caranchini's counsel DB[12] withdrew, these Judges refused to permit Caranchini to represent herself over these telephone calls/texts even after Caranchini advised them that in her 40 years she had practiced in the State Courts of Missouri and Kansas, (including Appellate), the Federal Courts of Missouri and Kansas, the 8th, 9th and 10th Circuit Courts of Appeal and the United State Supreme Court and before Federal Administrative Courts representing government whistleblowers and employees having EEO claims, calling her "incompetent" in open court; the Judge also insisted she give him grounds to appoint counsel and Caranchini, in fear that she would be returned to jail and physically/sexually assaulted again, indicated her home was in "foreclosure. . ." and the Judge cut her off and appointed counsel without permitting Caranchini to explain it had been in foreclosure LITIGATION for almost nine years which was ongoing! This

---

[12] There is no need to recite the name(s) of the attorney(s) representing Caranchini unless the Court believes it is necessary.

Caranchini believes violated her rights to represent herself under 42 U.S.C. Sec 1982 et seq.

**VENUE**

The actions complained of with regard to LPeck and RPeck occurred in both Kansas and Missouri; the actions involving Caranchini's "jailing" occurred in Kansas; Caranchini resides in Missouri; Caranchini has seen almost 15 additional doctors since her release from jail derived from problems arising from her physical injuries in Kansas premised on acts that took place in the Kansas jail. To the best of Caranchini's knowledge, LPeck and RPeck remain residents of the State of Kansas, County of Johnson. Clearly, the referenced " JOCO entities" are part of the State of Kansas as well as actions involving the ADA's and Judges which occurred in the State of Kansas. The actions against the Pecks are based upon the common law, there is also a common law claim against ADA Fritz; the claims against the remaining entities are pursuant to federal statute and are appropriately brought in Kansas, although they may be brought in Missouri under some circumstances.

Based upon these facts, and the ruling of the Federal Court in Missouri, venue is appropriate in the State of Kansas Federal Court.

Caranchini wishes to preserve for purposes of appeal in THIS lawsuit that venue may also beappropriate in Missouri Federal Court.

## ATTEMPTS TO RESOLVE CASE PAST AND PRESENT[13]

Multiple attempts have been made to resolve the issues against the parties named in this Complaint as set forth below. Caranchini started to practice in 1978 with Jackson & Sherman, a defense law firm, and subsequently worked with Campbell & Bysfield also a defense firm in which she was a partner. She was the senior woman litigator on the Hyatt primary defense team. She settled her first major employment case at the end of the Hyatt case and realized she had found her "calling" doing employment litigation. She left Campbell & Bysfield and started her own office doing employment law which was just starting as a "specialty" in 1984. Caranchini became one of the first Missouri federally trained mediators in 1993 and urged plaintiff attorneys to join that mediation program as she had. Caranchini was chosen as one of the mediators for employment law as she was one of the "oldest" employment lawyers in Kansas City practicing in that area of the law since 1983 and joining NELA in 1985. Between the cases she mediated for others and her own cases she mediated, since the 1980's Caranchini has probably settled through some type of mediation well over 75 -175 cases.

**1. Mediation in Missouri case.**

Before filing the case in Missouri Federal Court, Caranchini sought to settle the matter by sending to the defendants (with the exception of the defense attorney representing the Sheriff/Jail and another defense attorney representing the Health Care provider now involved) the lawsuit and tried to settle. ***It was totally fruitless***. In fact it was the single most fruitless settlement attempt the undersigned has ever engaged in-- bar none! The Pecks expected

---

[13] These only note with whom there were discussions and the general nature of the discussions—not particulars.

Caranchini to pay them! The remaining defendants did not even reply to enter into settlement negotiations. After the undersigned filed the lawsuit, the defendants filed Motions to Dismiss. The Missouri Federal Court dismissed the case solely on the grounds that the case should have been filed in Kansas and did not address the other issues raised by defendants. Defendants after that ruling made no attempt to settle.

**2. Attempts to Resolve This Lawsuit Prior to Filing in Kansas**

The undersigned advised the defendants in the Missouri case and the attorney for the Jail of which she became aware of through numerous emails before the filing of the lawsuit in Kansas of her intent to file the lawsuit in Kansas, and her redrafted/expanded claims; that she would provide all defense counsel a copy of the intended filing before the lawsuit was filed. Caranchini also advised the defendants of new information that had become known to her since the original filing as well. The defendants who were in the original lawsuit made it clear they were not interested in settling but Caranchini indicated that since the lawsuit was in fact "different" and "expanded" she would make it available to them. The outcome, clearly, because we are before this Court, was that settlement negotiations were again "fruitless" .

**3. Request to Mediate at Commencement of This Case**

Caranchini, consistent with her background in federal court cases and mediation in those cases, requests this Court provide the opportunity to mediate this case sometime after the filing of this lawsuit. Caranchini will be happy to meet and mediate with all the defendants. She looks forward to doing so and is hopeful that the presence of the Federal Court will perhaps engender some willingness to settle.

## FACTS COMMON TO ALL CLAIMS[14]

A. **The following facts are related primarily to the Pecks but may be relevant to other parties.**

1. Caranchini met RPeck approximately nine to ten years ago when she was seeking to have some bids on some plumbing work on her home. She and RPeck established an immediate rapport and chatted the very first day about his marriage to LPeck as it was LPeck, a fellow real estate agent of Caranchini's, that had referred her husband to Caranchini to do work. They spoke for several hours that first day as they seemed to have an "east coast" background they shared. (Rick Peck was from New Hampshire literally "steps across the border" from Caranchini's (deceased) husband's place of birth—Vermont--which Caranchini had frequented during her marriage, and Caranchini was from New York.)

2. RPeck informed Caranchini in that initial conversation he had just finished two years of counseling with LPeck regarding their marriage and the Pastor had told them their marriage was essentially "null and void" because LPeck had refused to engage in any sexual contact with him for almost two years as she was "having sex with god". RPeck was clearly upset about this. RPeck said he was finding it difficult to divorce LPeck because of his vows. This was not a "typical" conversation you have with someone you "have just met".

---

[14] This is not meant to be ALL the facts supporting the Plaintiff's claims. It is a goodly number and is believed to be sufficient to support the claims made. More facts will become known during depositions and as the case progresses in response to any motion.

3.  Caranchini and RPeck, as the above conversation demonstrated, had an almost "instantaneous" "connection" which neither could explain which was beyond "sexual"; they did, however, engage in a sexual act in their first meeting which both were "embarrassed" they did—especially since neither was exactly a "spring chicken". Caranchini had never ever engaged in sex with any man before they had dated three to four months. RPeck claimed he had not either and he was "embarrassed" and said so.

4.  RPeck and Caranchini did not have any contact for approximately two months after their initial meeting but RPeck subsequently initiated contact with Caranchini but Caranchini was too embarrassed by her sexual contact with RPeck to initiate a second contact and had another "contractor" perform the work. She agreed to meet him again as she was curious about how she had "felt" when they first met.

5.  Fortunately, or unfortunately, they had the same "reaction" to each other and they again ended up talking for several hours and then returned to her house and ended up in bed. As they both said "It was very bizarre" as they were "older" and yet had a strong attraction sexually and also could talk for hours to each other.

6.  Over the next several years RPeck and Caranchini developed a friendship where they talked over the telephone about seemingly everything in their lives; they also engaged in sexual contact which grew in meaning between them. Caranchini also maintained a friendship with RPeck and LPeck as a couple initially, frequently going to their home in Wyandotte County for meals and even attending a birthday celebration for LPeck who she made a birthday cake for and also helping RPeck

begin his new contractor business with numerous contacts she made for him with her real estate associates and friends which amounted to approximately $300,000 plus over six years.[15]

7.    During this time RPeck continued to maintain to Caranchini that LPeck would not engage in sexual relations with him and in fact informed Caranchini that she claimed she was "having sex with 'god'. He also maintained she would not speak to him for days on end, and had no "interaction of any kind" with him. He also informed Caranchini he had tried to "repair" the relationship by seeking further counseling with LPeck with a Minister but LPeck was not interested in repairing their relationship. He was torn between his vows and his growing relationship with Caranchini he said which had developed from a friendship and casual sex into a deeper friendship and regular more meaningful sexual contact.

8.    Also, his Minister had told him that her lack of respect for her vows of having sex with him meant he was free to remarry if he chose as she had broken her vows to him. However, in conversations with RPeck, it became clear to Caranchini he could not bring himself to divorce LPeck. As he often said to Caranchini: "It's not you, it's me." Based upon this statement, Caranchini believed her relationship with RPeck was "acceptable" given his Minister's statement and his own religious beliefs as well as Caranchini's even if he could not bring himself to "divorce" LPeck. Caranchini as a long time trial lawyer of some 40 years relied on her "evaluations" of clients and

[15] Caranchini is fully aware from a review of tapes of the Pecks' interview with the Police in their home that RPeck contends he slept with Caranchini "only" to get business. Caranchini believes that is what he told LPeck. However, Caranchini does not believe that is why RPeck slept with Caranchini. See the following facts.

witnesses over the years and did not see any indication whatsoever that RPeck was "lying" to her in any way—he was consistent in what he said and never changed even minor statements. Despite Caranchini wanting to be with RPeck, she respected his religious views and recognized it had to be his decision to leave LPeck and be with Caranchini for the relationship "to go forward".

9. As stated heretofore, the relationship continued for initially several years as primarily a friendship and sexual relationship. Once or twice RPeck indicated he had sex with other women. Some of these women Caranchini "knew"; they were not women who would say "no" to an offer of sex and that is why RPeck asked them; he needed to be "needed" because both of his wives had "rejected" him and Caranchini and he were not together "enough".

10. About four years into the relationship it became more serious, and RPeck would daily call Caranchini once or twice a day, and often more frequently, and talk to Caranchini for hours; they would see each other once or twice a week as Caranchini and his time permitted. This continued over the next several years until December 24, 2016. During these years, RPeck gave Caranchini several pieces of jewelry, including annual "diamond hearts" she wore as a necklace.

11. There were periods of time when RPeck did not see Caranchini; he claimed he had work in other parts of the metropolitan area and could not see Caranchini; but the relationship continued uninterrupted. Whether RPeck was seeing other women, Caranchini does not know; unfortunately it will have to be a subject for discovery. However, RPeck always came "back" to Caranchini and continued their relationship

and throughout the time they could not "physically" be together he would continue to call her on a daily basis.

12. Caranchini and Peck never "argued" or had fights which was consistent with Caranchini's relationship with her deceased husband of over 34 years and her fiancé of over two years.

13. RPeck always maintained he loved Caranchini during this time period; from time to time he would deal with wanting to be divorced from LPeck but had issues with his "vows" or that was what he told Caranchini. RPeck and Caranchini, however, continued their relationship without interruption despite Caranchini wanting "more" of the relationship but understanding RPeck's "conflicts of conscience". For Caranchini and RPeck's relationship "to work", it had to be RPeck's decision to "leave" LPeck once and for all and be with Caranchini exclusively. He seemed to have made that decision by December 22, 2016.

14. In approximately August or September of 2016 RPeck informed Caranchini that LPeck wanted a divorce from him as she believed he was engaged in a relationship with Caranchini. RPeck decided it was not worth angering LPeck after discussions with her ex-husband who warned RPeck that LPeck could be vindictive and carry on the divorce for years if he did not agree to the terms she wanted. RPeck told Caranchini about this conversation. RPeck kept a low profile and gave LPeck everything she wanted which included all interest in their home and in their bank accounts; he agreed to be out of the home by December 31 at 11:45 p.m. There was no agreement to provide her any money whatsoever after the divorce but she was

to receive all monies in their joint accounts and RPeck's ownership in the home in Gardner, Kansas.

15. LPeck and RPeck had over the years of Caranchini and RPeck's initial relationship had been the recipient of approximately $300,000.00 that RPeck had earned from his referrals from Caranchini. These referrals had "dried up" over the last few years yet RPeck continued to see Caranchini. Caranchini believes it finally became clear to LPeck that RPeck was staying with Caranchini despite the fact that there were no more referrals and this was angering LPeck; she then determined that she would break up RPeck's relationship with Caranchini as it was no longer benefitting LPeck. This was not about LPeck's "love" for RPeck, but merely about a lost source of income.

16. At this point in time (August 2016 to December 2016) she decided RPeck needed to stay away from Caranchini as she needed someone to pay for the home they lived in and take care of it; this was not about anything else between LPeck and RPeck and therefore she filed for divorce.

17. RPeck's willingness to give LPeck "everything" in order to get a divorce from her and go forward with his relationship with Caranchini further solidified in Caranchini's mind (and heart) that RPeck loved Caranchini and was moving forward to have a life with Caranchini and leave behind LPeck.

18. By this point in time Caranchini and RPeck communicated five to eight times a day throughout the week. It was not unusual to speak morning and evening for at least an hour each time; frequently it was more often.

19.   RPeck informed Caranchini at the commencement of the divorce that he was
      concerned about the guns and ammunition in the Pecks' house and that LPeck may
      harm Caranchin;i and, he was therefore removing all the guns and ammunition from
      their home.  He would not discuss the details of the divorce further with Caranchini
      and Caranchini did not "push" RPeck to go into the particulars as it served no
      purpose.  The mere fact that RPeck was going forward with the divorce from LPeck
      and he and Caranchini would be together was a major step forward in his and
      Caranchini's relationship.  However, it was very clear that RPeck was VERY
      concerned that LPeck could, and WOULD, physically hurt Caranchini in some way.

20.   RPeck was very, very concerned during this time period that LPeck might see
      Caranchini and RPeck together.  He was very cautious.  Caranchini and he would
      meet in parking lots so as not to be seen together at her house.  He constantly
      reinforced that LPeck might become violent towards Caranchini and Caranchini was
      beginning to become concerned as to what LPeck might do and to this date might
      do.[16]

21.   Throughout the divorce proceedings LPeck repeatedly drove up and down
      Caranchini's street and followed Caranchini's car literally appearing "out of
      nowhere".  RPeck was so concerned he would only meet Caranchini to see her in an

---

[16]  Recently, Caranchini has had "problems" with the garage lighting on her home which she has
intentionally kept on at night to light her driveway and backyard; she has not put her car in her
garage as she was concerned that LPeck would access her garage and sabotage her car.  She has
added a lighting service to her house, and the lighting was "disconnected"; Caranchini had her
electrical lighting people check it out and put it back on May 5, 2018.  This type of thing
concerns Caranchini as it was the type of harassment that LPeck engaged in when she left beer
bottles under Caranchini's porch.

open parking lot in a shopping center fearing what LPeck might do if she saw them together!

22. From time to time during the divorce proceedings Caranchini and RPeck discussed what type of a relationship they would have when he was divorced from LPeck; Caranchini made it clear she did not want to be married again nor did she want to live with RPeck full time, at least for a period of time; she wanted to have a committed relationship where they lived apart during the work week but saw one another and stayed at one another's home one or more days, but then would be together on the weekends, but each would maintain his/her own home initially. RPeck never departed from his position he did not want to remarry and that he did not want to live full time with anyone. For that matter, neither did Caranchini. The only statement that Caranchini ever made to RPeck was that he could "move in" until he found a home to move into; she even looked for a home for him and had a real estate broker she knew look for a home for him.

23. Caranchini never informed friends of her relationship with RPeck until the last year; she did inform her sister, Dr. Webber, and her daughter, Kelly Gross, now Dr. Gross, who actually met RPeck and did not express any problems; her sister spoke to her and supported Caranchini in her decisions. RPeck never introduced Caranchini to his daughter claiming that she was divorced and it would be a problem; there were never any confrontations with LPeck at any time during the nine years of the relationship in person or by telephone, email or text, and Caranchini never made any "scenes" with anyone in his family, including LPeck, over the relationship.

24.  Caranchini has always been "in love" with RPeck and repeatedly told him over the years that he was the only man she ever loved other than her husband, who was deceased. He never told Caranchini he was "not in love" with her or had questions about their relationship but led Caranchini always to believe by both his repeated statements of love to her and his actions that he was in love with her and professed repeatedly his love in phone calls and in person. He repeatedly told Caranchini he was "instantly drawn to her" when they met and he "could not explain" the feeling. He also told her it was like a "love" different from any he had ever had". Caranchini's neighbor who knew RPeck from work he did in her house always said that when he and Caranchini were in the same room there was a certain "electricity" between them and even if you did not know Caranchini you knew "there was something between them" when they were in a room together, it was that "obvious".

25.  As the divorce was finalizing RPeck told Caranchini he wanted to go "hunting" with her and was looking forward to having nights with her and making love and having a relationship--; he never indicated otherwise--; Caranchini and he talked about their choice of "bed" and other things in Caranchini's home and that Caranchini needed a sofa for them to watch television on as they both enjoyed the same television shows. They talked about going around the country in a small caravan for a year. They talked about their choice of food and what they liked to cook and how to use a "pressure cooker". In short there was no indication of any kind that their

relationship was going to cease, it was only to go forward without LPeck to a new level of interaction and commitment.

26. When it became clear that RPeck could not find a home to move into, Caranchini agreed to have him move into her home until he did find a home; he was going to move furniture and tools in on the Thursday before Christmas himself and then have his daughter's boyfriend and his grandson move other items in on Christmas Eve; They were going to have dinner with "a neighbor" that Caranchini and RPeck knew on Friday evening and she prepared a special meal for them all to enjoy; on Saturday they were going to have a special Italian Christmas eve meal that was traditional in Caranchini's family and spend their first night together in almost nine years and have Christmas morning together. It was the very first Christmas that Caranchini had not had with her daughter in 36 years or her grandchildren or a family member as she could not travel because of illness.

27. Caranchini was concerned that after the divorce was final LPeck would continue to make threats to RPeck about what she was going to do to Caranchini if she knew RPeck was continuing to see her and RPeck believed he needed to be with LPeck until the divorce was final to protect Caranchini from LPeck's threats to Caranchini. However, Caranchini never anticipated what did in fact happen after December 14.

28. On Thursday morning RPeck called Caranchini and told her he would be there that afternoon with tools and his daughter would be there Friday with furniture to move into the house. He never showed nor called nor did anyone else show up.

29. On Friday the 23rd RPeck did not call which he always did; Caranchini was unable to reach him; Caranchini's neighbor was concerned that LPeck had killed him as she was a gun fanatic and again RPeck did not answer calls or call Caranchini.

30. On Christmas Eve Caranchini received an early morning call from RPeck asking to meet with her in Brookside and it was clear from the tone of the call that something was "wrong".

31. Caranchini met RPeck in Brookside; he got in Caranchini's car when she parked. He gave her a set of diamond earrings and then said he was leaving her. He said he did not want to discuss it in the car so Caranchini could ask questions. He got out of the car and they walked to Michael Forbes restaurant. RPeck informed Caranchini he had talked to LPeck for ten hours (a conversation he clearly indicated to Caranchini to have been "contentious") and "given it a lot of thought" and was leaving Caranchini and going back to LPeck . This since Thursday morning's call!

32. RPeck would not answer any questions whatsoever from Caranchini about what had transpired since they had talked Thursday morning when he had said he would be over with his tools Thursday afternoon and furniture Friday . RPeck mostly sat silently during some breakfast and would not answer any questions.

33. After breakfast Caranchini and RPeck walked silenty back to their respective vehicles where unexpectedly RPeck got into Caranchini's car, which Caranchini was shocked at, and started immediately to cry with—tears running down his face. ***He said he loved Caranchini and always would*** and "***that Caranchini did not know how very much he loved her and she had never understood how much he had loved her***

***and always would***"; and without further "ado" exited Caranchini's car. Caranchini sat there flabbergasted and crying in a state of shock. He NEVER said 'why' he was leaving but as time went by over the last year it has become more and more clear why he left and the collusion of LPeck with ADA Fritz and Jail Personnel.

34. The only explanation for this statement and RPeck's conduct is that RPeck believed, and knew, he needed to protect Caranchini from LPeck. You can lie about many things; but "faking tears running down your face" is not one of them. RPeck knew that LPeck would find a way to harm Caranchini unless RPeck did exactly as she told him to do; and as time went by that repeatedly has shown itself to result in harm to both Caranchini and RPeck as shown by LPeck having put Caranchini in jail.

35. Caranchini went home and called her sister, daughter and numerous friends telling them what had happened; all were shocked and unable to understand what had happened given their knowledge of the relationship.

36. Caranchini called RPeck over the next week, as well as texted him, and told him she had questions and wanted answers to questions as he had not given her time to digest what he had said. He answered the first or second call and said he would, but never met with Caranchini and refused to take any further calls, emails or texts from Caranchini after the initial first or second call Caranchini initiated. ***He never told her "why". However, RPeck NEVER told Caranchini not to call him.*** In fact, until Caranchini's calls were blocked January 18, Caranchini did not know her calls were going to be blocked. As of May 5, 2018 they remain blocked and Caranchini often

cries over not being able to talk to the man she still loves and who told her he loved her.

37.   It is clear the reason RPeck did not tell Caranchini his rationale for leaving her and going back to LPeck who he repeatedly told Caranchini had made his life "hell" for years on end was that LPeck was harassing and threatening him, and she demanded he give up Caranchini and RPeck was increasingly concerned LPeck would harm Caranchini after December 24.

38.   RPeck never told Caranchini not to call or he would seek a Temporary Restraining Order, hereinafter referred to as "TRO", against her or file a Municipal Charge against her.  Until Caranchini was served with the TRO at her home in mid January of 2017 and arrested in Judge Trigg's courtroom after winning the TRO she had no idea there was to be a Municipal Charge as RPeck never made any mention of the TRO or Municipal Charge to Caranchini.  Clearly, both of these legal actions were done at the insistence of LPeck.

39.   Additionally, Caranchini believes LPeck did not explain to RPeck the details of the TRO or Municipal Charge. ADA Fritz drafted the documents and most likely explained very little to RPeck and "brushed over" the fact Caranchini "could possibly" go to jail when RPeck stated he did not want Caranchini to go to jail.  LPeck, based upon ADA Fritz drafting of the documents, got RPeck to sign them, but both LPeck and ADA Fritz had made "light of the fact" that Caranchini could go to jail and with that "assurance" RPeck had signed the documents. This explains RPeck's comments in the Courtroom at the end of the TRO when he said to HStuart, his attorney during

the TRO hearing, "I told you I did not want her to go to jail", and Stuart pulled him away.

40. It is clear RPeck had been misled intentionally when he signed the documents which was LPeck's and ADA Fritz' intent. She wanted both RPeck and Caranchini to suffer, and wanted them both to see each other in the courtroom suffer, as the Sheriff took Caranchini away. Clearly, the only person who could have given RPeck the impression Caranchini would not go to jail is ADA Fritz when the statements were drawn in his office. That demonstrates clearly ADFritz colluded with LPeck to put Caranchini in jail from the time the TRO and Municipal Charge were drawn in his office and filed as well as what happened thereafter. **LPeck had made "a deal" with ADA Fritz.**

41. LPeck was threatening Caranchini to RPeck but was also "telling" RPeck she would have sex with him.[17] RPeck did not tell Caranchini on December 24 she was being threatened, but did tell her LPeck agreed to have sex with him and had that morning. RPeck told LPeck if she did not, he would leave. LPeck had always told RPeck it was" too painful". Clearly, LPeck was the only woman in America who did not understand she could go to the local Pharmacy and get an "over the counter" medicine to take care of this "so called pain".

42. RPeck informed Caranchini on December 24 that LPeck had had sex with him December 24 (before he had met with Caranchini) and that she had rubbed

[17] Whether LPeck ever did have sex with RPeck, or whether it was "perfunctory", or whether it was engaged in only "briefly", is yet to be determined during deposition. LPeck only told RPeck this to try to get him to leave Caranchini as she knew how important "sex" was to him.

"frankinsense" on her belly and said it did not hurt anymore which Caranchini

laughed hysterically over and continues to laugh over everytime she reads this

document.  Caranchini does not believe LPeck had sex with RPeck continually

thereafter, and it is one of many claims RPeck has against LPeck if he ever decides to

sue LPeck which Caranchini hopes he does.

43.    After RPeck left that morning, Caranchini cried all Christmas Eve and cried for

months and months and still cries.  She had intended he would join her that evening

for Christmas service and a special Italian dinner and he did not.  For the first seven

or eight months thereafter it was a very painful time each day despite having the

help of a psychiatrist and psychologist and doctors to deal with her excruciating hip

pain preventing Caranchini from walking at all for months.    That first Christwas

was the worst Christmas since Caranchini's  husband had died in 2003.  The second

Christmas in 2017 was also very very difficult even though spent with Caranchini's

daughter, son-in-law  and grandkids in Chicago and Caranchini's daughter comforted

her knowing how badly Caranchini felt without RPeck.  A day still does not go by that

Caranchini does not think of RPeck and that it hurts—very much and hopefully

RPeck when reading this document understands that Caranchini is filing this

document at least in part because of the huge amount of pain he has caused her by

leaving her when he and Caranchini were going to spend the rest of their lives

together and Caranchini hopes that he will have the strength to leave LPeck and

move on with his life—with or without Caranchini—as LPeck is a "destructive" and

"lying"  person.

44. Caranchini believes LPeck intended Caranchini suffer this on Christmas Eve so that RPeck and Caranchini would never forget the events that happened to them on Christmas Eve. LPeck also intended RPeck to continue to suffer as a result of her demands he leave Caranchini. Caranchini believes LPeck made these statements to RPeck intentionally-- not only to make him stay with her but to harm Caranchini emotionally by RPeck remaining away from her. She had refused to carry on her marriage for years and she had no intention of reinstating her relationship with RPeck. She would continue to tell RPeck she would harm Caranchini until he ceased to indicate any desire for a relationship with her and LPeck believed him.

45. LPeck took great pleasure in knowing the "harm" she caused both RPeck and Caranchini by her "plan" to break them apart and cause them both harm for what she believed was "their fault" in causing "her" to suffer. However, it was neither RPeck nor Caranchini's fault that LPeck "suffered". RPeck had tried through his attempts for two years in therapy to get LPeck to fix their marriage and she would not do so nor did she in any way over the next years try to interact with RPeck who remained in the marriage to "fix" the marriage.

46. It is clear LPeck threatened to harm Caranchini and communicated that to RPeck on the afternoon/evening of December 22 after Caranchini and RPeck talked that morning and left RPeck with no alternative but to return to LPeck to keep Caranchini "safe".

47. RPeck never gave Caranchini any explanation for his actions either on December 24 or since that time; except to infer both at the inception of the divorce and on

December 24, 2016 that LPeck would "hurt" Caranchini as he referred to the guns in their home and he was removing them; there was also a "strange" telephone call in January in which RPeck said he would meet with Caranchini but only if she agreed in writing beforehand "not to sue LPeck" . Caranchini refused based upon LPeck's interference with RPeck and Caranchini's relationship on December 24 and thereafter. Such "inference" by RPeck could mean only one thing: that LPeck was threatening Caranchini. The threats continued after December 24 and in Caranchini's opinion continue to this day as referenced in this filing and as she will reference in her deposition.

48. During the weeks after December 24, 2016 LPeck followed Caranchini, and drove up and down Caranchini's street which Caranchini observed as she worked at her dining room table and looked out the window at her street.

49. One day LPeck left a condom both outside Caranchini's car door while she was at her physical therapist in Olathe, and then while Caranchini was at her church answering the telephone; on both occasions the condom was unwrapped and directly in front of the driver's door. It is obvious LPeck had followed Caranchini to her church or listened in on conversations RPeck had with Caranchini on Fridays with Caranchini while she was at church and knew where Caranchini was going and followed her.

50. On another occasion LPeck drove on the highway directly past Caranchini as Caranchini drove to her physical therapist in Olathe and she starred at Caranchini.

51. When Caranchini had not heard from RPeck, she went to the Pecks' home in early January; Caranchini parked off the property as she did not see RPeck's vehicles or

LPeck's vehicle. After parking, LPeck came racing down the dirt road to their home

pass Caranchini's car; shortly thereafter, two Police vehicles arrived on the scene.

Since Caranchini had done nothing wrong and was not on the property, she did not

engage in any conversation with the officers other than to explain what had

happened. Clearly, LPeck had called them and had not informed them of all the

facts. Just as clearly she had "listened in" on a message Caranchini had left for RPeck

about the issue. They asked Caranchini to leave and Caranchini left. (There is a

video of this from the Police produced during the discovery on the Municipal charge

which Caranchini has viewed and which will be obtained in this case which clearly

verifies these facts).

52. RPeck, when Caranchini left a message regarding what had happened, informed

Caranchini that he had not called the Police but that LPeck had seen Caranchini on

the highway and recognized "her" and Caranchini's car. RPeck said LPeck had

accessed RPeck's email (or text—Caranchini cannot recall) and found out Caranchini

was going to see RPeck to obtain "answers".

53. This was very unsettling to Caranchini as she had not seen LPeck in years which

LPeck admitted in the video of a meeting with the Police regarding filing a charge

(again something that Caranchini has seen) and Caranchini had lost 45 lbs since the

last time she saw LPeck, and during that time she had changed her hair color and her

car. It was clear that LPeck had been at Caranchini's house and "seen her and

Caranchini's (new) car". RPeck had said he believed she was following him during

the divorce. There is no way that LPeck could have recognized Caranchini's car or her "on the highway" given such facts.

54. Additionally, on at least two subsequent occasions in January, Caranchini believes that LPeck was following Caranchini when Caranchini was driving.

55. Caranchini received in mid-January a very nasty email allegedly from RPeck late one evening of approximately four pages. It was totally shocking to Caranchini as it took statements made to Caranchini by RPeck out of context and twisted them in a manner to suggest Caranchini and RPeck had no relationship or it was merely based upon sex throughout the nine years of the relationship. After Caranchini wrote numerous emails or texts disputing the four page letter, she talked to her sister, who after reviewing the letter, informed Caranchini that obviously RPeck had not written it, but it was written by LPeck which subsequently RPeck did not deny at a hearing on the TRO filed by him and LPeck.

56. RPeck repeatedly told Caranchini over the years when they talked about his leaving LPeck "that it was not you (Caranchini), it's me" referring to his leaving LPeck. It was clear from those conversations that he had an "issue" leaving LPeck which he could not "deal with" or "resolve". However, he never indicated that he was "in love" or "loved" LPeck at any time whatsoever either before LPeck moved for divorce or after she moved for divorce or after her divorce was finalized.

57. Caranchini might add that when RPeck broke up with her he never told Caranchini not to contact him again. He never blocked his telephone from receiving Caranchini's telephone calls or texts or emails. However, sometime in mid-January

Caranchini's calls, texts and emails were blocked and clearly it was LPeck who was doing so. This continues to this day. If RPeck is blocking Caranchini's calls, in Caranchini's opinion, it is at LPeck's insistence and not because he wishes not to talk to Caranchini.

58. These events lead Caranchini to believe two things: first, LPeck based upon conversations Caranchini had had with RPeck over the years about LPeck, had become "vengeful" against Caranchini and would do what she could to "harm" Caranchini, with or without the assistance of RPeck; and second, that LPeck knew she had to take such actions to lead RPeck into such situations so that she could harm Caranchini without RPeck's knowledge but with the "knowing" assistance of the Kansas District Attorney Fritz and Sheriffs.

B. **Temporary Restraining Order Hearing**

59. In mid January of 2017 a Johnson County Sheriff rang Caranchini's door bell in Missouri and served her with paperwork to appear in Johnson County Magistrate Court on a Temporary Restraining Order. Although, Caranchini questioned the legitimacy of such service, Caranchini appeared in the Courtroom of Judge Trigg on the date specified.

60. Both RPeck and LPeck were present; RPeck would not look at Caranchini demonstrating to Caranchini, both individually and as an attorney, that he clearly did not want to be present. Judge Trigg could not be present and another Judge appeared who raised an issue with the undersigned as to whether he should enter an Order on the continuance because Caranchini and He had a case several years

prior in which He and Caranchini were on opposite sides; Caranchini waived the "conflict" and the case was set over to another date when Judge Trigg was available. LPeck did not indicate at that time that she did not intend to appear in the future.

61. Although LPeck had arranged for Caranchini to be served with the TRO with the assistance of ADA Fritz, there was no arrangement to serve Caranchini simultaneously with the Municipal charge. As a result of not "serving" Caranchini, ADA Fritz informed LPeck Caranchini would be handcuffed at the conclusion of the TRO hearing and taken directly to jail on the Municipal charge as it was outstanding. LPeck was "pleased" that that would occur in the presence of RPeck. That was the primary reason she was not in the courtroom; so that RPeck could not force LPeck to withdraw the Municipal claim against Caranchini. This would give both Caranchini and RPeck great pain which would give LPeck "great joy".

62. During the February TRO trial, Judge Trigg stated that if RPeck did not want Caranchini to call him after December 24, he should have immediately blocked her calls/emails **but he did not, clearly indicating to Judge Trigg as it had to Caranchini, that RPeck did not want to block his calls from Caranchini**. Caranchini contends RPeck did not block her calls before January 18 because he wanted to continue his relationship with Caranchini and believed that LPeck would realize he was going to do that; but Caranchini contends LPeck blocked Caranchini's calls to RPeck because she was determined to keep RPeck away from Caranchini.

63. It is clear based upon the TRO and Municipal paperwork LPeck made RPeck sign , that RPeck was responding to the demands of LPeck who wanted him to

immediately stop his relationship with Caranchini even though he had told Caranchini on December 22 he was to move in with her on December 24.

64.    LPeck's divorce from RPeck was based upon his relationship with Caranchini and it had been finalized on December 14. The Pecks had NOT remarried at the time LPeck made these demands upon RPeck. When RPeck informed LPeck he was moving out on December 22 to be with Caranchini, she threatened Caranchini if he did so, and RPeck believed he had no choice but to stay with LPeck to protect Caranchini.

65.    On February 9, 2017 Caranchini appeared in Court on the Pecks' Temporary Restraining Order before Judge Trigg. RPeck appeared with an attorney, but LPeck did not appear. Prior to the hearing Caranchini approached the attorney and RPeck and asked the attorney's name and for a business card, but he refused to identify himself or give her a business card. Caranchini later determined that the lawyer's name was "Heath Stuart". He told Caranchini he was asking for a 30 day continuance (which he should have known he probably would not get as there had already been a seven day continuance by the Court itself). He also said he would "beat the shit out of her (Caranchini)". Caranchini said nothing and went into the Courtroom.

66.    RPeck's attorney asked for a continuance but gave no reason whatsoever to support his request for a continuance, which was denied. The Attorney gave no explanation for the absence of LPeck and made no "reservation" of any claim(s) she might have

against Caranchini.[18] HStuart put his case on for RPeck (and LPeck) and the Court asked numerous questions. The Court also permitted Caranchini to question RPeck. HStuart made no objections whatsoever that Caranchini can recall, or at least substantive ones. Caranchini testified herself and the Court questioned Caranchini. The attorney did not cross examine Caranchini to her recollection.

67. During the trial RPeck's attorney HStuart continually passed paper to his client with "answers". Extremely unprofessional. Caranchini attempted to object, but the Court "waived Caranchini down" stating to Caranchini "I see what's going on".

68. At the conclusion of the testimony, the Court entered an order after calling RPeck repeatedly "a liar", denying the Restraining Order Request and ruling in Caranchini's favor.

C. **Taken to Jail and Jail Experience**

69. At the conclusion of the TRO hearing, two or three Sheriffs came into the Courtroom and without stating anything to the Court or Caranchini handcuffed Caranchini as she was packing her briefcase. The Court informed Caranchini she was being arrested on a separate charge brought by the Pecks. The Judge was clearly disturbed by the arrest and indicated to Caranchini she did not have jurisdiction of the other case. She also stated (off the record) she had asked for the Municipal

[18] Caranchini believes that given the absence of said preservation of LPeck's claims, and the lost by RPeck, LPeck has no right to raise at any time in the future any claims she might have had arising out of the facts of this TRO against Caranchini.

Court charge as well, but it was not given her and no reason was given to her why it was denied her.

70.   RPeck was still in the Courtroom with his attorney and he turned to him and said **"I told you I did not want this to happen"**, and the attorney took him by the shoulder and led him out of the courtroom leaving Caranchini with but one impression:  LPeck had gotten RPeck to sign the Municipal Charge, with the assistance of ADA Fritz, and neither ADA Fritz nor LPeck made any mention to RPeck that Caranchini might go to jail if bond was not posted although clearly both ADA Fritz and LPeck knew that could occur if Caranchini was arrested without knowledge of the charge—which was exactly what happened.

71.   This was LPeck's intent and ADA Fritz knowingly helped LPeck put Caranchini in jail by manipulating the timing of the municipal charge—misleading RPeck, denying Caranchini the opportunity to post bail and then "loosing Caranchini" in the jail system intentionally.  It appears ADA McElhinney did not know of these events or acts by LPeck and ADA Fritz at the time they occurred.

72.   Apparently, LPeck had no intention of coming to the TRO hearing and being present when Caranchini was "handcuffed" and arrested as she did not know what RPeck would do, or make her do to withdraw the Municipal claim at that point in time.

73.   From looking at the Court records on the Municipal Charge, it is clear the Municipal claim was "filed" on January 23, 2017 simultaneously with the TRO or shortly thereafter.  The TRO was served by a Johnson County Sheriff upon Caranchini at her home shortly after it was drafted; but the Municipal Charge was never served at

Caranchini's home on her even though it could have been and SHOULD HAVE BEEN so that Caranchini could post bond and avoid being arrested and spending time in jail. However, LPeck clearly wanted Caranchini arrested in the presence of RPeck and wanted RPeck to know that Caranchini was going to be jailed.

74. **Additionally, the Municipal Charge could have been served on Caranchini at the first hearing date for the Municipal Charge when Judge Trigg was not available and another Judge was setting the matter over; Caranchini was in the Courthouse and she could have arranged for bond and a continuance; but again LPeck and ADA Fritz intentionally avoided serving Caranchini at this time as well.**

75. There clearly had been an agreement between LPeck and ADA Fritz that Caranchini be handcuffed in open court and NOT served at her home with the Municipal Charge giving her the opportunity to post bond and avoid jail entirely.

76. What LPeck wanted was Caranchini handcuffed in the Courtroom in the presence of RPeck without having any foreknowledge and taken to jail where she would be held and not be able to "bond out" immediately or appear before a Judge for up to 24 hours or more. This would cause Caranchini more "pain and suffering". This would also cause RPeck "pain and suffering" as he would witness Caranchini being handcuffed.

77. LPeck got what LPeck wanted. It was done intentionally by her with the clear cooperation of ADA Fritz without whom it could not have been accomplished. There was no reason NOT to serve the Municipal Charge at Caranchini's home with the TRO as Caranchini could then avoid being handcuffed in open court by arranging

for bail before hand and also avoid going to jail. By "catching her off guard" in the courtroom after winning the TRO, and then handcuffing Caranchini in open court before RPeck, both would suffer "pain and suffering" in each other's presence which is exactly what LPeck wanted.

78. Even when she was handcuffed in Judge Trigg's Courtroom on the Municipal Charge, Caranchini was not served with the Municipal Charge, or brought before a Judge regarding the Charge for which she was handcuffed. Caranchini knew nothing about why she was being handcuffed and that was exactly what LPeck wanted. For a lawyer, this was extremely difficult.

79. Caranchini instead was put in a Sheriff's vehicle and driven across the street to the Johnson County jail with her purse and briefcase and taken to a room to be "admitted to the jail".

80. At no time was Caranchini served with any documents from the moment that the Sheriff's approached her in Judge Trigg's courtroom as to the reason why she was being arrested and placed in jail.

81. Caranchini was brought to a small area in the jail and her purse and briefcase was gone through and a list was made of her belongings. At this point Caranchini specifically directed the Sheriffs attention to two lists in her wallet: one that had a list of her medications to be taken by time and the amount of the drug; and the second list which had all her emergency contacts, specifically the name of her sister who could be contacted regarding this matter, as well as her doctors' names, telephone numbers, faxes and drugs associated with them, as well as the name of

her Pharmacy. Her jewelry was enumerated but Caranchini would not take off her emerald and diamond ring given to her by her husband on their 25th wedding anniversary as she was concerned what might happen to it. Her 75 year old pearl necklace belonging to her mother was taken from her; as well as everything else in her briefcase and purse including $40.00 in cash and enumerated; all her clothes except her panties were taken from her and she was given jail pants to put on and after taking off her bra was given her sweater to put back on.

82. She was then taken to an area and photographed surrounded by four women less than twenty feet from men with one woman photographing her.

83. Caranchini could have avoided all of this if she had been properly served at the same time as she was served with the TRO and given the opportunity to obtain a bond; however, LPeck had colluded with ADA Fritz so that Caranchini would not be served with a subpoena for hearing on the Municipal charge and instead would be taken to jail at the conclusion of the TRO hearing.

84. Caranchini although she asked to make a telephone call, asked why she was in jail, asked to appear before a judge was denied all of these and was merely put in a jail cell still without any knowledge of why she was in jail and on what charge. **She had been denied an opportunity while at the Courthouse to appear before a judge and now was being denied the opportunity to obtain even basic information on the charge she was in jail upon which was done based upon collusion between ADA Fritz and LPeck.**

85.   The facts surrounding the Municipal Charge occurred despite the fact ADA Fritz wrote the charge January 23, 2017 at the same time as the TRO was written.  ADA Fritz clearly had to know that Caranchini had been served with a subpoena on the TRO hearing in Missouri as the Pecks had brought that charge against Caranchini at the same time as the Municipal Charge; yet he failed to arrange for service of the paperwork for the Municipal Charge. This was intentional collusion on ADA Fritz' part with LPeck to cause harm to Caranchini.

86.   Caranchini asked when she could appear before a judge to request bond and the Sheriffs would not respond. She asked to make a telephone call to her attorney and they would not respond. She asked to see a nurse or doctor regarding drugs that were due and no one got her a doctor or a nurse.

87.   Some food was given to her which she could not eat; she informed the Sheriff and he said "that's what you get" and nothing else was given her but inedible sandwiches. She continued to ask to see a doctor regarding her drugs but never got a single drug on her medical list the entire time she was in jail no matter how many times she asked.  She asked to go before a judge and make bond. No one gave her any information.

88.   After leaving jail at a point in time and getting the "paperwork" it shows on one page that Caranchini for some reason is shown as "Uncooperative". On what basis this statement is made is unknown; but it appears that the jail personnel made this statement in order to "protect themselves" from Caranchini's statements.

89.    Caranchini had been asking to make bond, see a doctor, for her meds, for food she
        could eat and for a telephone call since shortly after she was put in a cell. Over 30
        hours went by and nothing was done.  All Caranchini heard from the guards was to
        "be a good girl";  "we have discretion" and "we can do whatever we want with you"
        (which they had); a full day of this went by and no telephone call; no drugs, no food
        Caranchini could eat, no insulin.  The guards just kept saying "they had total control"
        and Caranchini had to be a "good girl", which apparently included subjecting herself
        to their sexual touching.

90.    During this time the sheriff deputies started to come to the cell and press their faces
        against the glass door panes licking them.

91.    Caranchini finally took some toilet paper and pressed it with the peanut butter in a
        food bag on the window so the deputies could not glare at her and "lick" the
        window; they demanded she give them the toilet paper and take down the toilet
        paper on the window. Caranchini refused.  They then stormed into the cell slamming
        Caranchini against the wall in a corner and yanking her arms behind her back and
        leaning against her rearend in a menacing sexual manner and humping her in a
        sexual manner.  Caranchini was dragged out of the cell without her shoes and her
        feet started to bleed and she was screaming; someone started to take pictures.

92.    Caranchini can recall how several men dragged her across the jail compound to
        another cell as someone took pictures and she was screaming at the guards;
        Caranchini was 69 at the time and these Sheriffs were literally dragging her across

the cell compound to another cell with no window and no toilet and no water and Caranchini had never even been charged with anything at all at this time.

93. She was told to "poop on the floor and pee and drink her pee" and she was given only a bag with the some more inedible food and no water. The other cell had a toilet and water as the first and second cell had had but the third cell had neither a toilet nor any water. She had to rely on someone giving her water and no one did. She was unable to eat and at one point in time she was given no water whatsoever for some ten to twelve hours. No nurse came to check her bleeding feet or whether she had suffered in any way from the officers attacking her in the second cell. An officer came up and said to her that when they got around to food and water they would get to her. They never did for the next ten or so hours until a "psychologist" or "social worker" came to the cell.

94. The lights were worse in this cell and the floor very cold and Caranchini was given no blanket or anything to sit on. Caranchini sat on the floor in a corner as far away from her "poop and pee" on the opposite corner of the cell. It was cold and the jail clothes barely kept her warm.

95. Caranchini wishes to state that no one has ever found Caranchini to be "uncooperative" at any time in any matter whatsoever but apparently the jail staff were also telling the "psychologist" Caranchini was "uncooperative" and was yelling and screaming and that was why they were not letting her see the Judge. Caranchini told the "psychologist" she was not "uncooperative", and the only thing she was "yelling and screaming about" was that for the last 30 hours she had been denied

the opportunity for a telephone call, or told why she was in jail, or given her medications, and food she could eat and to be able to bond out and they refused to talk to her at all.

96.  But it is clear from a review of the paperwork from the "Jail" that the Jail Staff failed to tell the Court exactly what "led up to Caranchini allegedly yelling and screaming". Caranchini is setting forth in this lawsuit what exactly happened and will have the jail produce every person that worked that time period for Caranchini to identify them and all the records of those who worked. If as an attorney you are put in jail and you know you had a right to be given a reason for being put in jail, an opportunity to bail out, be given your drugs, food you could eat, water and are not and are refused the opportunity to appear before a judge, most lawyers would start "yelling".

97.   **One additional statement was made to Caranchini by jail staff: "you don't get it, you are going to do what we say and we are in charge and we have total "discretion". That was certainly the case and it has resulted in numerous medical problems for Caranchini for over a year and many months now and is still ongoing which no doubt makes LPeck very happy, and RPeck sad Caranchini believes.**

98.  Additionally, the atmosphere projected in the jail area was horrific: the Sheriffs strode around in uniforms one sees in old films worn by Nazi's; there was only one woman "sheriff"; the rest of the women sit on a platform working at computers and never look up no matter what occurs or how much screaming or yelling is happening. It is the most bizarre atmosphere.

99. During the 36 hours Caranchini was in jail she never received any insulin (4-5 doses) or the over 20 pills she was to receive in six doses throughout the 36 hours she was incarcerated; nor did she receive the six meals she was required to have.

100. The Court documents demonstrate that no bond was set on Thursday and no bond was set on Friday morning or afternoon. It was not until the "psychologist" or "social worker" contacted someone (for some reason after 24 hours had passed) that a bond was set on Friday sometime late in the day after dinner when the that person had contacted Caranchini's sister or according to Caranchini's neighbor CL she had contacted RPeck and he told her Caranchini was in jail that bail was finally arranged.

101. Additionally, there is nothing to indicate that Caranchini was made aware on Thursday or Friday at any time what the charges were against her. Caranchini was never brought before a Judge at any time while she was in jail nor was she ever given any paperwork with the charges against her on it.

D. **Lack of Healthcare/aka "Bad" Healthcare**

102. When it became clear to Caranchini she was not leaving any time soon, she asked to see a doctor or nurse; given the drugs on her medical list and limited diet she was astounded she never saw a doctor and the "alleged" nurse she saw was "rude" and never gave her the medicines on the list she had given the Sheriff when they "took her in", at all, let alone a "timely basis". Nor was any attempt made to contact her doctors or take her blood sugars regularly. The medical care was non-existent. In the 36 hours in jail she never received any medication, or diabetic meal or drink, nor

were her diabetes numbers taken or insulin given her. Caranchini cannot drink "soda" which she was given and the jail staff did not even know that a diabetic cannot drink "soda".

103. The jail staff only provided someone who claimed to be a nurse once who showed up with "a" single pill which she claimed was "similar" to what Caranchini claimed she was taking but she did not explain it. Caranchini asked for her other pills and the "nurse" said "this is all you get, take it or leave it." Caranchini did not take it because she was not sure it would or would not conflict with the medicine in her body because of prior problems and she had been warned by her doctors to only take what she had been prescribed. Caranchini was denied six rounds of drugs and four to five rounds of insulin. It took one week after she got out of jail to get her "diabetes numbers" back to a relatively normal range.

104. Given the size of the facility in Olathe and the size of the facility that Caranchini has seen in Gardner it is simply unbelievable that Johnson County does not have on staff at least two to four R.N.'s 24/7 who can oversee medications and a doctor 24/7 who can oversee medical care.

105. Caranchini never received any of her meds during the entire time she was incarcerated; she should have received meds at 5:30; 8:30, pm; 6:30 am.; 12:30 p.m.; 5:30 p.m; 8:30 p.m. She also should have received insulin at 5:30 pm; 8:30 p.m. and on Friday at 12:30 p.m., 5:30 p.m. and 8:30 p.m. None of this was done. Also the food was inedible and would have caused Caranchini's diabetes numbers to go off the charts.

106. Caranchini never at any time in the 36 hours she was incarcerated was seen by a doctor or treated by a nurse or received any of her medications, received any shot of insulin or had her blood sugars tested by a nurse. No meal that Caranchini was given comported with any diabetic standard and the jail totally ignored Caranchini's requests for a diabetic meal; Caranchini was repeatedly given soda drinks with sugar and then nothing but water and finally nothing to drink at all for the last ten or more hours. Caranchini went to a medical facility after being released from the jail for multiple reasons and had no normal blood sugars for a week.

107. Caranchini does not know whether the Johnson County Jail supervises "Corizon" and its staff, or whether Corizon works totally independently of the Jail; hence, Caranchini pursues her claims against the Jail and Corizon both independently of one another and jointly hereinbelow in Counts VI and VII; Caranchini has addressed this issue (among others) to defense counsel but defense counsel refuses to engage in any "conversation" whatsoever regarding Caranchini's claims whether orally or "on paper".

E. **Failure to Appear Before A Judge**

108. Caranchini was not brought before Judge Vokins (or any other Judge) at any time she was incarcerated and advised of the charge, nor was she advised of what her bond was and why it had taken so long to be given an opportunity to post that bond given what she was being subjected to at that time; rather she continued to be held and subjected to violations of her constitutional rights included being sexually assaulted by employees of Johnson County and/or the Jail all of which amounted to

violation of her constitutional rights of an intentional nature by Judge Vokins and he should not be protected in any manner by his "position as a judge" given the actions set forth below.

109. In the approximate 36 hours Caranchini spent in the Johnson County Jail the Sheriffs did whatever they wished and said whatever they wanted to Caranchini without any oversight whatsoever. Statements of : "When we get to you we get to you", were common as were "we are totally in control", or "take it or leave it" and no one did anything about these out of control statements or actions. That this "gorgeous" facility fed "moldy bread and cheese" three times a day to prisoners who had dietary restrictions, or that the Sheriffs withheld water or medications is barbaric and hopefully, the requests for oversight of this Court set forth below will be taken seriously.

F. **Post Jail/Medical**

110. After Caranchini was permitted to bond out, she was taken by TB (a friend), to a facility to be checked out medically; her blood sugars were very high and it took multiple days to get her blood sugars under control.

111. Caranchini was very upset psychologically and based upon her background knew that she needed to see a psychiatrist and made arrangements to see her psychiatrist who made arrangements for a psychologist to also see Caranchini. Caranchini continues to see both doctors.

112. Caranchini also saw her General Practitioner who is an Internist shortly after being released to check in with her about what had happened in the jail.

113. Caranchini has absolutely no recollection of this last visit and will have to obtain a copy of the records to review them and speak to her doctor about this visit.

114. Caranchini was totally disoriented having done without six rounds of drugs and four rounds of insulin and little if any edible food for 36 hours. Either that night or the next morning Caranchini went to her doctor's urgent care where she was evaluated. Her blood sugars approached 400 (135 being normal) and her blood pressure was 212 over 196. It took several days for her blood sugars and blood pressure to stabilize and normalize.

115. Caranchini started to see her physicians over her physical condition and mental condition which required the attention of her psychiatrist who sent her to also see a psychologist who she has continued to see. Such visits continued unabated for months with daily migraines which increased necessitating more drugs to control them which Caranchini had never needed in the past. The migraine doctor added a fourth botox shot to her schedule. Her February botox shot had almost no effect whatsoever. It was her May shot before her migraines started to decrease in pain and frequency which meant she spent six or seven hours during the day lying down with migraine pain in dark rooms. Nothing helped. Caranchini had a subsequent botox shot which began to reduce the migraine pain but this had never occurred before her jail "stint". Since that jail stint she is on four botox shots a year with different medications to augment the medications.

116. Another immediate problem after leaving jail, was that Caranchini used to be

able to walk three to four miles a day without any problem; since the jail incident she could barely walk three or four blocks. After seeing seven to eight specialists to rule out multiple causes for the pain in her back and neck and spine including "electrical impulse studies", the location of the pain was diagnosed to be in her left hip which she had slept upon for 30 years. She has seen multiple physical therapists who specialize in such hip therapy north of the river in Gladstone twice a week for almost a year and with the help of doctors finally have determined the cause and has been given a shot and it is beginning to resolve itself. However, it will take six to nine months more Caranchini is being told. Llast month ( early April 2018) physical therapy was stopped, without the need for surgery) and at home exercises were prescribed. Although Caranchini still has some pain in her left hip, she has since the beginning of the fall begun to walk about a mile a day if she does not overdue her work at home. She is hopeful she can again walk three miles a day to loose the weight she has gained over the last 15 months and get the pain in her hip to subside.

117. In the last two weeks Caranchini is beginning to walk close to two miles once a day but still unfortunately is working on weight loss; which she had worked very hard to loose. Not walking for over a year has been the main cause for this weight gain. The pain in her neck was addressed by another therapist and after six months it has been relieved as of last fall with the help of Caranchini's pain doctor who has sent Caranchini to multiple doctors. The current hip doctor believes surgery may not be necessary on the left hip and physical therapy has stopped. Caranchini has never in her life had any neck, back or hip pain until this "jailing".

118. Additionally, Caranchini's psychiatrist after Caranchini saw her after her release from jail added some medication for Caranchini to deal with stress; again this is something that Caranchini has never taken but her psychiatrist believes it is necessary given the stress that Caranchini has been put in the last year by the break up, jailing and physical pain; unfortunately the first drug caused an interaction with other drugs Caranchini takes and it was changed—again an indication that Caranchini and her doctors need to be very aware of what Caranchini takes and make her other physicians aware because of her drug interaction problems caused by the number of drugs she takes particularly the number of drugs for her migraines. This is just one example of the pain this event has caused.

119. Caranchini's psychiatrist also added a psychologist to Caranchini's list of doctors for her to see who has helped her a great deal. Caranchini has seen him for almost a year now. He was the one who suggested after a period of time that Caranchini consider filing suit as she does for her own clients, as it would help her resolve the issues she had, much as it did for clients who came to her to have issues resolved by court cases. He was right. The filing of suit has in fact helped Caranchini resolve much of the pain she has suffered.

**Post Jail Interaction with DA Howe/Judges**

120. Caranchini wrote DA Stephen Howe two detailed letters the Monday and Tuesday after the incarceration about what she suffered and handdelivered them to his office about the horrors of her incarceration including not being permitted to make a call or bail out or get her medications and being physically assaulted by the jailers.

Caranchini has never heard a thing about her complaints at all—no investigation of any kind whatsoever.

121. She also wrote ADA McElhinney-, several letters and he too did nothing initially. Eventually, after handling the matter for almost nine months, out of the blue, he dismissed the case entirely, and expunged the matter without giving any reason whatsoever, and returned the bond. His deposition should be very interesting as to the reason why.

122. Caranchini early on after getting out of jail hired DB and his firm, criminal lawyers, for five months, and although they tried to get a resolution of the criminal matter they were unable to do so. Although their charges were reasonable, after five months DB was not getting anywhere with the Pecks or ADA in resolving the matter, Caranchini had him as well as his firm withdraw and Caranchini entered an appearance to represent herself.

123. As part of that withdrawal, Caranchini received in July 2017 from DB[19] paperwork filed by LPeck[20] against Caranchini regarding her telephone calls to RPeck

---

[19]  DB when he was hired shortly after Caranchini was released from jail in February apparently determined that Caranchini was extremely ill over what had occurred and did not want to share with her all that the Pecks had done because of her state of mind. In point of fact, Caranchini only learned on July 28, 2017 from DB when he provided her documents from the Court files when he withdrew of many of the filings made by the Pecks on the criminal matter. The first lawsuit filed in Missouri Federal Court had to be redrafted (again) and its filing postponed because there was a need for more additions. Caranchini wishes to specifically state at this point, that nothing she is stating here regarding DB or his lawfirm is meant to be any type of waiver of her attorney client privilege with either him or his lawfirm, all such privilege being retained.

immediately after his breaking up with Caranchini on December 24. Caranchini had

no idea that the charges against her stemmed from December 24 to December 29.

124.   Likewise, the only thing that Caranchini did during that time period was make

telephone calls and send texts to RPeck which was consistent with their relationship

of nine years.

125.   In the PUBLIC paperwork filed by LPeck, NOT RPeck, SHE contended Caranchini was in

need of a "mental examination".[21]   Caranchini has seen a psychiatrist off and on for

various reasons[22] over the years who she fired in 2014/15. A new psychiatrist was hired

and after seeing Caranchini multiple months wrote a full report to her doctors on

Caranchini's mental health and Caranchini was removed from her psychiatric

---

[20]   Apparently, LPeck was filing the paperwork shortly after RPeck told Caranchini he was leaving her, something which Caranchini did not know until July 28 of this year, making the whole circumstances even worse.

[21]   Caranchini is outraged an ADA put on a public Court document from complainant LPeck who has a mere GED education that Caranchini was in need of a "mental examination" which is libelous and slanderous per se (see Count V below, a claim against LPeck and ADA Fritz for such statement) especially in light of the fact that Caranchini had NEVER had any interaction with LPeck for years on end.   Caranchini's medical records establish she has no such problems whatsoever. That such a statement would be included in a public court record without any substantiation whatsoever demonstrates the District Attorneys' office, and ADA Fritz particularly, clearly had done no investigation whatsoever into the charges against the undersigned. This is further substantiation in Caranchini's opinion that ADA Fritz had colluded with LPeck over the manner of pursuing the claim against Caranchini, including her jailing, as no attorney would make such comments in any record, let alone a public record, based upon such little information and that from a complainant with no medical training. This gives rise to claims against both LPeck for libel and slander hereinbelow and against ADA Fritz for several different claims, including but not limited to libel and slander hereinbelow.

[22]   Caranchini suffered the loss of her father in August of 2002, her mother in January of 2003, her husband in August of 2003; she had $25,000 taken from her by her then attorney in 2004; her husband's illness wiped out their investments in a Florida "elder" business, her family jewelry was taken from her in 2005 by a 'friend', she lost $4million in an investment in 2006 by a business partner who took the money to the Caymans; her fiancé also died in 2006; she suffered numerous illnesses for years thereafter and many other issues thereafter leaving her essentially broke and struggling when she met RPeck.

medications prescribed by the prior psychiatrist completely over a year and a half ago. However, neither psychiatrist ever indicated that Caranchini had any "psychiatric issue" as referenced by LPeck or required "psychiatric medication" to deal with any "mental problem".

126. Caranchini then obtained from DB the paperwork on her incarceration and she learned that ADA Fritz who had prepared the charge, never contacted Caranchini or Caranchini's attorney regarding the facts or what had occurred which was completely different than what the Pecks had said—or actually LPeck had said. Caranchini reviewed the tapes that DB gave her which totally misrepresented the relationship that she and RPeck had had and which also totally misrepresented the facts giving rise to the charge; yet, ADAs Fritz and McElhinney continued to disregard those facts and solely relied on the facts put forth by the Pecks. Such conduct is not only grossly negligent, but amounts to a gross violation of a lawyer's ethics in Caranchini's opinion AND IS ANOTHER CHARGE THAT CARANCHINI WILL SEEK TO BRING AGAINST ADA FRITZ WITH THE KANSAS BAR ASSOCIATION.

127. Judge Phelan as well as Judge Vokin had been, and were, incredibly rude and plain out "sexist" and Caranchini has never been subjected to such overtly sexist conduct in her 40 years in courtrooms since 1978. Caranchini has appeared before dozens of state and Federal Magistrate/trial and appellate judges in Missouri and Kansas, in Federal District Courts in Missouri and Kansas, in Kansas and Missouri State Appellate ( including Supreme Courts) , in the Eighth, Ninth and Tenth Circuit Federal Courts of Appeal and written briefs in the United States Supreme Court. Caranchini has also appeared in

State "Magistrate" Courts in Missouri and Kansas and Federal Agency Courts for the EEOC and MSPB for the last 18 years and never has she ever seen such rude conduct directed at women, including herself, as that engaged in by these Judges. Caranchini has never felt the "need to" raise such misogynistic conduct but truly in this day and age it was quite "distressing" to Caranchini in these Judges' courtrooms.

128. When Caranchini informed Judge Phelan she was going to represent herself, he raised "whether she had sufficient background" and was "competent" (his choice of words—which is insulting given Caranchini's 40 years of practice and the decisions she has had in her clients' favor) to do so. Caranchini immediately outlined her experience set forth above including her current work on whistleblowing and EEO work in Federal Administrative Agencies.

129. However, Judge Phelan continued to question Caranchini's ability to represent herself which is incredibly insulting. Caranchini wonders whether His Honor ever raises with any male attorney whether he is qualified to represent his client in Court; Caranchini is extremely doubtful of that, even if the attorney is extremely young and never appeared in court.

130. The Court set the matter over for pretrial on a later date and for trial as well. Caranchini thereafter filed approximately ten various pretrial motions regarding the upcoming trial.

131. Caranchini informed ADA McElhinney repeatedly that RPeck was not complaining, that LPeck was "making" him complain; and that it was not reasonable to believe that RPeck would file a charge against Caranchini for December 24, 2016 the day he

broke off the relationship with Caranchini because of the diamond earrings he had given Caranchini and because he had told Caranchini how much he loved her; yet McElhinney persisted in pursuing the claim against Caranchini and did not investigate any facts raised by Caranchini even though she came twice to his office to speak to him in person.

132. It was only after months and months involved in the case did ADA McElvinney realize on the eve of actually trying the case that he had a problem with trying the case based upon the claim it was based upon--events between December 24 and December 29, 2016. Only then did he seek to amend and add claims against Caranchini through January 18; and, this was not based upon an additional complaint by either of the Pecks, but only upon HIS review of the documents provided by LPeck. After almost nine months, this "motion" was not going to get past the "giggle test". This may have been another reason, or THE reason that ADA McElhinney decided to drop the case against Caranchini; or, he may have finally realized that ADA Fritz had colluded with LPeck.

133. But when Caranchini appeared at the pretrial, the Judge would not hear the motions Caranchini had filed (approximately 12) or the ADA had filed, at all, and only said that Caranchini was "incompetent". When Caranchini asked what was the Court's basis for such statement, His Honor abandoned that contention IMMEDIATELY (interesting) and demanded Caranchini give him another reason to essentially remove herself from being pro se—. (Something that Caranchini had never heard of a Judge doing). He then asked her what her income was. Caranchini then started to say her house was "in

foreclosure_____" and His Honor cut Caranchini off not letting her explain that it had been for eight years because of complex legal issues.

134. Cararanchini was sure this Judge who treated her with total distain would incarcerate her if she would not agree; she signed the paperwork and noted under her name that she did not agree with the Judge's actions, but the Judge appointed counsel who was ADA McElhinney's wife's partner! Caranchini waived the conflict but the mere appointment of such an attorney was absolutely astounding to the undersigned but consistent with the actions of this Judge and his misogynist conduct not only to the undersigned but to all the women that the undersigned witnessed him addressing in His courtroom.

135. Subsequently, after this lawyer's appointment (her name is not necessary), ADA McElhinney decided not to pursue the case. He moved to dismiss the case in its entirety, claiming he was "too busy"—some 10 months after it was started, at a cost of $15,000.00 in legal fees to Caranchini and a year of Caranchini's life! The bond was returned, the case was expunged. And, all ADA McElhinney could say was "it was taking too much time!" Caranchini has never heard such a statement from any lawyer. Also, to move to dismiss the case, and expunge it, without a motion by Caranchini's attorney was nothing less than "astounding". Something had convinced ADA McElhinney that the case must be dismissed before discovery was produced and trial had. The bond was returned, the case expunged, and the case dismissed with prejudice.

136. Caranchini was left with almost a year of her life in total shambles; out $15,000 in legal fees and no explanation from Johnson County for its actions that resulted in her life

being turned upside down for one year over a man she deeply loved and still loves and who she believes and knows in her heart loves her. Caranchini still "looks over her shoulder while driving" to see whether LPeck is following her or some Kansas Police Officer is following her. Her phone is still barred from contacting RPeck. And Caranchini has no answers—yet.

**xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx**

**xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx**

**xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx**

**xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx**

**xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx**

**xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx**

**xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx**

**xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx**

**xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx**

**SUMMARY STATEMENT OF LAWSUIT BY GWEN G. CARANCHINI**

**CLAIMS AGAINST PECKS, ADAS, JUDGES, JAIL, CORIZON, JUDGES**

**INDIVIDUALLY AND JOINTLY**

I have spent a great deal of time thinking about this revised lawsuit. One thing I clearly resolved in my mind was that ADA Fritz colluded with LPeck to arrange for me to be arrested in the courtroom, jailed and as they say "lost in the system". How she made that contact I am still sorting through as I have multiple theories.

My second issue is with Rick. I knew Rick for nine plus years. Among the things that Rick used to say to me was "even his mother didn't understand him". I get that after these events. What I do know is that the man who gave me diamond earrings in my car Christmas Eve as he cried and said "You will never know how much I love you"—was not faking it. I also know that he was truly "afraid" of what Lola could do to me, and to him, if he did not leave me to protect me from her and her "friends" and that was the reason he left and stays with her. I have been a lawyer forty years and I go with both my gut and my legal knowledge both of which have served me quite well in those 40 years. My win/loss is 75/25. So, at this point in the litigation, I am not suing Rick except in one claim and even that is "iffy". I will take his deposition at the commencement of this case and determine whether he should be sued at all. People who do bad things should get sued.

I did not owe anyone, including the Court, these explanations, but the lawsuit is long and complicated. It's who I am and what I have done most of my life and what caused me in my opinion to lose my license—I stepped on some important toes. I also feel very strongly that these so called civil servants need to be brought to task. They no doubt engage in this conduct frequently, but few if any of their victims have the money or legal background I do to go after them even if they recognize "they have been had". I'm almost 70, I have 40 years experience mostly in federal courts and I have learned to be patient. I hope I can make change for them as well as for me. I'm a "child of the 60's and early 70's" and still believe in change for the better.

The statute under which I was charged was very vague and probably is still on the books. It allows the DA and ADAs to file charges which should not be filed and spend inordinate amounts of time AND money going after citizens and creating criminal records for ridiculous claims while more serious issues remain out in the system. That ten months was spent on this claim and multiple ADA's were involved as well as lawyers is incredulous to me. No one did any basic legal investigation. If I had filed a claim on these facts in federal court, the book would have been "rightly" thrown at me. What a waste of judicial/ADA/lawyer/personal time. It took one year of my life; it has caused both me and my family huge emotional distress and is ongoing and I saw and see 12 additional doctors for hip pain and psychological distress. (Thank god I have good insurance and wonderful family support). RPeck is clearly in need of some help and hopefully if I get any money I can arrange for it. They say the system is "broken". This is a perfect example of the "broken system". Perhaps I can "win" and get some change for others.

But this is why I am here in three short paragraphs and some 150 plus pages of "legalese".

## COUNT I

**Comes now Caranchini** and for her first claim against LPeck, and RPeck JOINTLY and against LPeck individually[23] alleges and states as follows:

137. Caranchini incorporates by reference Paragraphs 1 through 135 above.

138. Caranchini states this claim is based upon diversity of citizenship between her and LPeck and/or RPeck under the common law of Kansas/Missouri.

139. Caranchini references the Order of Judge Trigg incorporated into the transcript of the hearing on the Temporary Restraining Order brought by the Pecks, and tried before Judge Trigg, and which binds both the Pecks by inference as LPeck never withdrew prior to the hearing even though she did not appear and she had filed the TRO with RPeck signing the paperwork with him.

---

[23] During the first lawsuit Linus Baker represented both the Pecks. Caranchini since the dismissal of that lawsuit has written LBaker and provided a copy of that letter to RPeck with the proposed facts of this lawsuit without LBaker or LPeck's knowledge as LBaker refused despite numerous emails to him to advise Caranchini whether he was going to represent both the Pecks again in the new lawsuit. Caranchini has written LBaker several times that there is a definite conflict among and between any attorney representing BOTH Pecks in this second lawsuit. In the undersigned's opinion, LBaker should not have represented both Pecks in the first lawsuit and because he was probably paid by LPeck he did not choose to recognize that "conflict". This first Count is the only Count in which RPeck is sued but that still does not lessen the need for RPeck to have a separate attorney, if anything, it increases the need. LBaker will no doubt scream that I don't have the right to contact his client. However, I have asked him whether he represents the Pecks or either one of them and he has never replied. However, given that he has not indicated to me that he does in fact represent both the Pecks or LPeck or RPeck in this litigation, I do believe I have the right to contact RPeck. I might add I have repeatedly asked whether he represented the Pecks in this litigation and he never replied. I will save everyone some time and tell the Court RPeck has not replied. However, there are several more counts and it will become clear there are conflicts "galore" between the Pecks and even though RPeck is not named currently, he may be named after his deposition is taken or, at the least he may be a witness against LPeck in this lawsuit and certainly against several other defendants. Therefore, it is imperative that he have separate counsel even if appointed.

140. Caranchini alleges the TRO was intentionally false in its entirety, and that both the Pecks knew such allegations were false, but that LPeck made RPeck sign such charges and file said charge against Caranchini with her and RPeck signed said TRO in the belief that unless he did LPeck would harm Caranchini as she had indicated such to him; RPeck knew that Caranchini had not harassed either of the Pecks at any time, but particularly during this time period as he had just given her diamond earrings on December 24, the day he was going to move in with her, and broken up with her after a nine year relationship, consistent with the "orders" of LPeck, and she was not engaged in any type of harassment of him or LPeck neither one of whom she had ever harassed during the entire nine years of RPeck and her relationship.

141. Additionally, although LPeck filed said claim jointly with RPeck, LPeck had no grounds to make such claim, as the telephone calls were made solely to RPeck's telephone at all times and absolutely none of the calls were made to any telephone owned by LPeck for the simple reason that Caranchini never had LPeck's telephone number at any time during the entire time of RPeck and her relationship and LPeck knew that Caranchini had never harassed her at any time.

142. Also, if LPeck claimed at a point in time that she had "accessed" RPeck's telephone, it was done without the foreknowledge of Caranchini, as RPeck never informed Caranchini at any time that LPeck could access his telephone or telephone messages and LPeck's access of RPeck's telephone messages was therefore done intentionally

after they had occurred and intentionally invaded the privacy Caranchini expected of her calls with RPeck and without Caranchini's knowledge at any time.

143. RPeck, in order to protect Caranchini from harm that LPeck was threatening, signed the Temporary Restraining Order with LPeck;

144. Caranchini was served at her home in Kansas City, Missouri by a Kansas process server with the Temporary Restraining Order hearing notice;

145. Caranchini knew when she read the paperwork she was served with, that both LPeck and RPeck were lying in the TRO filing, and she knew that RPeck knew Caranchini would know that both the Pecks were lying in the TRO filing; however, LPeck had clearly required that RPeck sign the TRO paperwork, in addition to herself, and also required that he make false statements about Caranchini allegedly harassing RPeck as well as LPeck, which of course, RPeck knew Caranchini had never done.

146. That thereafter, Caranchini appeared in the Johnson County Courthouse for the hearing on the TRO as well as RPeck and LPeck, but the matter was set over to February 9, 2017 as Judge Trigg was unavailable for hearing;

147. That on February 9, 2017 Caranchini appeared in Court for the hearing; RPeck appeared in Court with Heath Stuart, an attorney that LPeck or ADA Fritz had arranged to appear with RPeck, but LPeck did not appear;

148. That LPeck had made it clear to RPeck prior to the TRO hearing that he had to testify againt Caranchini at the hearing or she would take steps to harm Caranchini; this is the only reason that RPeck would have signed this TRO and would appear and testify

against Caranchini in Caranchini's opinion given that on December 24, 2017 he had professed his love for Caranchini—"crying as he did so" and telling her he had to leave-- and given her diamond earrings and told her "he could not explain why" he was leaving and Caranchini would never know how much he loved her and always would love her.

149. That RPeck in order to prevent Caranchini from being harmed by LPeck went to the TRO hearing and testified as he was "directed" to do by HStuart and/or LPeck and/or ADA Fritz had arranged for RPeck to do against Caranchini even though he knew he was lying during that hearing; HStuart throughout the hearing passed notes to RPeck with answers on them to questions Judge Trigg posed to RPeck and both the Court and Caranchini observed this conduct by H Stuart; Caranchini objected, but the Court stated on the record that "She had observed this conduct by Mr. Stuart";

150. That RPeck knew that if he did not lie as LPeck requested him to do she might in fact harm Caranchini; that consequently his testimony against Caranchini was not "voluntary", consistent with his not having voluntarily filed the TRO as he had been directed to do by LPeck, on his part but was coerced by LPeck;

151. That the Court at the end of the hearing found that RPeck had lied multiple times during the hearing and found against him on the TRO.

152. That even though LPeck was not present, because she had filed the TRO with RPeck, and not in any way dismissed her claims either prior to the hearing or at the hearing through the attorney, nor did she file any motion contesting the decision, she too is

guilty of the finding by Judge Trigg as she was the one who made RPeck file the TRO and --testify as he did in fact do.

153. Caranchini believes that RPeck, as well as LPeck, should be held liable to Caranchini for the filing of the false TRO claim, the requirement that RPeck testify as he did in fact do, and also for the emotional distress Caranchini suffered as a result of that filing and being questioned by RPeck's attorney; and request that the TRO be expunged in its entirety from the Johnson County records and all costs associated with it that Caranchini incurred be paid to Caranchini as well as such sums as will compensate Caranchini for the emotional distress she suffered for going through such hearing and also for damages seeing RPeck being forced to pursue such claim against her by LPeck. Caranchini believes that expungement is necessary as this claim has been on file over a year and has besmirched Caranchini's reputation, even though Caranchini won the TRO, by its mere filing and Caranchini should be compensated for such as it remains on file and has also besmirched RPeck's reputation when at no time did he wish to make these statements but was in fact forced to make these statements by LPeck, HStuart and ADA Fritz. That the intentional nature of this filing to cause Caranchini pain and suffering should also be compensated.

154. Alternatively, Caranchini pleads, LPeck and RPeck jointly filed the TRO , and if, AND ONLY IF, it can be shown that RPeck VOLUNTARILY filed such TRO, rather than being forced to file it by LPeck WITHOUT COERION , that he also be held accountable for the filing of such claim and any damages that Caranchini sustained or will in the

future sustain as a result of the filing of such claim, he shall be jointly held liable for with LPeck.

155. That the actions set forth in the TRO were intentional against Caranchini by LPeck, and in such case she is liable to Caranchini for actual as well as punitive or exemplary damages; and, if AND ONLY IF, it can be shown that RPeck intentionally filed this claim against Caranchini and pursued it against Caranchini does Caranchini seek punitive damages and exemplary damages against RPeck as well. Whoever did this act intentionally imposed great emotional distress upon Caranchini, and Caranchini did suffer and continues to suffer emotional distress from the trial of this TRO, whether it was pursued by RPeck individually, or LPeck forced RPeck to pursue such claim and LPeck is therefore solely responsible or RPeck and LPeck jointly pursued this claim voluntarily together and Caranchini pursues them jointly for their actions.

156. Caranchini therefore seeks actual damages in an amount in excess of $100,000 from each defendant liable to Caranchini, and punitive damages in a sum in excess of $250,000 or more from each defendant who engaged in such act intentionally and for her costs herein incurred and expended.

**WHEREFORE**, Caranchini requests a jury of her peers determine

First, determine whether RPeck willingly pursued this claim or was forced to do so by LPeck;

Second, if RPeck was forced to pursue this claim by LPeck, then Caranchini asks this jury to not find any damages against him and find all damages solely against LPeck; and

Third, if LPeck forced RPeck to pursue this claim then all damages should be found against her;

However, if both RPeck and LPeck pursued this claim jointly, then find damages against each of them in a sum in excess of $100,000 actual damages and $250,000 punitive damages and for her costs herein incurred and expended.

For Injunctive relief as set forth hereinafter and as entered by the Court and for her costs herein incurred and expended.

**COUNT II**

Caranchini for Count II of her claims against LPeck for libel and slander alleges and states as follows:

157. Caranchini incorporates by reference as if fully set forth herein Paragraphs 1 through 155.

158. LPeck intentionally made false statements in the paperwork supporting the filing of both the Temporary Restraining Order (TRO) and the filing of the paperwork supporting the Municipal Charge. Those written false statements were then made orally to the ADAs Fritz and McElhinney. Those false statements constitute both libel and slander against Caranchini as the statements were, and are, false. LPeck knew they were false. She signed them and required RPeck sign them, and if

necessary, make them orally to ADA Fritz and McElhinney; and, if he would not, she threatened to harm both Caranchini and RPeck.

159. That additionally, LPeck made false statement(s) about Caranchini to the Police who interviewed her (and RPeck) on multiple occasions; and, required RPeck make false statements to the police to support the filing of the Municipal charge; and, she also required RPeck to make "random" false statements about Caranchini whether or not necessary for the filing of the Municipal Charge. Although RPeck made comments against Caranchini to the Police, he did so again, only to protect Caranchini from LPeck who was threatening to harm her if he did not support her (LPeck) at all times.

160. That all of the statements by LPeck when made were knowingly made and known to be false to hurt Caranchini and cause her harm individually, as well as hurt her relationship with RPeck, and Caranchini's business as an "attorney" for government employees in administrative forums of the MSPB and the EEOC if judgment was entered against her, and Caranchini believes that RPeck believed at the time he had "no choice" but to "go along" with LPeck in making these statements against Caranchini to protect Caranchini from LPeck's threats of physical harm against Caranchini that she continually made to him and that making such statements were the "lesser of two evils".

161. Caranchini when she initially saw the statements made by RPeck could not believe he would say such things about her; but, she came to realize that RPeck believed that "saying such things about Caranchini" was the lesser of two problems: if he did not say these things, LPeck would harm Caranchini and RPeck hoped that Caranchini

would remember how he had told her Christmas Eve how much he loved her and always would love her.

162. That Caranchini is also concerned for RPeck and what LPeck's demands upon him are causing him emotionally to suffer given the emotions he expressed to Caranchini the day he left her and Caranchini's knowledge of how much LPeck can hurt RPeck based upon RPeck's statements to Caranchini about LPeck over the years;

163. In addition, Caranchini has had to deal with RPeck "going along" with LPeck to protect Caranchini and how very difficult this is not only for her, but for RPeck. Consequently, as a direct and proximate result of said actions, statements and filings Caranchini has been caused to suffer emotionally and physically, she worries how her distress will affect RPeck as well as her relations with her family and friends as she has been greatly depressed, it has caused her to incur additional pain and suffering, caused her to incur expense to defend the charges brought against her, all to her damage as follows:

- She has suffered emotionally from dealing with RPeck not being with her as they had planned after December 22;
- She suffered from the statements made emotionally and knew she would suffer for some time and has already suffered for over a year;
- She has had to deal with the fact that RPeck had made statements contrary to everything he had said and done for nine years and especially in the last weeks leading up to December 24 when they had talked about their future together;

- She incurred the emotional distress of dealing with litigation the more so because as a litigation attorney for some forty years she knows what litigation could cause if not properly resolved as she has seen it in her own clients over the years and currently sees it in one of her clients she has represented for over five years;

- She suffered the daily loss of a very dear friend in RPeck who she confided in and who confided in her daily and that loss was and continues to be very difficult;

- She has had to deal with a severe loss of someone who has loved her for nine years and expected to spend the rest of his life with her and who she loved as much as her husband of 34 years;

- She has worried about the affect of LPeck's demands upon RPeck and whether under such demands he can still love her;

- She has had to deal with her family and friends who have tried to help her through the most difficult period of her life since the death of her husband in 2003;

- She has had to deal with financial burdens occasioned by the costs associated with the Municipal charge;

164. That the actions of LPeck were, are and will continue to be" intentional" entitling Caranchini to actual and punitive damages now and for the foreseeable future in a sum at least in excess of $75,000 for actual damages and in excess of $100,000 for punitive damages and for her costs involved and the injunctive relief sought below.

WHEREFORE, Caranchini seeks the decision of this Court and a jury in her favor and against LPeck and for actual and punitive damages in her favor and for her costs herein incurred and expended and for injunctive relief set forth hereinbelow.

**COUNT III**

Caranchini for Count III of her claims against LPeck for harassment and threat of bodily harm alleges and states as follows:

165. Caranchini incorporates by reference as if fully set forth herein paragraphs 1 through 163.

166. As noted in the "fact section incorporated above", LPeck was "physically" threatening Caranchini: RPeck stated to Caranchini at the time of the filing of the divorce he was removing the guns from the house; after the divorce was finalized he again made a statement to Caranchini he was concerned about Caranchini's "physical safety"; and after the first of the year (2017) he stated he would only meet with Caranchini "if she agreed in writing not to sue LPeck" before he met with her with obvious reference to his previous statements that LPeck might physically harm her. Obviously, her threats were real and numerous and RPeck was very concerned for Caranchini's safety and believed he needed to "stay with LPeck" to prevent "serious" harm to Caranchini by LPeck. That RPeck would make such statements to Caranchini reinforces to Caranchini that such threats were not only "real", but very serious as RPeck did not exaggerate.

167. Caranchini considers such statements by RPeck regarding LPeck's threats to Caranchini very "real" and believes she is threatened on a daily basis by LPeck whether or not RPeck is with her and watches carefully where she drives and parks.

168. Caranchini believes that LPeck by threatening Caranchini to RPeck is attempting to make RPeck remain with her (for whatever reason as Caranchini knows from discussions with RPeck that he does not love her and LPeck does not love him) and that she knows by threatening Caranchini RPeck will remain with her; LPeck is angry that Caranchini allegedly "took" RPeck from her and does not acknowledge that it was her actions and inactions that was the cause for RPeck being with Caranchini as well as Caranchini's expression of love for RPeck which LPeck had never expressed..

169. Also, as noted above in the fact section, LPeck engaged in conduct such as: following Caranchini on the highway; going up and down Caranchini's street; following Caranchini to her doctor's office and placing a condom by her car and even going to her church parking lot and placing a condom by her car; she is believed to be the cause for setting off the house alarm multiple times and also leaving beer bottles in Caranchini's back yard after the bond was in place and letting the air out of her tires on one occasion all of which required cameras put on Caranchini's house in addition to the alarm system Caranchini already had on the house and within days of the filing of this document causing the lights to go off on Caranchini's garage preventing protection to Caranchini's car and which required Caranchini to retain an electrician to fix.

170. That Caranchini, keeping in mind that RPeck was very concerned that LPeck might physically harm Caranchini, suffered daily from fear that LPeck may in fact attempt to breach her alarm. As noted in the prior lawsuit in a footnote, in July of 2017 the ADT alarm went off multiple times which were unexplained. RPeck would not tell Caranchini exactly why he was so concerned but he was very concerned LPeck would physically harm Caranchini and Caranchini has been very careful since this entire incident started, to arm her alarm at all times, even when home or when seeing her neighbor across the street.

171. These actions caused Caranchini to be put in fear and have installed a $2,000 ADT camera system and to be extremely careful where and when she drove anywhere; to always arm her alarm system and watch the lighting in her house. Caranchini in her past law career has been subjected to being shot at and followed in the 80's and 90's in cases she had but this was so much more "personal" and also frightening and contributed to the emotional distress that Caranchini has and continues to suffer despite being a very strong person who has been through quite a bit in her career and life.

172. Caranchini does have occasion to travel south on I-35 and/or to South Overland Park and always wonders whether she will see LPeck on the highway. Likewise, as Caranchini worked on the drafting of this Complaint in her dining room, she looks out her window and remembers LPeck driving up and down her street dozens of times on multiple days in January and February of 2017 and whether she will resume such conduct with this filing.

173. LPeck also sent multiple emails to Caranchini over RPeck's name after December 24 which sought to change information she had obtained by reviewing emails sent to RPeck by Caranchini or by RPeck to Caranchini over numerous months in 2016. These emails sought to entirely change the relationship between RPeck and Caranchini into a sexual relationship with no relationship of any other kind including friendship and "love". They were also sent to Caranchini late at night which RPeck never did at any time.

174. Caranchini brought one of these emails to the courtroom on the first hearing date for the TRO to give to RPeck and handed it to him in an envelope; Caranchini watched as RPeck opened the envelope and read it and nudged LPeck and pointed to the letter and LPeck just "shrugged". RPeck would not look at Caranchini at all after that letter was given to him.

175. That as a direct and proximate result of these actions Caranchini has had to seek additional medical care as it has increased her tension and migraines, given her more tension and increased her back pain, caused her extreme emotional distress and caused this matter to be ongoing for months and months without any end in sight. The emails caused Caranchini terrible emotional distress which was clearly the intent and that someone in her 60's would engage in such conduct is not only childish, but makes one truly wonder about her mental stability, especially given the rest of her conduct towards the undersigned. Caranchini wishes to express in this document that she is concerned for RPeck and knows that he stays with LPeck to protect Caranchini from her but wants RPeck to know that she misses him and their

daily talks more each day and she will do everything in her power in the courts to bring LPeck to justice.  Caranchini because of her representation of hundreds of individuals in 40 years understands even more the pain that clients can feel when they are persecuted by others in their workplaces.

176.  That also as a direct and proximate result of LPeck's actions she has made Caranchini question whether she can ever again have a  relationship with RPeck even though Caranchini still loves him a great deal and thinks of him each day and what their life would have been like had it not been "rudely interrupted" by LPeck; Caranchini would like to believe they can resume their loving relationship and trust in one another as Caranchini had hoped to share the next 15 years of her life with RPeck and now questions whether that will be possible or whether RPeck still desires that and shares his dream to help others that they had discussed; hopefully RPeck will find the strength to leave LPeck and move on with his life away from this destructive woman who has no love for him and merely uses him for her own purposes.

177.   There is no compensation for a lost relationship; money cannot compensate for a lost love but a verdict in Caranchini's behalf and money for her pain and suffering from LPeck can help.  Also injunctive relief that would mandate that LPeck receive mental evaluation and counseling  as well as be required to remain a substantial distance away from both Caranchini and RPeck is necessary.   Likewise, if ever there was a case for "punitive damages" this is it.

178. That Caranchini seeks actual damages in an amount in excess of $75,000 and punitive damages in an amount in excess of $100,000. For the the actions of LPeck which are both actual and intentional.

WHEREFORE, Caranchini seeks the decision of this Court and a jury in her favor and against LPeck and for actual and punitive damages in her favor and for her costs herein incurred and expended and for injunctive relief as set forth hereinbelow.

**COUNT IV**

**Comes now Caranchini**, and for Count IV against LPeck and ADA Fritz, jointly and severally, for conspiracy to incarcerate Caranchini alleges and states as follows:

179. Caranchini incorporates Paragraphs 1 to 177 hereinabove.

180. Caranchini states that LPeck coerced RPeck to join with her to file both the TRO and the Municipal Charge against Caranchini in the Johnson County District Attorneys' office.

181. That Caranchini believes that at the time that LPeck went to the District Attorney's office with RPeck she had already determined (or been informed) that ADA Fritz would assist her in pursuing Caranchini and had contacted ADA Fritz by telephone or in person regarding what he could do to help her. She could have also possibly met with HStuart on this matter with or without ADA Fritz.

182. ADA Fritz had told LPeck he could arrange to have Caranchini to not be given the opportunity to post bail on the Municipal charge and as a result she would be handcuffed in open court at the end of the TRO hearing in RPeck's presence and then brought to jail and incarcerated for an indeterminate period without being able to bail out. LPeck was very pleased with this scenario and agreed to "confidentially retain the services of ADA Fritz" for an "indeterminate amount of money to accomplish what they had discussed".[24] They both agreed to tell RPeck as little as possible about what would happen after the TRO hearing and Municipal charge were signed and filed. ADA Fritz told LPeck to say very little to RPeck about the matter.

183. It is unknown whether ADA Fritz or LBaker arranged for HStuart to represent the Pecks, but Caranchini believes with the passage of time that ADA Fritz put LPeck in touch with HStuart as he knew that HStuart would "go along" with the plan for Caranchini and RPeck. However, all the "arrangements" had been "made" before the Pecks went to the District Attorney's Office to file the TRO and Municipal Charge Caranchini believes, and everyone agreed to keep RPeck as much "in the dark" as possible.

---

[24] Caranchini after a great deal of analysis of the facts over the last months after dismissal of her case in Missouri Federal Court has determined based upon the facts that LPeck was advised or became aware that ADA Fritz could assist her in having Caranchini "jailed" without service of the Municipal charges and therefore without the opportunity to bond out. Discovery will further elaborate on these facts, but it was clear to Caranchini that LPeck individually could not have arranged to have Caranchini arrested in open court without the assistance of someone, nor could LPeck have arranged for Caranchini to be "harassed" in jail as she was as set forth below; and after a great deal of thought and looking at the facts, it was clear that "someone" was more than likely ADA Fritz.

184. When LPeck and RPeck went to the District Attorney's office in January 2017, they met with ADA Fritz who "penned" the charges against Caranchini for both the TRO AND the Municipal Charge; at this time RPeck wanted to be assured that as far as the Municipal Charge was concerned that Caranchini would **NOT** go to jail; ADA Fritz probably "made light of this" and left RPeck with the belief that was not going to happen even though he and LPeck had already arranged for Caranchini to be handcuffed in open Court at the end of the TRO hearing.

*185.* ***This was clearly an "intentional misstatement" by ADA Fritz at the time it was made and he, LPeck and HStuart all knew that it was wrong; and that Caranchini was going to be arrested in open Court at the conclusion of the TRO hearing.***

*186.* ***This is further substantiated by RPeck's statement in Judge Triggs' Courtroom to HStuart as Caranchini was being handcuffed at the conclusion of the TRO hearing that "I (RPeck) told 'you' (Heath Stuart) I did not want Caranchini to go to jail."***

187. **ADA Fritz had also penned the TRO and had arranged for service on Caranchini at her home of the TRO; but although ADA Fritz could have arranged for service of the Municipal charge at the same time, he did not do so consistent with his agreement with LPeck. This "signaled" to Caranchini (with the passage of time) that ADA Fritz had intentionally not served a subpoena for the Municipal charge so that Caranchini could not post a bond prior to the TRO hearing. That allowed Caranchini to be handcuffed at the conclusion of the TRO hearing without Caranchini having any knowledge of the intended Municipal Charge and hence the opportunity to post bond and avoid being jailed.**

188. ADA Fritz clearly was violating the law by failing to advise, ***or wrongfully advising***, RPeck that Caranchini was not going to jail and if this is the case, his actions should be the subject of a Kansas Bar inquiry as well as this lawsuit. It is difficult to determine how else LPeck could have arranged for RPeck to see Caranchini arrested in the Courtroom at the conclusion of the TRO hearing on the Municipal charge when the Municipal Charge could have been served on Caranchini at the same time as the TRO. This was clearly not "accidental"; and ADA Fritz appears to be the most likely person to have accomplished this and what subsequently occurred in jail given all the facts. It is clear, too, that ADA Fritz intentionally put Caranchini, a 68 year old woman, in jail to be subjected to the "whims" of the Sheriff's "staff"and this was done at the request of LPeck.

189. LPeck did not convey her arrangement with ADA Fritz to RPeck as she knew that RPeck would not agree with this conduct or any conduct that resulted in Caranchini going to jail, or being assaulted or denied her medications as RPeck loved Caranchini; LPeck and ADA Fritz had said little, if anything, about this when ADA Fritz was penning the charge as RPeck clearly did not want Caranchini to go to jail, while LPeck clearly wanted Caranchini to go to jail and RPeck did not understand the consequences of his "signing" the municipal charge penned by ADA Fritz.

190. That RPeck when he saw Caranchini being arrested and handcuffed, said to HStuart, his (TRO) lawyer, in Caranchini's presence "I **told you** I did not want her to go to jail". Such statement, after the passage of time, and with other events, clearly conveyed to Caranchini that RPeck **had** specifically told LPeck and ADA Fritz as well as H Stuart

**beforehand** that "he did not want Caranchini to go to jail". **In point of fact, LPeck, H Stuart,[25] and ADA Fritz all colluded to have Caranchini charged with the Municipal Charge and not served upon her with the TRO and kept RPeck "in the dark" when their intent was at all times, at the request of LPeck, to handcuff Caranchini in the presence of RPeck and take her to jail at the conclusion of the TRO hearing.**

191. LPeck wanted not only to cause Caranchini emotional and physical harm from being arrested, but she wanted to cause RPeck[26] emotional harm watching Caranchini being arrested in his presence, knowing that she had arranged for it, and more importantly, had the "power" to arrange for such jailing—communicating to RPeck that she could, and would, continue to harm Caranchini even after Caranchini was released from jail if he continued to have any "contact" with Caranchini and continue his relationship with her. It also conveyed to RPeck that LPeck would also harm him as well.

192. That as set forth hereinabove and incorporated herein, LPeck clearly with the assistance of ADA Fritz, ensured that Caranchini's time in jail was a "nightmare"; LPeck was hopeful Caranchini knew that if she continued to try to have a

---

[25] HStuart is a "minor player" in this "mess" and there are enough "players" with significant "parts" in this matter that Caranchini believes she does not have to clog the case with such minor players even if they did "collude" with some major players against Caranchini. Caranchini will probably join him with the ADA in the Bar Complaint she intends on filing.

[26] It is hoped with the reading of this Complaint that RPeck will understand what LPeck did in fact do and that she cannot be trusted in any way, nor can the attorney who allegedly represented "his" interests in the first lawsuit—LBaker. The undersigned cannot represent RPeck but RPeck needs to obtain counsel to file a cross claim against LPeck for the emotional distress that LPeck caused him, and a claim against LBaker for the harm he has caused RPeck, including, but not limited to any money he may have charged RPeck. HStuart should also be joined in such lawsuit. Both HStuart and LBaker should have Bar Complaints filed against them as well which Caranchini intends on doing.

relationship with RPeck that LPeck would continue to cause Caranchini "problems" and that LPeck would also begin to cause RPeck problems as well, and RPeck would likewise realize any attempt by him to continue a relationship with Caranchini would cause both of them more problems. LPeck wanted RPeck and Caranchini's relationship stopped and wanted RPeck to only "be" with LPeck to serve LPeck's "needs" whatever those might be, although it is doubtful they included any type of sex, as they had not for most of the last nine years.[27]

193. However, Caranchini continued to oppose the Municipal charge as she knew it was false and it was brought by LPeck. Caranchini did not know whether RPeck willingly agreed to it **initially**. However, with the passage of time and analysis of the situation, she had come to realize that LPeck continued to insist, more than likely, that RPeck persist with LPeck in pursuing the Municipal charge and that RPeck was not voluntarily a part of the Municipal charge against Caranchini.

194. That LPeck also in conversations with ADA Fritz wanted to ensure that Caranchini when she was jailed would "suffer" in jail and ADA Fritz told LPeck that he would make sure that Caranchini would in fact "suffer" in jail and would not be able to immediately bail out and those in jail would cause her "harm".

195. That LPeck with that assurance from ADA Fritz "turned the matter over to ADA Fritz" to make sure that Caranchini was further "punished" for her relationship with RPeck

---

[27] Until LPeck is brought to "justice", RPeck will not be able to pursue any personal relationship with Caranchini or any other woman for that matter as LPeck is "vindictive" and wants RPeck "around" to take care of her and her "property". RPeck has got to understand that she wishes to control him as much as she wants to hurt Caranchini or any other woman who "dares" to attempt a relationship with him.

and that RPeck was also "punished" for having a relationship with Caranchini knowing what Caranchini was being subjected to in the Jail because of his relationship with her ***and LPeck's ability to cause Caranchini "pain***".

196. As a result of LPeck's false statements and insistence that RPeck pursue the matter which he did do, which LPeck knew he would do because of her (LPeck's) threats that she would harm Caranchini if he would not join with her in the filings, and with the assistance of ADA Fritz, Caranchini suffered as follows and will suffer for the foreseeable future as follows:

--She was not served with a subpoena for the Municipal charge which would have allowed Caranchini to appear in Court, become fully aware of the charges against her, post a "reasonable bond", and pursue the Municipal charge thereafter rather than being denied all opportunity to be aware of the charge and be able to post a reasonable bond for that charge;

--She could have avoided being handcuffed in open court and brought to jail and and never being given the opportunity to make a "plea" to the charges;

--She would have had the opportunity to have a criminal attorney appear with her rather than being denied any opportunity to have an attorney appear with her on the matter;

---She was denied necessary medications (six rounds including seven insulin shots) over 36 hours while in jail because she was unnecessarily jailed;

--She was denied any food she could consume because of dietary restrictions;

--She was even denied liquid she could drink and in the last ten hours was denied even any water except for a sip provided by the "psychologist/social worker" who came to the jail door";

--She was subjected to repeated taunts by jail personnel both male and female throughout her entire time in jail;

--She was leered at through the window of her second cell and the window was licked by one or two male sheriffs as they humped the door;

--She was screamed at when she stuck toilet paper on the window by the sheriffs who licked the window who then threatened her;

--She then was sexually assaulted when they stormed into the cell jammed her into a corner of the cell and humped her sexually;

--She was dragged out of her cell as her toes bled on the floor and put in another cell that had no toilet or water and her toes continued to bleed and she was given no medical care;

--She was denied water for 10 to 12 hours which given the drugs she was on, even though she had not been given them for a long period, made her extremely thirsty;

--She was subjected to intense lighting which increases the intensity of her migraines;

--As a result of being denied her medications, water, food she could eat, when she was finally released she had severe medical problems;

--She had to go to her doctor's intensive care unit upon being released to deal with her symptoms;

--She had multiple medical issues for the next year plus with her back and headaches requiring the care of over nine specialists in addition to a psychologist who supplemented her psychiatrist;

--She had migraine issues over the next three to four months requiring; additional medications and the migraines made it impossible to do any work for months for part of each day until she received her migraine shot in May;

--She had to take on meds for her depression which she has never suffered and never taken medication for;

--She had to take on seeing other doctors because of medical problems and needed changes in meds she is already taking;

--She has had to reduce the time spent working on a case for a "whistleblowing" government client and the filing of a claim for him until she was better able to work with his fact situation and did not file the claim until two days short of the statute of limitations running which she has never done at any time;

--She had five months in which she struggled to do work on her law cases;

--She has had to deal with a severe loss of someone she has loved for nine years and expected to spend the rest of her life with and who she loved as much as her husband of 34 years;

--She has had to deal with her family and friends who have tried to help her

through the most difficult period of her life since the death of her husband in

2003;

--She has had to deal with financial burdens occasioned by the costs associated

with the Municipal charge which were in excess of $15,000 from the law firm she

hired and other costs of litigation;

197. That the actions of LPeck and ADA Fritz were intentional at all times and meant to

cause harm to Caranchini as LPeck believed it was Caranchini who had "broken up"

her marriage as she would not accept any responsibility whatsoever that it was her

actions and inactions that had caused the breakup of her marriage and her

unwillingness to reconcile with RPeck who tried through working with their minister

over two years to resolve their issues. And, she was thus intent on breaking up

RPeck's relationship with Caranchini in revenge for his having the relationship with

Caranchini and Caranchini having the relationship with RPeck and LPeck solicited the

help of ADA Fritz to help her cause harm to Caranchini, and also harm to RPeck.

198. That the actions of ADA Fritz were outside the scope of his employment for Johnson

County District Attorney's Office and he intentionally colluded with LPeck to cause

harm to Caranchini, and RPeck, as necessary and to subject Caranchini to "harm" by

the Jail "staff" as set forth hereinbelow in additional "counts".

199. That therefore, these intentional acts subject LPeck to actual damages in excess of

$75,000 as well as punitive damages in excess of $100,000 now and for the

foreseeable future in an amount to be determined by a jury of Caranchini's peers

and to such "Injunctive Relief" as the Court may find appropriate as set forth hereinbelow.

200. Additionally, the actions of ADA Fritz who colluded with LPeck, assuming for some sum of money, were intentional, and totally outside the scope of his employment, as LPeck could not have arranged for the arrest of Caranchini in the courtroom at the conclusion of the TRO hearing, or arrange for the treatment of Caranchini to which she was subjected to in jail unless she had some "contact" or arrangement with someone; that "someone" was obviously ADA Fritz when all the facts are looked at; ADA Fritz also arranged for Caranchini to be put in jail without appearing before a judge to hear what her charges were and the bail that would be set on the charges which she could pay and avoid remaining in jail; rather Caranchini remained in jail for 36 hours without seeing a Judge or a doctor for her medications or getting food she could eat; again, something that LPeck could not arrange herself but which ADA Fritz could arrange and therefore Caranchini seeks actual and punitive damages against ADA Fritz as well in like sums and for injunctive relief as set forth hereinbelow. As a result, ADA Fritz is subject to actual damages from Caranchini in a sum in excess of $75,000 and punitive damages in a sum in excess of $100,000 as at all time the actions set forth in this "Count" were totally outside the scope of his employment for Johnson County and therefore he is "personally liable" and does not have the protection that would be afforded him if his actions were within the scope of his employment for Johnson County; he should be terminated from his employment without any protections whatsoever.

WHEREFORE, Caranchini seeks the decision of this Court and a jury in her favor and against L Peck and ADA Fritz for actual damages in an amount in excess of $75,000 each and punitive damages in an amount in excess of $100,000 each in her favor and such Injunctive Relief as the Court may find appropriate as requested separately hereinbelow and for her costs herein incurred and expended.

**COUNT V**

Caranchini for Count V of her claim against ADA Fritz and LPeck for libel and slander alleges and states as follows:

201. Caranchini incorporates by reference Paragraphs 1 to 200 and specifically the footnote making reference to a filing made by LPeck with ADA Fritz at the time she and RPeck made their Municipal charge against Caranchini.

202. In that document, LPeck claimed Caranchini was in need of a "mental examination"; LPeck has a GED Education with absolutely no training whatsoever in nursing of any kind or any education that would qualify her to make such a statement..

203. ADA Fritz made no investigation of LPeck's basis for such a statement; the least bit of investigation would have revealed that LPeck had had no contact of any kind whatsoever with Caranchini for almost eight years! There is no indication whatsoever that ADA Fritz made any inquiry of RPeck as to whether he believed that Caranchini was in need of a "mental examination" even though he had carried on a

relationship with Caranchini for some nine years and on an almost daily basis for the last three to four months!

204. That LPeck made such a statement, and ADA Fritz let such a statement be made in a public document without any basis whatsoever, which the public could have access to, and did have access to, until it was (hopefully) expunged some ten to eleven months later, is gross negligence on the part of ADA Fritz as well as dereliction of his duties as an Officer of the Court; as for LPeck, it is plain libelous and slanderous and she knew such statement was libelous and slanderous when made, and that such statement would be made public; it was intentional on her part and malicious.

205. Whether this "totally false and baseless statement" contributed in ADA McElhinney's decision to dismiss and expunge this case is not known, but will also be the subject of his deposition as well as to how decisions are made as to what is made a part of "official records".

206. That these actions were clearly intentional by both ADA Fritz and LPeck and are wrongful and should be considered outside the scope of ADA Fritz' regular and acceptable job duties as an ADA for Johnson County; that these actions by LPeck are just another example of her intentional acts against Caranchini of a wrongful and hateful nature that have no basis in fact whatsoever.

207. That as a result of the aforementioned actions, ADA Fritz should be fired from his position immediately; and LPeck should be fined for all the pain and suffering she has caused Caranchini as set forth hereinabove with ADA Fritz including the pain and suffering of her incarceration.

208. That Caranchini seeks actual damages against both LPeck and ADA Fritz in an amount at least equal to $75,,000 each and also to punitive damages against both ADA Fritz and LPeck for their actions in making this statement on a public court document in Johnson County Court records which have no basis in fact whatsoever in an amount equal to $100,000 each, and for such injunctive relief as is deemed appropriate and for her costs herein incurred and expended..

WHEREFORE, Caranchini seeks the decision of this Court and a jury in her favor and against L Peck and ADA Fritz for actual and punitive damages in her favor and such Injunctive Relief as the Court may find appropriate as requested separately hereinbelow and for her costs herein incurred and expended.

**COUNT VI**

Caranchini for her claims against ADA Fritz, ADA McElhinney, Calvin Hayden, the current Sheriff in Johnson County who oversees the Johnson County Jail and the Sheriffs who work in the Johnson County Jail located across the street from the County Courthouse and Corizon, the health care provider for inmates in the jail, alleges and states as follows:

209. Caranchini incorporates by reference paragraphs 1-208 hereinabove and specifically incorporates Counts IV and V as "predicates" to this Count VI as to references regarding ADA Fritz and his interaction with LPeck and his "retention by her" to

intentionally "harm" Caranchini while she was in the Johnson County Jail located across from the County Courthouse, hereinafter referred to as the "Jail";

210. Calvin Hayden, as Sheriff of the Johnson County Jail, hereinafter referred to as "Hayden", has responsibility for oversight of the Sheriffs in the Jail, and also has responsibility for oversight of Corizon, the health care provider for the Johnson County Jail system, which allegedly provides health care for the "inmates" of the Jail which included Caranchini on February 9 and 10, 2017, through a purported "nurse", whose name is unknown at this time, but who came to Caranchini's (second) cell on one or two occasions between the afternoon of February 9, after Caranchini was admitted to the Jail, and the time when Caranchini was "let out" of the Jail on the evening of February 10," purportedly to provide health care services" to Caranchini during this time, but Caranchini, as set forth below, denies same.

211. Caranchini complains and seeks damages of the Jail and the Sheriffs who work therein as the entity believed to be responsible for the "management" of the Jail in Olathe, Kansas; and oversight of the procedures followed by that facility which result in the alleged treatment of those incarcerated in that facility, including, but not limited to, Caranchini. Caranchini specifically denies that at any time during the time she was incarcerated she received "any medical treatment", let alone "acceptable medical treatment", for "any of the medical conditions she was currently diagnosed as suffering from" and which she provided the jail with knowledge of by way of written document" which contained specific diagnoses, names of doctors, drugs prescribed, telephone numbers, fax numbers, for each of the physicians.

212. Caranchini complains, and also seeks, damages of Corizon who provides " alleged medical personnel for the Jail" in Olathe, Kansas, and oversight of inmates needing medical assistance in that facility, including but not limited to the undersigned on February 9 and 10, 2017.

213. The Assistant DA's, both ADA Fritz and ADA McElhinney, hereinafter referred to as "ADA's", should have known that the acts referred to hereinabove and incorporated herein are violations of the United States Constitution and Caranchini's rights; it is difficult for Caranchini to believe that she is the "first" person to be subjected to such conduct, as it was clear to Caranchini that the Jail personnel acted at all times as if their conduct was "standard operating procedure" for them in dealing with "prisoners", such as Caranchini, who did not "cowtow" to them in "their" Jail.

214. Caranchini does not believe that the actions to which she was subjected are an "aberration", but in fact occur on a regular basis; that the reason these acts continue on a regular basis and Caranchini was subjected to them, is that no inmate complains and files suit against the Jail and its Sheriffs and its nursing staff for their failure to "treat" the inmates appropriately under the law; and those who are incarcerated do not understand that the manner in which they are being treated violates their constitutional liberties in multiple ways; or, if they do, do not have the "wherewithal"—including but not limited to money-- to contest the actions to which they have been subjected; or, they do not wish to be subjected to the "legal hassle", so to speak, of contesting the events and reliving them and or it is too difficult to find Johnson County attorneys who will "take on" the wrongful actions of the "jail

personnel, including Corizon" who have mistreated them as they mistreated Caranchini.

215. Caranchini from the time she was incarcerated-- without a hearing and a right to post bond to avoid being "jailed"-- understood her rights were being violated; although she has somewhat limited financial resources to hire an attorney and was using those resources for the defense of her Municipal charge[28]; she does have 40 years of extensive federal court experience and knowledge of the law particularly in constitutional law issues and litigation in federal Court (although not in Kansas); and, she has the stamina to contest what has happened to her, and, more importantly, the "will" to do so. She has in her career had many cases that lasted as much as five, six, seven and even nine years in the federal court systems, and she is fully prepared to do so now. She has taken cases from the lowest level of the federal system to the Supreme Court and is willing to do so again. She has been shot at while in her home; she has had her home broken into by well known defendants; she has had to send her family to live in another state; she has had to have body guards. She will do what is necessary to make change(s) to this Jail, and those that run it, and the sso called "medical staff" and the lawyers who engage in the conduct to which she has

[28] Caranchini has prepared this lawsuit consistent with the numerous lawsuits she filed in the past 40 years. She intends on doing the discovery in this lawsuit as she had a great deal of experience in doing written discovery and well over 3000 depositions in 40 years (including every primary first tier deposition in the Hyatt Regency case) which resulted in the settlement of 90 percent of her cases successfully. However, Caranchini will not produce "herself" for her deposition. She will arrange for counsel to produce her, AFTER Caranchini has taken all the other depositions which will be noticed with the filing of her lawsuit. Also, if the case cannot be settled, Caranchini will arrange for counsel to try the matter. Caranchini will not produce herself until she takes the depositions of both the Pecks, both the ADA's, both the Judges in this case of which notices will be filed with the lawsuit.

been subjected and who have violated her constitutional liberties and no doubt violate others' constitutional liberties on a regular basis. The "injunctive relief" she seeks is meant to seek basic changes in Johnson County so that the liberties of those incarcerated are not violated as hers have been by incarcerating her without her having any knowledge of the reason why, without providing her the opportunity to appear and plea or appear and seek bond to avoid incarceration, or the opportunity to make a telephone call to her attorney or her family; any and all juries will recognize that such conduct was "willful" and will forcefully "punish" Johnson County and those responsible for what happened to the undersigned to "make a point"—it should not have happened and it will not happen again.

216. The Sheriff in charge of this Jail must understand that citizens of this Country do have rights—" are not guilty until proven innocent", which was how Caranchini was treated, although even "guilty prisoners " should not be treated as Caranchini was treated. You do not have the right to jail someone without informing them of the charge(s) against them and their rights in a timely manner before incarcerating them and giving them the opportunity to bail out. Jail personnel do NOT have unlimited discretion as the Jail personnel repeatedly stated they did to Caranchini. This needs to be stopped.

217. Likewise, bail needs to be reasonable. A $4,000 bail for making some 20-30 texts and 12-13 telephone calls is not only unreasonable, but outrageous especially in light of a failure of the DA's office to do any investigation of the facts at all. Just a 15 minute meeting with Caranchini versus a meeting with the Pecks would make one

suspicious of their claims, yet no one took the time to have such an interview with Caranchini that she asked for IMMEDIATELY after getting out of jail the following Monday.

218. The Jail, its Sheriffs and ADA Fritz  should be held liable for the following actions and inactions for violating  Caranchini's constitutional rights as a United States citizen:

   a. ADA Fritz because the Municipal charge was intentionally left  outstanding by him, when it could have been served at the same time as the TRO which was simultaneously filed, and was not ;

   b. ADA Fritz for having Caranchini handcuffed  in open court at the conclusion of the TRO hearing without advising Caranchini of the charge against her or giving Caranchini any opportunity to appear before a Judge and plea and post bond;

   c. ADA Fritz by having  multiple sheriffs come into a Courtroom  AT THE COURTHOUSE at the end of a hearing which Caranchini had just won and handcuff her without explanation whatsoever, and  take her to jail which is (almost) "amusing" for no other reason than that Caranchini was a 68 year old woman who was hardly threatening;

   d.  ADA Fritz gave Caranchini no opportunity to appear before any Judge in the Courthouse to hear the charges against her and plea;

   e. ADA Fritz gave Caranchini no opportunity to post bond on the charges and avoid being handcuffed and brought to the jail by two sheriffs;

f. ADA Fritz incarcerated Caranchini for approximately 36 hours[29] still not informing Caranchini of the charges upon which she was being charged and still not providing her an opportunity to post bond and leave the jail; and instead subjected her to intentional abuse by jail staff, including sexual assault and failure to provide her the medical care she needed even though Caranchini provided the Jail Staff with a list of her doctors, their telephone numbers and fax numbers and the medications they prescribed with the timing of the medications.and incarcerated her without obtaining any information from Caranchini regarding the purported charges;

g. Caranchini after being brought to the jail was strip searched in the presence of men within twenty feet of her in the jail and embarrassed and humiliated again without cause as she had never been informed of the charges against her, or allowed to plea to such charges, and it was not until after her bail was paid by her sister who her neighbor called in Tucson, Arizona and she was about to be

---

[29] It is not exactly known precisely how long Caranchini was incarcerated although it was over 30 hours. It is also not known whether the criminal records that Caranchini's criminal defense attorney has can be utilized in this matter without independent discovery for them in this case. Out of an abundance of caution those items were not given to Caranchini by her criminal defense attorney and will be requested in discovery and as necessary the pleadings in this case will be amended. Caranchini cannot get out of her mind those tapes as they are horrific. Caranchini is interested particularly in the tapes of the visits of the Police with the Pecks, the Police with Caranchini at the Pecks' property, the records of JOCO at the jail and tapes that were made while Caranchini was assaulted in her jail cell and was being strip searched. Caranchini does not recall seeing any tapes of the assault of her in jail or her being photographed when searched even though she remembers cameras. Although Caranchini has received psychiatric and psychological medical care as well as care for her physical problems resulting from her incarceration, her problems remain in a reduced capacity and she continues to have numerous problems physically and continuing problems psychologically over a year after the events in question.

released from the jail some 36 hours after she was jailed and was given some paperwork as she received her clothes with the charge against her that she even became aware of the charge for the very first time;

h. **The Jail Sheriffs subjected her to a horrid experience which denied her food, her medications, subjected her to jail personnel who repeatedly told Caranchini "we have discretion to do whatever we want with you" while she was in jail;**

i. **Although Caranchini's drug regimen, of which the Sheriffs were made aware when Caranchini came to jail, (by Caranchini giving them the paperwork in her purse), should have required that she see a physician, she never saw a registered nurse or a physician and she failed to receive six rounds of medications while she was incarcerated including five rounds of insulin -- causing very high sugar readings and blood pressure readings when she was finally released which then required numerous visits to her doctors after being released; she has had to see nine additional doctors for her hip and add a psychologist and do physical therapy for almost a year; because she was unable to walk more than three blocks formost of a year she has gained over fifteen pounds, and only now is beginning to be able to walk although she has great pain in her back and back spasms almost daily.**

j. **Additionally, Caranchini was subjected to the Sheriffs licking the window of Caranchini's jail cell in a sexual manner and the Sheriffs also humped the door to her cell; Caranchini then "pasted" toilet paper over the window with peanut**

**butter (which she cannot eat) from her lunch bag; the Sheriffs yelled and screamed at her to take it down which Caranchini refused to do; the Sheriffs then entered the cell, ripped the toilet paper off the window and slammed Caranchini in the corner of the cell, yanking her arm behind her and humping her against the wall then acting in a sexual manner against her backside which was absolutely outrageous;**

k. The Jail Sheriffs, two if not three, yanked Caranchini out of her cell and dragged her across the cell floor and put her in a cell without water or food or toilet and the Sheriffs told her to "poop and pee" on the floor; they continued to give her no food she could eat and gave her no medications or care for her feet which were bleeding;

l. **Jail personnel continued to tell Caranchini she needed to do what they said and be a "good girl";**

m. Caranchini was subjected to extremely bright lights in her cell for the entire time she was in the cells intensifying her migraines and all Caranchini could do was crouch on the floor and bend over to try to avoid the bright lights which intensified her migraine headaches for the over 30-36 hours she was in the jail cells; it also caused her to suffer a back pain which subjected her to physical therapy for almost a year and back aches which continue to this time;

n. Caranchini had to sit on the floor in all three jail cells as there was nothing to sit on and the floors were extremely cold in the thin jail pants Caranchini was given to wear; Caranchini shivered the entire time she was in jail and could do nothing

to get warm as she was given only one blanket she believes in the first cell to keep warm and none later;

o. Finally, Caranchini at the instance of a psychologist or social worker who came to her cell door arranged for her to be bailed out of her cell after telling Caranchini the jail personnel thought she was "crazy" because she kept asking for bail and telephone call and medicine as they had never seen anyone do these things;

p. Caranchini informed the elected DA in two separate letters hand delivered to his office the following Monday and Tuesday after she got out of jail what occurred to her but he never contacted her at all regarding the events;

q. ADA McElvinney persisted in pursuing the Municipal charge despite being provided the transcript of the restraining order hearing in which a Judge called RPeck a liar multiple times making it extremely difficult for pursuit of any other charge (in Caranchini's legal opinion on collateral estoppel grounds) and where the charges were identical to those in the Temporary Restraining Order **and RPeck said THERE WERE NO OTHER ISSUES. Likewise, what juror would believe RPeck when a Judge had called him a liar multiple times.**

r. ADA McElhinney refused to withdraw the claims against Caranchini until just a week or so before trial—nine months after Caranchini got out of jail and on the eve of having to respond to Caranchini's discovery requests consisting of twelve motions;

219. Both ADA Fritz and ADA McElhinney tolerated the actions of the Jail personnel towards Caranchini knowing as attorneys that the Jail personnel violated daily the civil rights of prisoners and yet they do nothing whatsoever to cure the situation.

220. The above actions and inactions constitute repeated violations of Caranchini's Constitutional rights as an American citizen and subjected her to needless violations of her rights as well as subjected her to needless physical and mental harm which continued throughout her incarceration and continue to this day as she recalls what happened to her in jail and she tries to recuperate from the physical and mental harm to which she has been subjected.

221. Caranchini has suffered harm and will continue to suffer harm in the future remembering the events associated with this claim; she has also suffered as follows:

- She was not allowed to bond out and suffered the indignities associated with jail time, including at 68 having to "poop and pee" without a toilet on the floor of a jail cell;

- She was denied any water whatsoever for at least the last eight hours of her incarceration which given the drugs she was on made her intensely thirsty;

- She was denied necessary medications (six rounds) over 36 hours which contributed to a week of very bad medical issues including high insulin numbers;

- She was denied any food she could consume because of Type II dietary restrictions which took over a week to rectify;

- She had nightmares of the repeated taunts by jail personnel and their humping her in her jail cell;
- She was subjected to intense lighting which increased the intensity of her migraines and increased the number of her migraines for months requiring additional medications and more frequent application of botox shots;
- She had to go to her doctor's intensive care unit upon being released;
- She had multiple medical issues for the last twelve months and continues to see multiple doctors, and to only recently a physical therapist, psychiatrist and psychologist;
- She had a higher than normal level of migraine issues immediately after getting out of jail for four months requiring additional medications and the migraines made it impossible to do any work for months for part of each day; the usual migraine shot in February of 2017 had almost no effect whatsoever and the next shot was given a bit earlier and with different additional drugs to help with the headaches;
- She had to take on meds for her depression which she has never suffered and had a drug interaction between the initial drug prescribed and her botox shot which had to be corrected because of her high level of drug interactions;
- She had to take on seeing other doctors because of medical problems and needed changes in meds she is already taking;
- She has had to reduce the time spent working on a case for a "whistleblowing" government client and the filing of a claim for him until she

was better able to work with his fact situation and only filed his claim two days short of the statute of limitations;

- She has had to deal with a severe loss of someone she has deeply loved for nine years and expected to spend the rest of her life with and who she loved as much as her husband of 34 years and tries to make sense of what he has done and the statements he made to her the day he left the relationship and what he has done since that day;
- She has had to deal with her family and friends who have tried to help her through the most difficult period of her life since the death of her husband in 2003;
- She has had to deal with financial burdens occasioned by the costs associated with the Municipal charge.

222. Based upon the above, Caranchini seeks actual damages against

**a.** ADA McElhinney who initially pursued the charge against Caranchini after she was released from jail and had to defend the charge, who although he violated Caranchini's rights, did so within the scope of his employment and which had been approved by the DA **and moved to dismiss the claim shortly before trial when he apparently came to believe that ADA Fritz had engaged in some "wrongdoing" as to Caranchini (see below);**

b. **ADA Fritz who at all times acted outside the scope of his employment** to ensure that Caranchini was subjected to conduct by the Jail Staff, including Sheriffs, in accordance with his agreement with LPeck, to harm Caranchini;

apparently at no time did he involve ADA McElhinney who was not aware of his agreement with LPeck until immediately before trial and then it appears that ADA McElhinney dismissed the case against Caranchini as he refused to join with ADA Fritz in pursuing Caranchini for LPeck;

c. The Jail and the Sheriffs which are employed therein; the Sheriff who is in charge of such Sheriffs at no time acted outside the scope of his employment, **but ADA Fritz engaged the Sheriffs themselves in acting outside the scope of their employment, as he knew they would, and daily did, and had them pursue Caranchini, as set forth hereinabove, subjecting her to "taunts" and even assault in a "sexual manner" and never provided her with food or medicines consistent with her diabetes which she had advised them of at the time she was admitted to the jail; and even denied her water at one period of time for almost ten hours and placed her in a jail cell without a toilet or water;**

d. Corizon, the purported health care provider, who had a purported "nurse" come to see Caranchini but never actually had her give Caranchini any of the drugs on Caranchini's medical list which Caranchini made available to her and only proffered one pill and told her "take it or leave it"—which is truly astounding for any alleged medical person to say to a patient; this alleged health care carrier **AT NO TIME ACTED WITHIN THE SCOPE OF ITS AUTHORITY BUT AT ALL TIMES FAILED TO PROVIDE EVEN A MODICUM OF HEALTH CARE TO CARANCHINI AND ITS ACTIONS ARE CLEARLY OUTSIDE THE SCOPE OF AUTHORITY PROVIDED IT**

**AND IT SHOULD BE HELD ACCOUNTABLE FOR ITS ACTIONS INCLUDING THE MEDICAL PROBLEMS SUFFERED BY CARANCHINI OVER THE LAST YEAR;**

223. Again, **the actions of ADA Fritz were intentional and not within the scope of his employment as an Assistant District Attorney for Johnson County**; he knowingly violated Caranchini's rights as an American citizen by withholding her right to be timely charged and timely have the opportunity to plead to the charge against her; the actions of ADA Fritz also put Caranchini in jeopardy as ADA Fritz knowingly violated her constitutional liberties as guaranteed by the U.S. Constitution to have an attorney represent her and thereafter bond out which he intentionally denied her;

224. That as a result of the above actions each of the named defendants in this particular Court have violated Caranchini's rights and each are liable to Caranchini in a sum equal to at least $75,000 actual damages for each party and those that acted outside the scope of their employment are subject to Caranchini for $100,000 for each party punitive damages and for Caranchini's costs herein incurred and expended and punitive damages as set forth herein.

WHEREFORE, Caranchini requests a jury award for her actual and punitive[30] damages for not only the wrongful conduct but the total violation of an American citizen's rights which

---

[30] Caranchini is well aware that "punitive" damages against a city or state entity including its employees are generally not permitted; that being said, the outrageous nature of these actions on a continuing basis that are basic violations of constitutional liberties may qualify for an exception as the actors may being putting themselves outside the protection of the statute by the "punitive nature" of their actions. The actions of ADA Fritz; the actions of the individual Sheriffs, the actions of the Corizon "alleged" Nurse, who provided absolutely no medical care

were done knowingly by each of the named defendants in this Count and for her costs herein incurred and expended. Caranchini also seeks immediate injunctive relief by this Court so that others are not subjected to the conduct to which Caranchini was subjected and for her costs herein incurred and expended and such injunctive relief as set forth hereinbelow.

**COUNT VII**

Caranchini for her claims against Calvin Hayden and the Johnson County Jail facility in Olathe, Kansas, and CORIZON, the Health Care Providers within the Jail facility in Olathe, Kansas, alleges and states as follows:

225. Caranchini incorporates as her alternative claims to those set forth in Count VI against Calvin Hayden and the Johnson County Jail and against CORIZON, the following claims as it is unknown whether CORIZON's actions are independent of those of the JAIL Corizon as set forth hereinabove in Count VI or whether they at all times acted at the direction of Johnson County Sheriff's office and therefore the Johnson County Sheriff's office is responsible for their actions.

226. Caranchini incorporates by reference Paragraphs 1 through 223 hereinabove and particularly those paragraphs in Count VI; however, Caranchini states in this Count

---

whatsoever and totally ignored Caranchini's health issues although provided with an extensive list of doctors and medications all point to serious problems for the County which put their actions outside of "protected activity". This is for a court to determine once Caranchini has had the opportunity to do some discovery on the issues with these individuals and have a hearing on the matter given the actions of these individuals which are set forth above. Caranchini wishes to make a claim and preserve the right to appeal this issue to a higher appellate court, including the United States Supreme Court. Our Consitutional liberties are under assault these days and what the undersigned suffered is but one example.

that Corizon acted at all times INDEPENDENTLY of the JAIL personnel, and that therefore, CORIZON, separate and apart from the JAIL personnel, are responsible to Caranchini for the injuries she suffered by the failure of Corizon's nurse to provide medical care as set forth hereinabove.

227. That additionally, CORIZON, in conjunction with JAIL personnel failed to provide Caranchini with the medical care she requested throughout her stay and BOTH CONTRIBUTED TO HER MEDICAL PROBLEMS.

228. That as a direct and proximate result of the above actions in this Count and the other paragraphs set forth hereinabove, Caranchini was caused to suffer physically and continued to suffer physically for months, and still suffers physically as neither JAIL personnel or CORIZON health care personnel properly cared for Caranchini's medical needs.

229. That because of Caranchini's age, and repeated requests for attention to her medical needs set forth on the paper(s) she brought to jail which were totally ignored by both JAIL and CORIZON personnel Caranchini was caused to suffer for numerous months and continues to suffer.

230. That the acts and inactions entitle Caranchini to punitive damages against Calvin Hayden and Jail personnel as well as the CORIZON health care providers in an amount in excesss of $75,000 actual damages and $100,000 punitive damages.

WHEREFORE, Caranchini requests a jury of her peers find in her behalf for actual and punitive damages and for her costs herein incurred and expened and for the injunctive relief set forth hereinbelow.

**COUNT VIII**

Caranchini for her claims against The Honorable Dan Vokins and The Honorable James Phelan alleges and states as follows:

231. Caranchini incorporates by reference paragraphs 1 through 229 hereinabove.

232. Caranchini makes these claims against the two Magistrate Judges she "appeared" before in Johnson County Court resulting from being charged by ADA Fritz, and that charge being pursued by ADA McElhinney between January 2017 and October 2017 when it was dismissed with prejudice and expungement sought by ADA McElhinney, and subsequently entered, on the eve of hearing and obtained as part of the dismissal with prejudice on ADA McElhinney's own Motion to Dismiss.

233. Caranchini has appeared before countless judges in countless jurisdictions since 1978; in the 1970's, 1980's and 1990's and early 2000 where she was subjected to extreme sexist behavior by State and Federal Judges as well as male defense attorneys, not because she was a young and good looking woman but because she was a woman with a head on her shoulders who pursued sexual harassment and discrimination cases as well as 1983 cases against very high level executives in major corporations which no one else would take on in the metropolitan Kansas City area, or high level government officials who also lawyers would not take on, and did both quite successfully—until she was disbarred by two well placed Missouri  Federal Judges, one of whom is now deceased and one of whom is now a "Senior Judge".

234. Caranchini found her recent experiences in the Johnson County Magistrate Coourtrooms and jail devoid of any attention whatsoever to the civil liberties they are supposed to guarantee and ensure. Caranchini even sat in the Courtrooms to get a "feel" for these Courtrooms at the current time as she has not appeared in them prior to this time and was appalled at the manner in which these Judges acted towards women in 2017.

235. This lawsuit is being in part pursued to ensure not only that Caranchini's rights are protected and she is given compensation for violation of her rights, but to help insure that other citizens' rights are guaranteed and ensured—much as Caranchini has done for some forty years in the local and federal court systems in Missouri and since 2000 in the EEO and MSPB courts for government employees.

236. Money does not cure all things; and that is why the injunctive relief hereinbelow is being sought in addition to money to compensate Caranchini for what she has suffered in these Judges' courtrooms and will hopefully stop and change some of the actions going on. Caranchini cannot walk away from what happened to her when she has spent her life helping others resolve like problems in their lives, a fact she was reminded of by her psychologist recently in therapy.

237. Caranchini suffered the following violations of her Constitutional liberties growing out of the denial of her right to be charged, have a telephone call, make timely bail, be able to have her medications during her incarceration and be seen by a doctor, and have food she could eat consistent with her medical problems of which she made the jail's medical staff aware at the time she was brought to the jail.

238. In Judge Vokins' Courtroom, to which Caranchini was initially assigned at the time she was incarcerated and while she was incarcerated,

--The case was never called up to charge Caranchini and set bond even though the charges were put in place on January 23, 2017 by ADA Fritz, but he did not pursue them until February 9, 2017, the day that Caranchini was in Court on a Temporary Restraining Order; and, according to documents in the criminal file, was not called up until February 9, almost 24 hours after Caranchini was put in jail;

--Judge Vokins permitted the jail staff to claim Caranchini was "uncooperative" , without any explanation therefor, which was stamped on a form in Caranchini's legal file which was part of the public filings when the Judge must have known that filing was false as there was no "stated" basis for such statement and no basis was stated in the record to support such "stamp"; the Court made no attempt to determine whether that statement was true by bringing Caranchini before him and questioning her;

--Judge Vokins arbitrarily and without talking to Caranchini in his Courtroom set a bond of $4,000 for 12 telephone calls and some 20 or so texts Caranchini made over four days (between December 24 and December 29) starting on the day RPeck broke up with Caranchini after they had breakfast on December 24 when he gave her diamond earrings! Caranchini when she made inquiry of Jackson County Sheriffs about setting bonds in their court, was informed that such a charge would have a $500.00 bond in Jackson County! Where did this huge

amount come from and why? Is there any standard chart of bonds and if not, why not?

b. Judge Phelan permitted this case to go on for almost nine months without any concern for the length of time and how it affected Caranchini, and actually tried to elongate the time repeatedly to punish Caranchini and make Caranchini forfeit the bond and take diversion; Judge Phelan also put Caranchini on a bond that required "no drinking" when alcohol had nothing whatsoever to do with the alleged "crime" of telephone calls and texts.

--When Caranchini finally asked to represent herself because she had spent $15,000 on a lawyer for this matter and it was nowhere near completed, Judge Phelan insulted her in open court saying she was "incompetent" even after Caranchini listed all the various jurisdictions she was admitted to practice before and in fact had practiced before (including multiple federal district and appellate jurisdictions and the United States Supreme Court) and insisted that Caranchini have a lawyer appointed for her. This was after Caranchini had filed ten motions and requests for discovery, which Caranchini had personally drafted, which Caranchini believed he clearly did not wish to rule upon or have ADA McElhinney produce to Caranchini which would have put the facts in Caranchini's favor in Caranchini's opinion.

--After the motions were filed and the new lawyer was appointed, who was ADA McElhinney's wife's law partner!, the case was going to be delayed for another two months which was absurd, and nothing could be done.

--Finally, ADA McElhinney decided to dismiss the case because he said "it was too much work"! Caranchini finds this astonishing and if made in the Western District of Missouri Caranchini believes a federal judge would have sanctioned the lawyer for even bringing the case.  This is outrageous as Caranchini had been nine months on a bond after being incarcerated and was still waiting for the bond money to be returned when she filed the first lawsuit in federal court in Missouri!

239.  These Judges by the above actions violated 42 U.S.C. 1982 et seq in their Court Rooms repeatedly and they should be removed from the bench and replaced.  They do not serve the public but merely serve Johnson County to get "more money" at the cost of violating citizens's rights, including the undersigned's and it must stop.

240.  Caranchini requests a jury find that the actions of these Judges were and are wrongful and violated the Constitutional rights of citizens appearing before them, including the undersigned; that they are in violation of their oaths to uphold the Constitution of the United States and the State of Kansas by the actions they engaged in against Caranchini and as set forth in the injunctive relief sought below, should be removed from the bench; additionally, their actions resulted in Caranchini being incarcerated in Johnson County jail and Caranchini's rights being violated:  she

was not aware of why she was in jail; she was not given the opportunity to bail out of jail; she was subjected to abuse by the Sheriffs in the jail as well as by the Medical staff who did not provide medicine to Caranchini all to her damage which is ongoing to this date physically and psychologically which should not be tolerated; that such actions are also "sexist" based upon the comments made by these two Judges to Caranchini which are abominable in this day and age and that each of them pay Caranchini actual damages of $75,000 or more and punitive damages of $100,00 or more for their actions.

Wherefore, Caranchini asks that these Judges be removed from the bench and that she be compensated for actual damages in an amount of $75,000 or more and for punitive damages in an amount equal to $100,000 or more for each of these Judge's actions and for her costs herein incurred and expended and for the Injunctive relief set forth below..

**INJUNCTIVE RELIEF SOUGHT**
**FROM THE PECKS**

Caranchini during the pendency of this litigation against the Pecks and given that the Pecks have already lost the hearing on the Temporary Restraining Order and damages may be sought immediately on that false claim and the claims on that false claim seeks the following injunctive relief from the Pecks during the pendency of this case. If , at the conclusion of this case, Caranchini prevails on any claim against LPeck or RPeck, or LPeck and RPeck, then Caranchini may seek to collect on one or more of the following to satisfy her jury verdict ;

however, during the pendency of this litigation the Pecks may not dispose of any of the following without the permission of the Court and Caranchini.:

    a. At the time of the "answer"r being made by the Pecks, that they also make a filing with the Federal Court listing all real property they have any interest in, and providing copies of the title papers thereto, and the Court shall prevent the Pecks from deeding said property to any third party during the pendency of this litigation;

    b. A filing made with the Federal Court listing all non real property, such as trucks or cars or other property of any value in excess of $2,500, and the title thereto, preventing the Pecks from selling said property during the pendency of this litigation;

    c. A filing made with the Federal Court listing all bank accounts other than a checking account with any amout more than $500, but any account that is a savings, or other form of money market or stock investment of any value with the Court and the Court will prevent the Pecks from selling such stocks and assets for the pendency of this lawsuit.

    d. The Pecks shall file with the Court every 30 days proof that they have not made any changes to these filings to any third party; that all financial assets remain in place and have not been sold or transferred in any manner whatsoever pending the resolution of this case.

    e. The Pecks shall provide to the Court a copy of their bank statement(s) every 30 days for review .

f.   The bar on RPeck's primary telephone which RPeck and Caranchini had previously used, shall be lifted; and, Caranchini shall have access to it, but LPeck shall be totally barred from access to that telephone for the remainder of the lawsuit, and shall not use that telephone number at all; RPeck and LPeck shall communicate through a different telephone number. LPeck shall not attempt, in any way, to access Caranchini's telephone or computer at any time.

g.   LPeck shall not come within ½ mile of Caranchini's home on either side of the State Line; if she is seen within that distance she will be in violation of this Court's Order; she shall not come on Caranchini's property at all.

h.   LPeck shall not contact Caranchini in any manner whatsoever for the remainder of the lawsuit or any relatives of Caranchini;

i.   LPeck shall not touch any of Caranchini's pets at all for the remainder of the lawsuit.

j.   LPeck shall not follow Caranchini or follow any car in which she sees Caranchini as a passenger at any time;

k.   LPeck shall not approach Caranchini's car for any reason whether or not Caranchini is in the car;

l.   LPeck shall not discuss with RPeck this matter;

m.   RPeck shall discuss this matter only with any attorney he retains, separate and apart from LPeck's attorney, and not Linus Baker, the Court, or Caranchini or any attorney she retains;

n.  The Court shall immediately allow Caranchini and RPeck to communicate on the telephone number they have used throughout their relationship;if they so choose; they shall block any and all access thereto to either RPeck's or Caranchini's telephone numbers  from LPeck, and she may not make any attempt to communicate with them on that phone or interrupt communications on that phone; nor may she interrupt RPeck and Caranchini's communications on that phone or attempt to tape them in any manner; in short, she is barred from accessing said phone(s) in any way henceforth. RPeck can call LPeck on her phone.

o.  LPeck may not intercept any Emails/texts to/from RPeck/Caranchini henceforth; LPeck has no authority to read them, print them off or forward them to any third party.

p.  Caranchini agrees she will not attempt to contact by telephone LPeck.

q.  Caranchini agrees she will not approach LPeck at any time.

r.  The Court agrees that RPeck and Caranchini may meet at any time at any place of their choosing with or without counsel and that LPeck may not preclude them from doing so.

s.   If LPeck required RPeck to marry her and RPeck states to the Court that the marriage was not consensual, LPeck will agree to file with the Court a motion to set aside the marriage saying that she had coerced RPeck into marrying her and that the marriage was not consensual and that RPeck wishes it be set aside and ask the Court to enter an Order so stating.  RPeck will then file said statement with the State of Kansas moving to set aside his marriage.

**INJUNCTIVE RELIEF SOUGHT WITH REGARD TO JOHNSON COUNTY JAIL**

1. That Johnson County immediately remove from its "Jail Records" any and all reference to Caranchini being incarcerated at any time in the Johnson County facility, and that all such records be deposited with the United States District Court for the District of Kansas pending final disposition of this case and that Caranchini have access to said records during the pendency of this case;
2. That Johnson County immediately remove from its Police Department Records any and all recordings of the following and provide them to this District Court for safe keeping during the pendency of this litigation; there should be a statement from the Police Department that the records represent the "complete file on Gwen Caranchini" which were ordered removed by "The United States District Court for the District Court of Kansas) –no case number should be referenced; the file number of the case will be provided the Police Department by the Pecks and a statement by the Pecks or their attorney shall be filed with this Court indicating that a filing was made, or there are no such records;

    A. Police recordings of Lola Peck and/or Rick Peck complaining aboutGwen Caranchini that were taken at Lola Peck and/or Rick Peck's home or at any Sheriff's office or District Attorney's office regarding Gwen Caranchini at any time up to and including the time of the filing of this lawsuit shall be provided Caranchini and duplicates provided the Court

B. Any other recordings or pictures you have taken of Gwen Caranchini since December 24, 2017 with a statement as to why the photographs were taken and where they were taken shall be provided Caranchini and the District Court with an explanation as to why they were taken;

C. Recording taken of Gwen Caranchini in her car outside the Peck home by the Police shall be provided Caranchini and the District Court;

D. Any other recording you have of the police recording Gwen Caranchini at any time regarding any matter since January 2017 shall be provided Caranchini and the District Court;

E. Any other recording you have of the Police recording LPeck or RPeck at any time regarding any matter since January 2017 shall be provided Caranchini and the District Court;

F. Any and all records of a Municipal Charge brought by the Pecks, penned by ADA Fritz, pursued by ADA McElhinney Before Judges Vokin and Phelan that are part of any records in any recording system of the Johnson County Jail System or Court System shall be provided Caranchini and the District Court;

G. Any and all records of a Temporary Restraining Order brought by the Pecks, penned by ADA Fritz, heard before Judge Trigg on

February 9, 2017 shall be provided Caranchini and the District Court;

3. the Temporary Restraining Order filing made by the Pecks which they lost be entirely shall be provided to Caranchini and the District Court and then expunged from Johnson County records;
4. That all records having to do with Caranchini's jailing including her "mug shot" shall first be provided Caranchini and the District Court and then be expunged from all Johnson County records so that there are no records indicating she was arrested at any time for any crime whatsoever;
5. That all of Caranchini's records of her incarceraton be provided her and the District Court and then totally expunged from all records of Johnson County as Caranchini's incarceration violated her Constitutional rights and there should be no record whatsoever;

**Changes to Court Procedures**

That in addition, Caranchini asks this Court, as a result of the actions that were taken against her on February 9 and 10, 2017, to enter an Order that Johnson County make the following changes to its procedures within 45 days of this Order and provide such changes to this Court to be made a part of the record of this case for the reason that this Court has found that the Johnson County jail violates the constitutional liberties of all citizens of the United States by its actions and inactions as shown by what Plaintiff Caranchini was

subjected to during her incarceration and that Caranchini may be subjected to such actions in the future.

1)     That no person be incarcerated at Johnson County jail unless they first have been advised of intended charges against them and have the right to plea to such charges in a court of law, have been advised of their right to have an attorney, and are informed of the bail that they must post, have the opportunity to make a telephone call and are told they have that right, and are given time to post such bond as follows:

   (a)     That no person who has had no prior criminal charge of any kind against them shall be required to post any bond of any kind and be incarcerated if the first charge is of a non-violent nature;

   (b)     That if the crime is of a violent nature that the bond be subject to the list of amounts that have been arrived at rather than an arbitrary amount but again only after being first advised of the charge, having the opportunity to contact his attorney or have an attorney appointed and make a telephone call

(2) That a standard form of "bonds" shall be developed for various crimes that is published, and it shall not be subject to change for various municipal charges;

(4) To institute procedures that require that all new inmates be "entered into a system" within one hour of arriving at the jail and record kept and given to the inmate upon

the inmate's release that includes record of when they arrived, their belongings were logged; they were given "jail" clothing; their "mug shot" was taken; information taken on any necessary meds required to be given; they were put in a cell and the cell number is noted; the time and type of food they were given; any request for medication is noted in the record and when it is given; any change of cell; any "incidents" are noted and who was the Sheriff involved; any transfer of the inmate to any other cell and the reason(s) therefor.

(5) That any inmate requesting to see a doctor regarding any medical issues they have be given that opportunity within one hour of such request and a written document be signed by the "inmate" and a person within the jail acknowledging the request and agreeing to contact a MEDICAL DOCTOR (not nurse) and that all drugs that each such inmate is currently taking be given in the manner in which the inmate requests and that records are made and kept regarding the request for drugs and the administration of such drugs and given to the inmate upon the inmate being released;

(6) All inmates dietary restrictions be met and records kept on the meals given, the timing of the meals and the nature of the meals and such record also be given the inmate upon release;

(7) That no inmate who has been arrested on a new charge without a hearing being had on the charge and the inmate being found guilty shall be placed in a cell more than three hours; such retention being a violation of constitutional rights to be

considered innocent until proven guilty; and all records of the incarceration be given to the person upon release;

(8)  That a complete record be made of such incarceration until the inmate is transferred to another facility or released and given the inmate or his representative and signed for by that person;

(9) That the sheriffs who were in charge of each shift in which Caranchini was present be terminated for violating Caranchini's civil liberties;

(10)    That the sheriffs who orally or physically "assaulted" Caranchini be terminated immediately for their actions;

(11)    That the woman sheriff who advised Caranchini that "she would do and they could do whatever they wanted based upon "discretion"" be fired;

(12)    That the" doctor who was on duty while Caranchini was incarcerated be fired for incompetence and medical malpractice as well as his "nurse"";

(13)    That there are medical records maintained for inmates that are given to them when they leave the jail; these should include records of any "assaults" by sheriffs on the inmates;

(14)    That "training" be given to every new person in this cell "block" before they commence working and that every six months the personnel's training is renewed and every six months to all personnel in the "cell block" which is acknowledged in writing by each such person, about procedures and what they can and cannot do and that all such personnel be told they do not have any discretion over treatment of inmates and shall sign a document so acknowledging;

(15) That all new cases filed against individuals be set for hearing within 14 days of

original filing and service on the individual and no one shall be jailed without an

investigation first by the DA of the charges being made against the individual and

the individual being given an opportunity to reply to the charges made against

him/her with an attorney if so requested;

(16) That no person shall be incarcerated unless after service an opportunity is given

to the individual to resolve the matter before being jailed;

(17) Johnson County will publish such rules as noted above and give such rules to all

individuals subject to possible incarceration at the time of their arrest and signed for

by them.

(18) Johnson County shall enact such laws as are necessary to enforce these rules

within 30 days of the Court entering an Order regarding these requirements and

publish in any news source available and any legal publication for six months weekly

these new regulations and make them available to any and all lawyers practicing

within the State of Kansas, Johnson County within the last two years.

Caranchini seeks the above relief for herself as well as for all others who may be

incarcerated or subject to incarceration in Johnson Count Jail so that their rights are

preserved.

**CORIZON**

**That CORIZON, the alleged health care provider for the jail, be subject to the following:**

A. That Corizon immediately terminate the "nurse" that was on duty February 9 and 10th 2017 at the Johnson County Jail in Olathe, Kansas for her incompetence in failing to provide Caranchini any of her medications that Caranchini advised her of; including but not limited to her six insulin shots over 36 hours, and 30 pills which she should have taken during that time period per the medication list provided her. She also failed to arrange for a cell conducive to Caranchini's migraine situation which increased Caranchini's migraine pain. She never checked Caranchini's blood pressure or checked her readings for insulin application or arranged for insulin application although Caranchini takes three substantial doses of insulin daily by "shot". She made no arrangements for appropriate food or liquid in compliance with her dietary restrictions. It was nothing short of gross negligence and the entire "nursing" situation needs to be "changed out" immediately and new procedures instituted or deaths will occur if they have not already occurred and have been "hidden" in the system. In short, Corizon not only will pay substantial sums for gross negligence but they should immediately change their manner of doing business if they want to continue to provide care to Johnson County jails.

B. That Corizon immediately provide the Johnson County Sheriff with its intended new Program to provide qualified RN and Doctor staff for the two facilities that Johnson County currently has nursing and doctor staff for overseeing "medicine distribution" and

oversight of of insulin and other such drugs to inmates in the jail. "Meals" also need to be arranged as Caranchini was subjected to standard moldy bread and cheese consistently throughout her incarceration.

**INJUNCTIVE RELIEF WITH REGARDS TO ADA FRITZ AND ALL ADA'S**

**And**

**REQUIREMENTS REGARDING JAILING, PLEAS, AND INCARCERATION**

Caranchini seeks the following relief be done with regard to all Assistant District Attorneys in the event that ADA Fritz is found to have colluded with the Lola Peck

AND also with regard to all ADA's for their training henceforth.:

A. If an Assistant District Attorney is found to have colluded with an individual in a matter to receive a particular result , depending on the severity of the "collusion", the ADA shall be subject to be fired; reported to the Kansas Bar; or disciplined for his/her actions and receive at least one to four weeks of disciplinary time "off" from work without pay with notations in his/her personnel file.

B. The ADA's office shall prepare a course for all ADA's to attend every six months of the year that reviews their responsibilities and what they may/may not do in their positions and what may expose them to discipline including but not limited to being fired. Collusion with one or more persons shall always be grounds for termination.

C. ADA's should be aware of conflicts of interests between and among clients. If an ADA believes that two or more clients cannot be represented by the same lawyer, it is the

obligation of the ADA to write a letter to the individuals and the lawyer indicating that it is not appropriate and that one or more additional attorneys must be hired. Johnson County cannot be part of wrongful hiring practices by private citizens which may cause wrongful decisions in the court systems.

D. Waiver of conflicts between husband/wives or between "couples" should be strongly considered; each party should be advised separately by two different ADA's as to their rights and whether they truly understand the importance of being represented by the same attorney before waiving their rights.

E. Paperwork should be prepared which also explains the "impact" of diversion on a person's background check and how it may affect them. Just because it "benefits" Johnson County, does not mean it benefits the individual. This should stop and the rights of citizens should take precedence.

**F.** No citizen should be incarcerated before he/she appears before a Judge and his/her rights are read to him/her along with the charges that are being made against him/her. This **must be done within three hours of being arrested at all times.** The amount of bail for the charge should be stated on the charge with telephone numbers of bail bondsmen. The person arrested should also be allowed to make a telephone call at Johnson County expense to a person of his choice both before the hearing and after the hearing. No person shall be put in jail garb until **after he/she has appeared before a Judge who heard the charges, it has been determined that he will have to be incarcerated if he cannot post bond, he has been given the opportunity to post bail and given one hour to do so after hearing the charge and the amount of bail he/she needs to post.** If an attorney is

going to appear for the person to be charged, the hearing may be delayed pending the arrival of the attorney. **Violation of these rules will be considered henceforth a violation of the constitutional rights of any individual arrested in Johnson County once they are adopted and subject the County to $150,000.00 fine.**

G. AT ALL TIMES SET FORTH HEREINABOVE SHALL BE STRICTLY ADHERED TO. NO PROPERTY SHALL BE REMOVED FROM THE ARRESTED INDIVIDUAL UNTIL IT IS DETERMINED WHETHER THEY ARE GOING TO BE INCARCERATED EXCEPT ANY WEAPON. A DETAILED LIST SHALL BE MADE. PICTURES OF ANY JEWELRY SHALL BE TAKEN.

H. If, and only if, incarcerated, then all items shall be listed carefully, particularly cash (the amount thereof), and drugs by name, and amount of pills in any bottle. Pictures shall be taken of all items before handed over. No mug shots shall be taken of any person until the person is being actually incarcerated.

**INJUNCTIVE RELIEF SOUGHT AGAINST JUDGES**

These rules are applicable to any and all Judges who are in the Magistrate Court positions presently held by Judges Vokin and Phelan.

A. Caranchini seeks to have these two Judges "admonished" or disciplined for their "sexist" statements to the undersigned that she is "incompetent" . Their demeanor towards women in their Courtrooms was mysognistic which is of a bygone era. They need to be admonished to treat women with the same respect as they treat men and not tell a woman, who has practiced law for 40 years that she cannot practice in their Court and continue a case until a woman is assigned to represent the undersigned—a woman who

is the partner of the ADA's wife no less!. Their conduct is something that the undersigned experienced in the 70's and 80's—but this is 2018 and it is totally inappropriate.

B. Likewise, Johnson County should have one Magistrate who is a woman who will address woman's issues and not assign woman to men who treat them as "whores" and there is no other way to put it if you sit in the courtroom and see what is going on.

**REQUEST FOR TRIAL BY JURY ON ALL COUNTS AND CLAIMS**

Caranchini hereby makes demand for trial by jury on all partial claims set forth hereinabove against all parties and does not waive any claim whatsoever to trial by jury.

Respectfully submitted,

Gwendolyn, a/k/a Gwen G. Caranchini, Plaintiff, pro se
1203 West 62nd Street
Kansas City, Missouri 64113
816-223-7178
gwencaranchini@gmail.com

State of Missouri )
)
County of Jackson )

Subscribed and sworn to before me the undersigned notary public in and for the above county and state this ____________ day of May, 2018.

Robert L Thatch
Notary Public

Dated: 5/10/18

ROBERT L. THATCH
Notary Public - Notary Seal
STATE OF MISSOURI
Jackson County
My Commission Expires: 1/31/2020
Commission # 12477597

**Courtesy Email Copies to but they will be served (by agreement) by rule and not served in person::**

Steve Phillips@ag.ks.gov represents the two Assistant District attorneys and the two Judges

Kirk Ridgway: kridgway@fbr2law.com 913 381 8180
Represents: The Johnson County Jail (but not Corizon)

Rick Peck and Lola Peck, I am blocked from RPeck's number
Whether jointly or severally above
Unknown. In the prior lawsuit Linus Baker did but he has not indicated he will In this lawsuit

KC KS
City State Zip Code

816-223-7178
Telephone Number

**DESIGNATION OF PLACE OF TRIAL**

Plaintiff designates { ☐ Wichita, ☒ Kansas City , or ☐ Topeka} , Kansas as the (Select One) location for the trial in this matter.

Signature of Plaintiff

**REQUEST FOR TRIAL BY JURY**

Plaintiff requests trial by jury { ☒ Yes or ☐ No } (Select One)

Signature of Plaintiff

Dated: 5/14/2018
(Rev. 10/15)