### IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS

Gwendolyn Caranchini,

                Plaintiff,

v.

                  No. 2:18-cv-02249-CM-GLR

Peck *et al*

                Defendants

### Lola and Rick Pecks' Special Motion and Memorandum in Support to Strike the Claims Against the Pecks Pursuant to K.S.A. 2016 Supp. 60-5320, Enforce the 30 Day Hearing Requirement and Stay of Discovery

The defendants Lola Peck and Rick Peck ("the Pecks") jointly specially move to strike the claims made against them by the plaintiff Gwendolyn Caranchini (Caranchini) pursuant to K.S.A. 2016 Supp. 60-5320 (anti-SLAPP statute). Caranchini makes claims of libel, slander, and those related to right to petition in pursuing judicial remedies which are all the subject of the Kansas anti-SLAPP statute as demonstrated below. Pursuant to that anti-SLAPP statute, the defendants ask that the mandatory 30 day hearing requirement be enforced as well as the automatic stay of discovery.

### A 60-5320 Motion to Strike is a Dispositive Motion

For clarity, while this motion is titled as a motion to strike, it is nevertheless a dispositive motion. *See* Fed.R.Civ.P. 72(a); see 28 U.S.C. § 636(b)(1)(A). The point being that a Federal magistrate may submit proposed findings of fact and recommendations subject to *de novo* review but cannot issue the order regarding this motion. *See Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1462 (10th Cir. 1988) (motion to strike characterized as having the "identical effect" of a dispositive order).

### Request for Enforcement of Expedited Ruling

Pursuant to K.S.A. 60-5320(d) the "motion to strike made under this subsection may be filed within 60 days of the service of the most recent complaint or, in the court's

discretion, at any later time upon terms it deems proper. A hearing shall be held on the motion not more than 30 days after the service of the motion." Under 60-5320(f) it also refers to the motion being ruled upon "in an expedited fashion." This motion is timely and the Pecks request that the Court adhere to the statutory mandate and rule upon this motion in an expedited fashion not more than thirty days after the service of this motion.

### Summary

This will be the first opportunity for this Court to enforce and interpret the Kansas anti-SLAPP statute. On March 12, 2018, in *Los Lobos Renewable Power, LLC v. AmeriCulture, Inc.,* the US Court of Appeals for the Tenth Circuit, in a case of first impression, held that the New Mexico anti-SLAPP (Strategic Lawsuits Against Public Participation) statute was a procedural mechanism and therefore did not apply in diversity actions in federal court (No. 16-2046 (10th Cir. Mar. 12, 2018). The Tenth Circuit analyzed the different subsections of New Mexico's anti-SLAPP statute, which provided the procedures applicable in case of a frivolous lawsuit, and found that the subsections did not set forth any rules of substantive law. The Tenth Circuit held that New Mexico's statute was not designed to influence the outcome of a SLAPP suit but was instead limited to the timing of that outcome. The *Los Lobos* Court held that the New Mexico statute did not define the scope of any state substantive right or remedy. *Los Lobos* concluded that the New Mexico statute was procedural in all aspects and would not apply in that diversity action. The Tenth Circuit specifically recognized that other anti-SLAPP statutes were substantive and could apply in diversity actions:

Unlike many other states' anti-SLAPP statutes that shift substantive burdens of proof or alter substantive standards, or both, under no circumstance will the New Mexico anti-SLAPP statute have any bearing on the suit's merits determination. *See, e.g., Makaeff v. Trump Univ., LLC,* 715 F.3d 254 (9th Cir. 2013) (addressing a California

anti-SLAPP statute that shifted substantive burdens and altered substantive standards). The New Mexico statute does not alter the rules of decision by which a court will adjudicate the merits of the complaint.

*Los Lobos*, p. 23.

Unlike New Mexico's anti-SLAPP statute, Kansas' anti-SLAPP statute is substantive and defines the scope of substantive rights and remedies:

(d) A party may bring a motion to strike the claim if a claim is based on, relates to or is in response to a party's exercise of the right of free speech, right to petition or right of association. A party bringing the motion to strike has the initial burden of making a prima facie case showing the claim against which the motion is based concerns a party's exercise of the right of free speech, right to petition or right of association. If the moving party meets the burden, the burden shifts to the responding party to establish a likelihood of prevailing on the claim by presenting substantial competent evidence to support a prima facie case. If the responding party meets the burden, the court shall deny the motion. In making its determination, the court shall consider pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based. If the court determines the responding party established a likelihood of prevailing on the claim: (1) The fact that the court made that determination and the substance of the determination may not be admitted into evidence later in the case; and (2) the determination does not affect the burden or standard of proof in the proceeding. The motion to strike made under this subsection may be filed within 60 days of the service of the most recent complaint or, in the court's discretion, at any later time upon terms it deems proper. A hearing shall be held on the motion not more than 30 days after the service of the motion.

K.S.A. 60-5320(d).

Burdens are shifted.  Remedies are set out.  Caranchini sets out one count against the defendant Rick Peck (Count I) and five counts against Rick Peck and Lola Peck (Counts 1-5).  Generally, Caranchini uses words such as "slander" and "libel" to describe her claims against the Pecks. Caranchini has sued the Pecks regarding the suspect class of legal proceedings as defined under the Kansas anti-SLAPP statute. Caranchini's real motive and purpose in bringing her second lawsuit against the Pecks (the first was brought in Missouri Federal court) is not for the purpose of "winning" a lawsuit but *winning* Rick Peck back. She wants "answers."  She thinks a lawsuit can force a conversation with Rick Peck – in hopes of

either hearing that he has never stopped loving Caranchini and would come back to her but for the clutches of Lola Peck – or to have some kind of therapeutic dialogue with Peck. Caranchini is intent at getting to a mediation or deposition setting in which to accomplish her win-back-Rick strategy. Since winning is not a primary motivation, 'traditional safeguards against meritless actions, (suits for malicious prosecution and abuse of process, and requests for sanctions) are inadequate to counter SLAPPs.'" André, Anti-SLAPP Confabulation and the Government Speech Doctrine, 44 Golden Gate U. L. Rev. 117, 119 (2014).

<u>**Facts**</u>

Caranchini's complaint is Doc. 1.  Caranchini's claims against the Pecks arise from the class of privileged communications defined under K.S.A. 60-5320.  She mainly complains of the Pecks' right to petition for judicial relief even though she compartmentalizes that with conspiracy theories.  Caranchini complains of a misdemeanor charge of Harassment by Telephone in State of Kansas v. Caranchini, No. 17DV111, Dist. Ct. Johnson County, Kansas. She cites a Protection from Stalking case. Caranchini claims Lola Peck "has false statements" made about her in various government records. Caranchini claims that the Pecks intentionally made false statements in the paperwork supporting the filing of both the Temporary Restraining Order and the filing of the paperwork supporting that prosecution.  See ¶2 ("Against LPeck for having ADA Fritz prepare and file a Municipal Charge against Caranchini based upon false statements by both RPeck and LPeck for pursuit by the DA's office complaining of alleged "harassing telephone calls and texts" by Caranchini"); ¶3 ("Against LPeck for making numerous false statements on paper with the help of Johnson County ADA Fritz against Caranchini, and to verbally make complaints to

the Johnson County Police Department on 'tapes' of said communications with the Police regarding Caranchini"); ¶145 ("Caranchini knew when she read the paperwork she was served with, that both LPeck and RPeck were tying in the TRO filing, and she knew that RPeck knew Caranchini would know that both the Pecks were lying in the TRO filing; however, LPeck had clearly required that RPeck sign the TRO paperwork, in addition to herself, and also required that he make false statements about Caranchini allegedly harassing RPeck as well as LPeck, which of course, RPeck knew Caranchini had never done."); ¶158 ("LPeck intentionally made false statements in the paperwork supporting the filing of both the Temporary Restraining Order {TRO} and the filing of the paperwork supporting the Municipal Charge. Those written false statements were then made orally to the ADAs Fritz and McElhinney. Those false statements constitute both libel and slander against Caranchini as the statements were, and are, false. LPeck knew they were false. She signed them and required RPeck sign them, and if necessary, make them orally to ADA Fritz and McElhinney; and, if he would not, she threatened to harm both Caranchini and RPeck."). Caranchini goes on to complain about false statements made to police (¶159) and that Lola Peck coerced Rick Peck to lie to police. ¶159. Caranchini generally seeks to discover whether Rick Peck loves her and was actually coerced into participating in the police reports and judicial proceedings. See p. 85 (Relief for Count I)("First, determine whether RPeck willingly pursued this claim or was forced to do so by LPeck. Second, if RPeck was forced to pursue this claim by LPeck, then Caranchini asks this jury to not find damages against him and find all damages solely against LPeck")

Caranchini seeks to hinder the Pecks' right to communicate as stated in her requests for injunctive relief. *See* page 132 (Injunctive Relief Sought from the Pecks). These claims

fit those under K.S.A. 60-5320(c)(3). She refers to statements made by one or both of the Pecks in conjunction with these judicial proceedings.  Caranchini said there was a "threat" from Lola Peck, not from anything Lola Peck did or said to her but from a double-inference coming from Caranchini's imaginations about what might have been said between the Pecks.

In her request for relief, Caranchini requests that the Pecks not be allowed to change their residence or leave the State of Kansas.  Caranchini seeks to have the Pecks list all of their property and be prevented from selling any property.  Caranchini also asks for a court order restricting Lola Peck from traveling within ½ mile of "Caranchini's home on either side of the State Line."  She seeks an order preventing Lola Peck from associating with Caranchini: Lola Peck "shall not contact Caranchini in any manner whatsoever for the remainder of the lawsuit or any relatives of Caranchini."  Notably Caranchini does not seek any restrictions upon Rick Peck.  Caranchini seeks to hinder the Pecks' association with each other: Lola Peck "shall not discuss with RPeck this matter" and "RPeck shall discuss this matter only with any attorney he retains, the Court, or Caranchini or any attorney she retains."  Again, Caranchini seeks to bar Lola Peck in communicating and associating with Rick Peck while requiring ("shall discuss") Rick Peck to have a conversation with Caranchini – without Lola Peck present.

## **ARGUMENT**

**The Claims Of Caranchini Against The Pecks Are Based On, Relates To Or Is In Response To The Pecks' Exercise Of The Right Of Free Speech, Right To Petition, And Right Of Association**

Caranchini's Complaint meanders about with the words "libel," "slander," "harassment" or "threat" providing no framework of the elements of a recognized Kansas

tort. Twenty-eight States and the District of Columbia have responded to the threat against First Amendment freedoms by enacting statutes meant to curb SLAPPs. *See* Lili Levi, The Weaponized Lawsuit Against The Media, 66 Am. U. L. Rev. 761, 822 n.252 (2017). Kansas is one such State. "The most frequent type of SLAPP suit is for defamation, but the causes of action are myriad." Tate, California's Anti-SLAPP Legislation: A Summary of and Commentary on Its Operation and Scope, 33 Loyola L.A. L. Rev. 801, 805 (2000).

Although Caranchini does not state any claims as defined under Rule 12(b)(6), this is neither dispositive nor relevant under the Kansas anti-SLAPP statute which focuses on a different analysis and defines "claim" differently. K.S.A. 2016 Supp. 60-5320(d) states:

> A party may bring a motion to strike the claim if a claim is based on, relates to or is in response to a party's exercise of the right of free speech, right to petition or right of association. A party bringing the motion to strike has the initial burden of making a prima facie case showing the claim against which the motion is based concerns a party's exercise of the right of free speech, right to petition or right of association.

Under 60-5320(c)(1) "claim" is "any lawsuit, cause of action, claim, cross-claim, counterclaim or other judicial pleading or filing requesting relief." Caranchini's "claim" is "based on, relates to or is in response to" the Pecks' exercise of the right of free speech, right to petition, and right of association – irrespective of whether it states any legal claim against the Pecks for libel, or slander. The plaintiff's Complaint is the best and only indicator of her claim against the Pecks for purposes of a 60-5320 motion to strike.[1]

---

[1] *See T&T Financial of Kansas City, LLC v. Emily Taylor*, No. 117,624 (December 29, 2017) (unpublished decision) (whether a plaintiff as made a claim triggering the anti-SLAPP protection is determined solely from the petition). *id*. at p.9. The *T&T* court addressed whether a defendant denying some of the alleged defamatory statements then became an admission that no free speech occurred. The trial court had interpreted the statute so that a defendant is "not entitled to bring a motion to strike under K.S.A. 2016 Supp. 60-5320(d) unless she admitted making the allegations in questions." The *T&T* court disagreed and held that the defendant's burden is in "showing that the claims in the plaintiff's petition implicate a protected right under the statute and it is irrelevant whether the defendant

A "claim" under the anti-SLAPP statute is broad.  A claim which is "based on, relates to or is in response" to the suspect class of proceedings. <u>Thus the Kansas anti-SLAPP statute does not require claims that would survive the requirements of Rule 12 and consequently does not require a movant to make the plaintiff's case that she has stated any claims for which the law would grant relief.</u>  That would be the plaintiff's burden under 60-5320(d) ("if the moving party meets the burden, the burden shifts to the responding party to establish a likelihood of prevailing on the claim by presenting substantial competent evidence to support a prima facie case.") Rather, all that a movant must demonstrate is a *prima facie* case showing Caranchini's claim "concerns a party's exercise of the right of free speech, right to petition or right of association."   A "*prima facie* case" is generally referred to in Kansas as referring to evidence *i.e.* "prima facie evidence." *See Baker v. City of Garden City,* 240 Kan. 554, 557, 731 P.2d 278 (1987) ("evidence which, if left unexplained or uncontradicted, would be sufficient to carry the case to the jury and sustain a verdict in favor of the plaintiff on the issue it supports.")  In this matter, the only "evidence" comes from Caranchini's Complaint.  Left unexplained and uncontradicted, it would provide a sufficient basis to find that Caranchini's claims "concerns" the Pecks' exercise of the three categories of speech identified in the Kansas anti-SLAPP statute.

Beginning with the "exercise of the right of free speech" the statute defines this to mean "a communication made in connection with a public issue or issue of public interest."

---

admits or denies making the statements in question." The Kansas anti-SLAPP statute is identical in relevant respect to the Texas statute. *See* Tex. Civ. Prac. & Rem. Code §§ 27.001-.011.  Section 27.003 recites the identical Kansas anti-SLAPP language: "If a legal action is based on, relates to, or is in response to a party's exercise of the right of free speech, right to petition, or right of association...."   The Texas Supreme court in *Hersh v. Tatum,* 526 S.W.3d 462, 467 (Tex. 2017) held that the basis of a legal action is determined solely by plaintiff's petition allegations and a defendant's admissions or denials are irrelevant.

60-5320(c)(4). The allegations of libel and slander made by Caranchini against the Pecks fit this category.   Caranchini's ramblings are disjointed but she specifically pleads that her "slander" and "libel" claims are related to Rick Peck exercising his right to petition a court: "Against the Pecks, jointly, in Count I, for filing against Caranchini a completely false Temporary Restraining Order/Restraining Order against Caranchini and pursuing that Temporary Restraining Order before Judge Trigg, which was denied by Judge Trigg the afternoon of February 9, 2017."   Complaint, page 14.   These were all communications related to the safety of the Pecks from the Protection from Stalking Johnson County case and the criminal telephone harassment prosecution brought by the Johnson County Kansas District Attorney.

The enactment of the statute is recent.   Given that there is but one unpublished decision regarding this statute, the movants address some additional issues.   Nothing in the statute requires these communications to be a public statement.   There is no "nexus" or causation burden placed upon the movant. *See ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 900 (Tex. 2017) (communications need not directly mention or have more than a tangential connection with the issue.)  60-5320(c)(7) broadly defines "Public issue or issue of public interest" to "include" "an issue related to: (A)Health or safety…." Noteworthy is that it does not say *public* health or *public* safety.   The Kansas legislature expressed its intent that the statute, enacted to protect the right of free speech, be construed broadly. K.S.A. 60-5320(k) ("shall be applied and construed liberally to effectuate its general purposes.")  Giving the word "safety" its ordinary meaning, a plain reading of the statute yields the conclusion that the Pecks' statements made during a court proceeding, to police, or a prosecuting attorney, made in an effort to obtain protection from

9

stalking or telephone harassment is "an issue related to" safety. Matters related to the reporting of crimes and related proceedings are matters of public concern. The Texas statute is similar. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.001(3) ("issue related to: (A) health or safety"). Texas interpretations of its TCPA should therefore be persuasive. Texas courts have applied the TCPA when a statement concerns an individual's safety. In *Cavin v. Abbott*, -S.W.3d-, No. 03-16-00395-CV, 2017 WL 3044583 (Tex. App. Austin July 14, 2017), that court concluded that private statements between family members making accusations of mental illness and domestic abuse about a daughter related to health and safety. *Id.* at *10-11. In *Cavin*, family members communicated privately sending texts, e-mails, and in person, professing their beliefs about another family member's mental health. *Id.* at *1. The parents claimed that their daughter's husband "won her hand through the use of 'Marxist' brainwashing, hypnotic implantation of phobias and false memories, or similar mind control tactics." *Id.* *Cavin* held that the statements were "free speech" under the Texas anti-SLAPP statute because the statements touched on "health" even though not in the public sector. In *Backes v. Misko*, 486 S.W.3d 7, 18 (Tex. App. Dallas 2015), that court concluded that a statement about parent's mental health and child's possible abuse involved both health and safety and satisfied the statutory definition of "matter of public concern." In *Bilbrey v. Williams*, 02-13-00332-CV, 2015 WL 1120921, at *9 (Tex. App. Fort Worth Mar. 12, 2015), the court held that statements made by youth baseball association coach to president of association about assistant coach's behavior at game relate to the health, safety, and well-being of those children. Protection from stalking in Kansas is a matter of public interest concerning the safety of Kansas citizens. Similarly, telephone harassment is also of public interest concerning the health and safety of Kansas residents.

Caranchini's complaint similarly relates to Rick Pecks' right to petition.  Under 60-5320(c)(5) the "Exercise of the right to petition" means "any of the following: (A) A communication in or pertaining to: (i)  A judicial proceeding... (E) any other communication or conduct that falls within the protection of the right to petition the government under the constitution of the United States or the constitution of the state of Kansas."   The communications referred to by Caranchini were communications made during the Protection from Stalking matter.  Any other communications Caranchini refers to "pertains" to either the civil or the criminal matter, both of which concerned the safety of Rick and Lola Peck.  Caranchini's Complaint also implicates the Pecks' right of association.  Under 60-5320(c)(3) the "Exercise of the right of association" means "a communication between individuals who join together to collectively express, promote, pursue or defend common interests."  In her claim for injunctive relief, she seeks all kinds of prohibitions limiting the Pecks' communications regarding their "common interests" including their ability to reside together in any geographic location, or to communicate with each other about their safety or the issues Caranchini complains of in her suit.[2]

So Caranchini uses the labels "slander" and "libel."  Caranchini pleads no facts to demonstrate that these communications were anything other than privileged.  *See* PIK Civ. 4th 127.53 ("A communication involving (open violations of law which justify police interference) (matters in connection with inquiries regarding the commission of crime) (matters which are of legitimate public concern) (information concerning a public official) (matters involving employer-employee relations) is qualifiedly privileged.")   The

---

[2] Injunctive relief is a remedy, not a stand-alone cause of action.  It is available as a remedy only where a party prevails on a separate legal theory. *See Dalcour v. City of Lakewood*, No. 08-cv-00747-MSK-KLM, 2009 WL 3162235, at *7 (D. Colo. Sept. 30, 2009).

application of the anti-SLAPP statute is particularly appropriate because her Complaint does not sufficiently allege the elements of her legal theory under which she is pursuing this claim, nor does Plaintiff's complaint provide the Court with sufficient factual basis for slander or libel.  The anti-SLAPP statute does more than merely force a plaintiff "to state their claims intelligibly so as to inform the defendants of the legal claims being asserted." *Mann v. Boatright*, 477 F.3d 1140, 1148 (10th Cir. 2007) – it requires substantive proof. Prolixity of a complaint undermines the utility of the complaint. *See Knox v. First Sec. Bank of Utah*, 196 F.2d 112, 117 (10th Cir. 1952) ("The purpose of [Rule 8(a)] is to eliminate prolixity in pleading and to achieve brevity, simplicity, and clarity").  *See Mann*, 477 F.3d at 1148 (complaint runs afoul of Rule 8 through unnecessary length and burying of material allegations in "a morass of irrelevancies.")

As to Count 2-5, the same amorphous claim is made.  Caranchini again says "libel and slander." Caranchini specifically pled that everything is linked to statements made in conjunction with the two Kansas legal proceedings. These are statements that are absolutely privileged under Kansas law. *See Froelich v. Adair*, 213 Kan. 357, 360, 516 P.2d 993 (1973)("Judicial proceedings are absolutely privileged communications, and statements in the court of litigation otherwise constituting an action for slander, libel, or one of the invasion of privacy torts involving publication, are immune from such actions.") Statements made in a pleading or motion receive absolute privilege, even if wilfully false. *Davis v. Union State Bank,* 20 P.2d 508, 510 (Kan. 1933).  Parts and pieces of each Count is directed against the defendant Lola Peck in purporting to state a claim for "harassment," "threat of bodily harm," and "libel and slander."  Caranchini speculates.  She claims "harassment" which is not a Kansas tort.  She speculates that Lola Peck was following

12

Caranchini on the highway; going up and down Caranchini's street; following Caranchini to her doctor and placing a condom by her car and even going to her church parking lot and placing a condom by her car. *See* Complaint paras 8, 49, and 169. On their face these allegations are sheer imaginations of Caranchini and are not plausible.  Overall, Caranchini refers to the "fact section incorporated above" and then infers that Lola Peck made threats – not to Caranchini but to Rick Peck. See page 50, para. 47 ("Such 'inference' by RPeck could mean only one thing: that LPeck was threatening Caranchini.") She doesn't allege that the defendant Lola Peck actually threatened her – only that *she thought Rick Peck thought* that which is not plausible. See page 90, para. 166 ("Obviously, her threats were real and numerous and RPeck was very concerned for Caranchini's safety and believed he needed to 'stay with LPeck' to prevent 'serious' harm to Caranchini by LPeck. That RPeck would make such statements to Caranchini reinforces to Caranchini that such threats were not only 'real', but very serious as RPeck did not exaggerate.")  She claims that Rick Peck left Caranchini to protect her from the continuing imagined threats of Lola Peck to Rick Peck against Caranchini.   None of this plausibly states a claim that Lola Peck assaulted Caranchini.   There is no allegation that there was any "intentional threat or attempt, coupled with apparent ability, to do bodily harm to another, resulting in immediate apprehension of bodily harm."  The plaintiff makes numerous speculations about condoms, beer bottles in her back yard, and her tires being deflated. She claims that her ADT alarm has gone off inexplicably.  All of this is not plausible but only her imagination running wild. None of her speculation gives rise to a factual basis for any claim.  The Counts purport to state a cause of action based upon emails that Caranchini claims were ghost written by Lola Peck.  The plaintiff claims two emails were not written by Rick Peck but by Lola Peck.  This

does not state a claim.  She then sets out a laundry list of soap opera irrelevant ramblings about whether her relationship with the defendant Rick Peck was or is still valid and ongoing.   In her claim for relief, she alleges the emails were intended to inflict mental anguish upon her.  Caranchini seeks injunctive relief and does not state a claim.  Caranchini refers to emotional harm.  "To succeed on a claim for negligent infliction of emotional distress, a plaintiff must first establish that he or she has a qualifying physical injury under Kansas law. *Anderson v. Scheffler*, 242 Kan. 857, 860, 752 P.2d 667 (1988). The qualifying physical injury must (1) directly result from the emotional distress allegedly caused by the defendant's negligence and (2) appear within a short span of time after the emotional disturbance. *Hoard v. Shawnee Mission Medical Center*, 233 Kan. 267, 279, 662 P.2d 1214 (1983).  Nothing Caranchini alleges meets any of those necessary elements and are not plausible.

Under 60-5320(c)(5) the right to includes "any other communication or conduct that falls within the protection of the right to petition the government under the constitution of the United States or the constitution of the state of Kansas."[3]   In the context

---

[3] By incorporating the constitution of the United States, the anti-SLAPP statute provides immunity under the First Amendment / Noerr-Pennington doctrine when they exercised their right to petition.  The Noerr-Pennington doctrine has been extended beyond antitrust cases and places limits on liability for a range of common law torts*. See Scott v. Hern,* 216 F.3d 897, 914 (10th Cir. 2000).  Many "federal and state courts have concluded that the Noerr-Pennington doctrine is rooted in the First Amendment right to petition and therefore must be applied to all claims implicating that right, not just to antitrust claims." Aaron R. Gary, First Amendment Petition Clause Immunity from Tort Suits: In Search of a Consistent Doctrinal Framework, 33 Idaho L. Rev. 67, 95-96 (1996) (citing cases where "the doctrine has been applied to claims for tortious interference with contract and with business relations/economic advantage, defamation, violation of civil rights, abuse of process, and intentional infliction of emotional distress.") *See also Computer Assocs. Int'l, Inc. v. American Fundware, Inc.,* 831 F.Supp. 1516, 1522 (D.Colo.1993) (recognizing Noerr-Pennington doctrine applies in suits other than those based on anti-trust violations). The Tenth Circuit has held that this doctrine may be used outside of the antitrust context, but

of the *Noerr-Pennington* doctrine incorporated under the anti-SLAPP statute, protection of the First Amendment right to petition exists because K.S.A. 60-5320 includes "any other communication or conduct that falls within the protection of the right to petition" under the U.S. Constitution.   The anti-SLAPP statute is consistent with that doctrine which requires a heightened pleading standard for addressing allegations of misuse or abuse of process. *See Cordova v. Cline,* No. S-1-SC-34093 (May 22, 2017)*; Protect Our Mountain Environment, Inc. v. Dist. Ct. In & For Cty. Of Jefferson*, 677 P.2d 1361, 1369 (Colo. 1984) *(en banc*). This heightened standard is "necessary to avoid a chilling effect on the exercise of this fundamental First Amendment right ... and conclusory allegations are not sufficient to strip a defendant's activities of *Noerr-Pennington* protection." *Oregon Nat. Res. Council v. Mohla*, 944 F.2d 531, 533 (9th Cir. 1991).

**The Burden Now Shifts to Caranchini to Establish a Prima Facie Case for Her Claim Which is Legally Impossible Under Her Complaint**

Pursuant to K.S.A. 60-5320(d), the "burden shifts to the responding party to establish a likelihood of prevailing on the claim by presenting substantial competent evidence to support a *prima facie* case." The plaintiff's prima facie case must be supported by substantial competent evidence.   One would have to be a tea leaf reader with official fortuneteller certification to discern Caranchini's Complaint – i.e. connection of any of her facts to any Kansas tort.   This is a cryptic "hairball complaint." *See D.J. Young Publ'g Co., LLC ex rel. Young v. Unified Gov't of Wyandotte Cty.,* No. 12-CV-2011-KHV, 2012 WL 4211669, at *3 (D. Kan. Sept. 18, 2012).   Caranchini's prolix diary of tea leaves could only be read using a teacher's guide authored by Caranchini. It is replete with random soap-opera type

---

only on the basis of the First Amendment right to petition. *See Cardtoons, L.C. v. Major League Baseball Players Assoc.,* 208 F.3d 885, 889 (10th Cir. 2000).

allegations which no practicing attorney would include in a complaint.  Every count incorporates by reference the allegations previously pled even though she states many of the allegations do not apply to the Peck defendants. Every following Count follows the same pattern.  The result is that each count is replete with factual allegations that could not possibly be material to that specific count, and that any allegations that are material are buried beneath innumerable pages of rambling irrelevancies.  All that the plaintiff has done is typed "Count" as a heading, and then say the words "slander" and "libel" without any recognition that there must be facts pled to meet those tort's respective elements.

Caranchini's "statement" is not plain but ugly, prolix and disjointed requiring the reader to sift through Caranchini's endless ramblings. The anti-SLAPP statute, as the federal rules of pleading similarly hold, will "will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997).  Caranchini is bound to her complaint and a response to this motion to strike is not the appropriate vehicle for asserting substantive legal claims found nowhere in the Complaint.  *See e.g. Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir. 1984) ("axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.")  Under K.S.A. 60-5320(d), there are no do-overs on the Complaint – the plaintiff who files a SLAPP lawsuit is stuck with that pleading.[4]  Caranchini's response cannot be a rewrite of her wholly deficient Complaint.  This plaintiff specifically pled that the offending statements were made in

---

[4] Caranchini has a pre-existing duty to assert a sufficient factual basis to support her claims against each defendant at the outset of the case. *See Jensen v. Am.'s Wholesale Lender,* 425 F. App'x 761, 764 (10th Cir. 2011).  Caranchini must now specifically identify each element of any tort from her Complaint and then provide evidence to support it. *See Brown v. Ameriprise Fin. Servs., Inc.,* 276 F.R.D. 599, 605 (D. Minn. 2011) (explaining that a plaintiff must plead a claim adequately before obtaining discovery, "not the other way around.")

conjunction with judicial proceedings which are immune under Kansas law and the First Amendment.  So given that Caranchini's Complaint is the sole focus under the anti-SLAPP statute, it will not permit Caranchini to bolster or otherwise rehabilitate that Complaint. As a matter of law, the Court can rule Caranchini cannot establish a likelihood of prevailing on the claims against the Pecks as set forth in her Complaint.

Even if Caranchini pled the requirement elements of a tort, under Kansas law, "substantial competent evidence" is typically a standard of review applied by appellate courts to review evidence.  It is analogous to that of a trial court which considers whether to take a case away from a jury by sustaining a motion for a directed verdict.   First, evidence must be admissible.  Second, "substantial competent evidence" is "evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved."  *Wiles v. Am. Family Life Assurance Co. of Columbus,* 302 Kan. 66, 73, 350 P.3d 1071 (2015).  Put another way, "substantial evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion." *Kansas Dept. of Health & Environment v. Banks*, 230 Kan. 169, 172, 630 P.2d 1131 (1981). Bare baseless opinions and conclusory statements made by Caranchini will not suffice.  Thus, for purposes of the anti-SLAPP statute, substantial evidence should be interpreted to mean relevant and admissible evidence from which a reasonable jury could find for the plaintiff – much like (if not identical to) the standards governing summary judgment or judgment as a matter of law.   This burden requires Caranchini to coherently address each element of a tort, as stated in her Complaint, against the Pecks with substantial competent evidence to support each essential element of her claim.

**K.S.A. 2016 Supp. 60-5320**

The Pecks are seeking enforcement of K.S.A. 60-5320 in this federal diversity suit. The First, Fifth, and Ninth Circuits, along with a host of federal district courts, have all applied state anti-SLAPP laws in federal court. The *Los Lobos* decision recognized the distinction in these cases arising from the differences in state anti-SLAPP statutes. On its face, K.S.A. 60-5320 provides immunity from Caranchini's libel / slander suit. State law governs the scope of 60-5320 immunity as to whether the immunity is from suit or merely from liability. *See Aspen Orthopaedics & Sports Medicine, LLC v. Aspen Valley Hosp. Dist.,* 353 F.3d 832, 837 (10th Cir. 2003) ("We must look to substantive state law ... in determining the nature and scope of a claimed immunity.")

"For purposes of determining whether state and federal rules collide, federal courts have consistently interpreted the federal rules with sensitivity to important state interests and regulatory policies." *Trierweiler v. Croxton and Trench Holding Corp.,* 90 F.3d 1523, 1539-40 (10th Cir.1996). "As a federal court sitting in diversity of citizenship litigation, our duty under *Erie v. Tompkins* principles is of course to conform to [Kansas'] substantive law." *Vanover v. Cook,* 260 F.3d 1182, 1186 (10th Cir. 2001). "[I]n diversity cases our task is simply to ascertain and apply the state law. As we are sitting in diversity and construing a [Kansas] statute, we must give it the meaning it would have in the [Kansas] courts. We may consider the textual context; the statute's legislative history; the state of the law prior to the legislative enactment; the problem addressed by the legislation; and the relationship between the particular legislation and other relevant legislative provisions in an effort to discern the legislative intent." *Kokins v. Teleflex, Inc.,* 621 F.3d 1290, 1304 (10th Cir. 2010).

Under Kansas law, this Court should ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016).  When a statute is plain and unambiguous, this Court should not speculate about the legislative intent and should refrain from reading something into the statute that is not readily found in its words. *Id*. at 409.  Where there is no ambiguity, the court need not resort to statutory construction. Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history to construe the legislature's intent. *Id.*

The determination of the procedural/substantive is critical under *Shady Grove Orthopedic. Assocs., P.A. v. Allstate Ins. Co.,* 559 U.S. 393 (2010) (if the federal rule addresses the dispute and the state law is procedural, not substantive, the federal rule applies)  "A federal rule, therefore, cannot govern a particular case in which the rule would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right.") *Id*. at 423 (Stevens, J., concurring).  This Court used a slightly different legal framework prior to *Shady Grove* but nevertheless came to a conclusion consistent with *Shady Grove.  See e.g., NAL II, Ltd. v. Tonkin*, 705 F.Supp. 522, 528 (D.Kan.1989) (finding the Kansas punitive pleading statute in conflict with Rule 9(g) but only procedural in nature and therefore not enforceable in federal court).

Under Justice Stevens's as-applied approach, the validity of a Federal Rule is assessed by examining the relationship between that rule and the state law to the contrary. "Federal rules cannot displace a State's definition of its own rights or remedies." *Id*. at 418. Under Justice Stevens' analysis, "when a State chooses to use a traditionally procedural

vehicle as a means of defining the scope of substantive rights or remedies, federal courts must recognize and respect that choice." *Id.*  In such a situation, a Federal Rule in direct conflict with a state law would violate the Rules Enabling Act of 1934 if it were applied instead of the state law.  In Justice Stevens' words, under this approach a Federal Rule does not "really regulate procedure when it displaces those rare state rules that, although 'procedural' in the ordinary sense of the term, operate to define the rights and remedies available in a case." *Id.* at 428 n.13.[5]  If that state law is either substantive in form or operation, the state law prevails and will be applied irrespective of a federal rule that would alter those substantive state rights or remedies embodied or bound up in that state law.

**The Kansas Anti-SLAPP Statute Does Not Conflict With Federal Law**

The Kansas anti-SLAPP statute does not collide with any Federal Rule.  Here, the only arguably relevant Federal Rules are Civil Rule 12 (which authorizes parties to file motions to dismiss) and Civil Rule 56 (which authorizes parties to seek summary judgment). Kansas' anti-SLAPP provision, however, does not directly collide with either of these. To the contrary, a federal court can (and should) give full effect to both the Federal

---

[5] Obviously Judge Scalia's approach leads to different results.  Scalia's analysis mandated that the Rule be considered in isolation – simply determining whether it "really regulates procedure" or "answers the same question."  *See Shady Grove* at 416. Rulings refusing to apply an anti-SLAPP statute have generally relied upon Judge Scalia's approach.  *See* Allan Ides, The Standard for Measuring the Validity of a Federal Rule of Civil Procedure: The Shady Grove Debate Between Justices Scalia and Stevens, 86 Notre Dame L. Rev. 1041 (2011). Using Scalia's analysis, the 11th Circuit would not enforce a Georgia anti-SLAPP statute.  In *Royalty Network, Inc. v. Harris*, 756 F.3d 1351 (11th Cir. 2014), the 11th Circuit analyzed Georgia's anti-SLAPP statute which required a plaintiff to file a written verification contemporaneous with the petition.  The *Royalty* court held because the Federal Rule did not require verification, the Georgia anti-SLAPP statute requiring verification could not be enforced.  The Georgia legislature has since passed new legislation eliminating the verification feature.  It is similar to the Kansas anti-SLAPP statute.

Rules and the substantive state provision in diversity cases, because the two establish complementary rather than contradictory grounds for resolving claims. Kansas' imposition of an additional requirement thus reinforces these Rules; it does not contradict them. Rules 12 and 56 set out minimum requirements that claimants must satisfy at the pleading and pretrial stages – necessary but not sufficient conditions for moving forward to trial. By imposing an additional requirement, Kansas' anti-SLAPP provision reinforces Rules 12 and 56; it does not contradict them.

There is no question that the Kansas legislature could simply abolish the tort of slander or libel.  It can therefore also choose a less extreme course: limiting causes of action challenging expressive conduct to instances where a plaintiff can make a threshold showing of merit upon substantial evidence.  The legislature is entitled to require that plaintiff to marshal her evidence within 30 days regarding these kinds of claims.  *See* 60-5320(d) ("A hearing shall be held on the motion not more than 30 days after the service of the motion" and motion being ruled upon "in an expedited fashion").  60-5320 creates a new defense to causes of action involving first amendment rights, which effectively provides immunity from suit and would act as a complete bar to the plaintiff's claim in this matter.  It also allows the Pecks, as a target of a SLAPP suit, to recover damages by providing for a mandatory award of attorney fees, costs, other reasonable expenses, and sanctions in the event a motion to strike is granted.

Kansas' anti-SLAPP provision does not directly collide with any Federal Rule, because no Federal Rule affirmatively authorizes litigants to proceed with the kinds of claims that the Kansas statute bars. Most importantly, the Rules set out *necessary* conditions for a plaintiff to advance to trial, not *sufficient* conditions.  Put another way, the

text shows that the Rules establish grounds for *disposing* of claims, not grounds for *proceeding* with them. Neither Rule states that claimants enjoy an affirmative right to move forward with their claims if they satisfy the Rules' requirements. *See Godin v. Schencks*, 629 F.3d 79, 86 (1st Cir. 2010). Rule 12 does not say that "plaintiffs who state a claim to relief may proceed to discovery." And Rule 56 does not say that "plaintiffs who raise a genuine issue of material fact may proceed to trial." The Rules Committee's drafting conventions underscore this interpretation. "The Federal Rules regularly use 'may' to confer categorical permission." *Shady Grove*, 559 U.S. at 398.  Indeed, the Rules Committee's authoritative drafting guidelines direct drafters to use "may" to mean "has a right to." Bryan A. Garner, Guidelines for Drafting and Editing Court Rules 29 (1996). For example, Rule 14(a)(1) confers a right to implead by providing that a defendant "may, as third-party plaintiff, serve a summons and complaint on a nonparty." Rule 18(a) confers a right to join claims by providing that a party "may join … as many claims as it has against an opposing party." Rule 23(b) confers a right to maintain class actions by providing that "[a] class action may be maintained" under specified conditions. And so on.

In marked contrast, Rules 12 and 56 lack the kind of rights-conferring language that all of these other Rules contain; they do not say that a party "may maintain" a claim if it satisfies the Rules' prerequisites. The inclusion of such language in many other Rules, but not in these Rules, shows that the rule makers "acted intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983).

The existence of numerous federal provisions identifying additional grounds for disposing of a case pretrial further confirm that Rules 12 and 56 set out minimal requirements rather than exhaustive ones. *See Godin*, 629 F.3d at 91. For example, Rule

9(b) requires fraud plaintiffs to "state with particularity the circumstances constituting fraud." Similarly, the Private Securities Litigation Reform Act requires certain securities-law plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). If Rules 12 and 56 affirmatively authorized any plaintiff who meets their requirements to proceed to trial, they would contradict these provisions.

The rudimentary standards for a special motion to strike are no different from those of the Federal Rules.  State law governs substantive matters such as the elements of a defense and the burden of persuasion.  As the *T&T* court determined, the preliminary determinations on the merits of a motion to strike are based upon what is alleged in the Complaint.  This is consistent with issues framed by a Complaint under Federal Rule 12. Under 60-5320, if the moving party meets this initial burden, the burden then shifts to the responding party to establish a likelihood of prevailing on the claim by presenting substantial competent evidence to support a prima facie case. K.S.A. 2016 Supp. 60-5320(d).  If matters outside the pleadings are admitted, there is no heightened evidentiary burden upon Caranchini under the anti-SLAPP statute than is imposed by Federal Rule 56.

Since Rules 12 and 56 merely "provide various theories upon which a suit may be disposed of before trial," but "do not provide that a plaintiff is entitled to maintain his suit if their requirements are met," they do not directly conflict with the state anti-SLAPP law. *Makaeff v. Trump Univ., LLC,* 736 F.3d 1180, 1182 (9th Cir. 2013) (Wardlaw, J., concurring in *denial of reh'g en banc*). The state law, after all, simply creates a "separate and additional theory" for disposing of claims. *Id*. It "supplements" the Federal Rules; it does not contradict them. *Id*. The object of Rules 12 and 56 is to winnow claims and defenses over

the course of litigation.  The object of the anti-SLAPP law, by contrast, is to "encourage and safeguard the constitutional rights of a person to petition, and speak freely and associate freely, in connection with a public issue or issue of public interest to the maximum extent permitted by law." The Federal Rules and state provisions thus ask "entirely different question[s]," "serve different purposes," and "control different spheres." *Makaeff*, 736 F.3d at 1182 (Wardlaw, J., concurring); *see also, e.g., Godin*, 629 F.3d at 89.  So the provisions do not directly collide with each other.[6]

The Second Circuit considered whether the Nevada anti-SLAPP statute conflicts with the federal rules of civil procedure.  *See Adelson v. Harris*, 774 F.3d 803 (2d Cir. 2014). It allowed enforcement stating "we, therefore, decide it as a threshold matter on the facts of this case. While our Circuit has not previously examined the issue, the specific state anti-SLAPP provisions applied by the district court ... seem to us unproblematic." *Id.* at 809. *Adelson* held that:"(1) [The Nevada anti-SLAPP statute] would apply in state court had suit been filed there; (2) is substantive within the meaning of Erie, since it is consequential enough that enforcement in federal proceedings will serve to discourage forum shopping and avoid inequity; and (3) does not squarely conflict with a valid federal rule." *Id.*

---

[6] This case most closely resembles *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541 (1949), which found no conflict between federal and state provisions addressing shareholder derivative lawsuits. The Federal Rule in *Cohen* (former Rule 23, now Rule 23.1) established prerequisites for bringing such lawsuits; for example, the shareholder had to verify the complaint and identify previous attempts to use the corporation's internal procedures to resolve the problem. The state law in *Cohen* imposed an additional prerequisite intended to deter frivolous derivative lawsuits; shareholders had to post bond covering the corporation's costs and attorneys' fees. The Supreme Court held that federal courts could apply the state rule, because there is "n[o] conflict" between the requirements set out by the Federal Rule and the supplemental requirement set out by state law. *Id.* at 556.

The First Circuit has held that Maine's Anti-SLAPP statute does not conflict with the federal rules. *See Godin at* 86-87 ("Rules 12 (particularly Rule 12(b)(6)) and 56 do not control" motions under the Anti-SLAPP provision and "the dual purposes of Erie are best served by enforcement of Section 556 in federal court."). The Court of Appeals for the Ninth Circuit has adopted a similar position with respect to California's Anti-SLAPP statute. *See United States ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963, 973 (9th Cir. 1999) ("We conclude that these provisions [of the anti-SLAPP statute] applies to the state law claims brought by Caranchini in federal court against the Pecks. *See Hilton v. Hallmark Cards,* 599 F.3d 894, 901 (9th Cir. 2010). This is based upon the Court's diversity subject matter jurisdiction and state law claims. *Id.* at 900 n.2 (stating that "we have long held that the anti-SLAPP statute applies to state law claims that federal courts hear pursuant to their diversity jurisdiction")

As *Godin* recognized, "Federal Rules 12 and 56 are addressed to different matters, whereas the [anti-SLAPP statute] provides a mechanism for a defendant to move to dismiss a claim on an entirely different basis: that the claims in question rest on the defendant's protected petitioning conduct and that the plaintiff cannot meet the special rules [anti-SLAPP statute] has created to protect such petitioning activity against lawsuits." *Godin* at 89. "Declining to apply [anti-SLAPP statute] in federal court would thus result in an inequitable administration of justice between a defense asserted in state court and the same defense asserted in federal court." *Godin* at 92. "Likewise, were [anti-SLAPP statute] not to apply in federal court, the incentives for forum shopping would be strong: electing to bring state-law claims in federal as opposed to state court would allow a plaintiff to avoid

[anti-SLAPP statute's] burden-shifting framework, rely upon the common law's per se damages rule, and circumvent any liability for a defendant's attorney's fees or costs." *Id.*

As demonstrated with *Diamond,* most district courts apply anti-SLAPP statutes in federal courts.  *See, e.g., Louisiana Crisis Ass't Ctr. v. Marzano-Lesnevich*, 878 F. Supp. 2d 662 (E.D. La. 2012) (holding that Louisiana's anti-SLAPP statute could be used to strike claims and theories of relief); *New.net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090 (C.D. Cal. 2004) (utilizing the decision in *Newsham* to apply California's anti-SLAPP statute); *Bargantine v. Mechanics Cooperative Bank*, No. 13-11132-NMG, 2013 WL 6211845 (D.Mass. Nov. 26, 2013) (using *Godin* to apply Massachusetts's anti-SLAPP statute); *Boley v. Atl. Monthly Grp.,* 950 F. Supp. 2d 249, 254 (D.D.C.2013) (following *Henry, Newsham, and Godin*).

**The Kansas anti-SLAPP statute Constitutes Substantive Law**

K.S.A. 60-5320 should be considered a part of Kansas' "framework of substantive rights or remedies." *Garman*, 630 F.3d at 984 (quoting *Shady Grove*, 559 U.S. at 419 (Stevens, J., concurring)).  The Kansas anti-SLAPP statute substantively alters the entire landscape of Kansas claims when it involves protected or privileged communications by providing defendants immunity from suit.  It clearly changes the remedies available to a defendant in responding to the classes of cases brought by a plaintiff.

Under Justice Stevens's *Shady Grove* concurring opinion, applying a federal procedural rule when there is a conflicting state law in a diversity case violates the Rules Enabling Act when "the state law actually is a part of a State's framework of substantive rights or remedies." *Garman*, 630 F.3d at 984 (quoting *Shady Grove*, 559 U.S. at 419 (Stevens, J., concurring)). The plaintiff Caranchini attacks the Pecks' free speech rights including the right to petition and right to associate.   Under Justice Stevens' analysis which

the Tenth Circuit has adopted, the key is the <u>functional nature</u> of the state law, not whether it appears procedural or substantive on the surface. *See Shady Grove*, 559 U.S. at 423 (Stevens, J., concurring) (a "federal rule, therefore, cannot govern a particular case in which the rule would displace a state law that is procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right.")

After the *Los Lobos* decision, the most recent Tenth Circuit case applying *Shady Grove* was *Racher v. Westlake Nursing Home Limited Partnership,* No. 16-6011 (10th Cir. September 28, 2017).[7] *Los Lobos* and *Racher* utilized Judge Stevens's *Shady Grove* analysis. *Racher* considered Oklahoma's statutory procedure to limit noneconomic damages in certain cases alleging bodily injury. The question was whether the statutory damage limit was an affirmative defense that defendants must assert, or a pleading requirement plaintiff must satisfy. *Id.* at p. 13. The *Racher* court stated that "to decide whether a state law is substantive and therefore applicable in federal courts, courts must decide whether applying the law will significantly affect the outcome of the litigation." *Id.* at p. 19. Failing to enforce the state law "would lead to different measures of the substantive rights enforced in state and federal courts, contrary to Erie's command." *Id.* The *Racher* court ultimately

---

[7] The Tenth Circuit has historically adopted Justice Stevens' concurrence governing the issue of whether a state law conflicts with the federal rules of procedure or can be enforced in a federal forum. *See James River Ins. Co. v. Rapid Funding, LLC,* 658 F.3d 1207, 1217 (10th Cir.2011) (addressing Rule 701); *Garman v. Campbell County Sch. Dist. No. 1*, 630 F.3d 977, 983 n. 6 (10th Cir.2010) (Rule 8(a)(1) notice pleading standards). Most district courts in the Tenth Circuit have applied Justice Stevens' as-applied test. *See Friedman v. Dollar Thrifty Auto. Grp., Inc*., No. 12-cv-02432-WYD-KMT, 2015 WL 8479746, at *3-4 (D. Colo. Dec. 10, 2015); *Diamond Ranch Acad., Inc. v. Filer,* 117 F. Supp. 3d 1313, 1319 (D. Utah 2015); *Upky v. Lindsey,* No. CIV-13-0553-JB/GBW, 2015 WL 1918229, at *20-21 (D.N.M. Apr. 7, 2015); *Pfeifer v. Fed. Exp. Corp.,* No. 09-cv-1248-EFM-KMH, 2014 WL 4294957, at *5 (D. Kan. Aug. 29, 2014).

held that the Oklahoma statute operated as an affirmative defense which posed no conflict between it and the Federal Rule 8.  Applying *Racher*, if K.S.A. 60-5320 is not applied in this federal forum, it would lead to inequitable results as between the same suit filed in a Kansas state court or one filed in federal court.  The outcome of litigation would clearly be altered as between the two forums.  *See Los Lobos*, p. 28, fn. 7 ("Our concern is with the proper interpretation of a much narrower statute, one that, as we have seen, does not protect a defendant "from the ultimate judgments of liability…. ('[D]eeper inspection has persuaded us that, while all of the [anti-SLAPP] statutes have common elements, there are significant differences as well, so that each state's statutory scheme must be evaluated separately.')(citation omitted)"

The Kansas statute provides for mandatory attorney fees and costs, as well as additional sanctions.  In *Diamond Ranch Academy, Inc. v. Filer*, 117 F.Supp.3d 1313 (D.Utah 2015), the Honorable Judge T. Campbell analyzed the Utah and California anti-SLAPP statutes.  Judge Campbell held that both created substantive rights. He recognized that "an anti-SLAPP statute is typically a hybrid procedural/substantive law … Most anti-SLAPP laws rely on procedural mechanisms to protect substantive rights and thus pose a quandary for federal courts hearing state law claims."  *Id*. at 1318.  "The anti-SLAPP statute 'is designed to protect the defendant from having to litigate meritless claims aimed at chilling First Amendment expression….'"  *Id*.  A "'defendant's rights under the anti-SLAPP statute are in the nature of immunity' because 'California lawmakers wanted to protect speakers from the trial itself rather than merely from liability.'"  *Id*.  Judge Campbell cited other anti-SLAPP rulings such as *Chi v. Loyola Univ. Med. Ctr.,* 787 F.Supp.2d 797, 808-09 (N.D.Ill.2011) (holding that Illinois' anti-SLAPP statute is substantive despite its location in

the state's civil procedure code because its immunity and attorneys' fees provisions "are plainly meant to affect conduct outside of the litigation process, such as a person's decision to exercise his First Amendment rights without fear of retaliation.")

The *Los Lobos* court recognized other statutes provide substantive protections even though the New Mexico statute did not. The vast majority of courts, including every federal appellate court to address the issue, have analyzed state anti-SLAPP statutes and concluded that they are substantive protections of state law applicable in federal court.[8] In *Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir.2003), the Ninth Circuit held that "because the anti-SLAPP motion is designed to protect the defendant from having to litigate meritless cases aimed at chilling First Amendment expression, the district court's denial of an anti-SLAPP motion would effectively be unreviewable on appeal from a final judgment." *Id.* at 1025. It held that "because California law recognizes the protection of the anti-SLAPP statute as a substantive immunity from suit, this Court, sitting in diversity, will do so as well.") *Id.* at 1025-26.

---

[8] *See Godin at* 91-92 (Maine statute); *Chandok v. Klessig,* 632 F.3d 803 (2d Cir. 2011) (New York statute); *Brown v. Wimberly,* 477 F. App'x 214, 216 (5th Cir. 2012) (Louisiana); *Eklund v. City of Seattle Mun. Ct.,* 410 F. App'x 14 (9th Cir. 2010) (Washington); *Gardner v. Martino*, 563 F.3d 981, 991 (9th Cir. 2009) (Oregon); *United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 970-73 (9th Cir. 1999) (California); *Tennenbaum v. Ariz. City Sanitary Dist.,* 799 F. Supp. 2d 1083 (D. Ariz. 2011) (Arizona); *Buckley v. DIRECTV, Inc.,* 276 F. Supp. 2d 1271 (N.D. Ga. 2003) (Georgia); *Chi v. Loyola Univ. Med. Ctr.,* 787 F. Supp. 2d 797 (N.D. Ill. 2011) (Illinois); *Containment Techs. Grp. Inc. v. Am. Soc. of Health Sys. Pharmacists,* 2009 WL 838549 (S.D. Ind. Mar. 26, 2009) (Indiana); *Russell v. Krowne*, 2010 WL 2765268 (D. Md. July 12, 2010) (Maryland); *Balestra-Leigh v. Balestra,* 2010 WL 4280424 (D. Nev. Oct. 19, 2010), *aff'd on other grounds*, 471 F. App'x 636 (9th Cir. 2012) (Nevada); *Bible & Gospel Trust v. Twinam*, 2008 WL 5245644 (D. Vt. Dec. 12, 2008) (Vermont).

**Stay of Discovery is Warranted**

The anti-SLAPP statute provides that all discovery must be stayed pending resolution. *See* paragraph (e)(2).  The plaintiff has referred to statements made in judicial proceedings which are privileged under Kansas law.  Caranchini must now stand upon her cryptic pleading and show how she is entitled to any relief from her Complaint.

**Request for Fees and Sanctions**

The anti-SLAPP statute under paragraph (g) states that the "court shall award the defending party, upon a determination that the moving party has prevailed on its motion to strike, without regard to any limits under state law: (1) Costs of litigation and reasonable attorney fees; and (2) such additional relief, including sanctions upon the responding party and its attorneys and law firms, as the court determines necessary to deter repetition of the conduct by others similarly situated."  An award of fees and litigation costs in this matter is requested.  As additional relief, sanctions for fees defending the same claim in Missouri is requested as it is necessary to deter repetition of the same conduct by other *pro se* litigants who are or were trained in the law.  These kinds of litigants need special deterrents as they misuse the court system, not from ignorance, but rather from their familiarity with it.[9]

---

[9] The *pro se* liberality rule is based upon a policy that the litigant is not legally trained as a lawyer.  Being disbarred does not change that. *See McNamara v. Brauchler,* 570 Fed. Appx. 741, 743 (10th Cir. 2014) ("We see no reason to hold McNamara to a less stringent standard than other legally trained individuals").  Although disbarred, the plaintiff did get a law degree, was trained legally, and her pleadings should be considered "drafted by a lawyer."  *See Presnick v. Bysiewicz,* 297 F.Supp.2d 431, 433 (D. Conn. 2003) ("While *pro se* complaints are held to less exacting standards than pleadings drafted by lawyers, plaintiff, a former attorney, is not entitled to the considerations accorded a typical *pro se* plaintiff."); *Thomas v. Humfield*, 1994 WL 442484, *3 (5th Cir. Aug. 2, 1994) ("With his formal legal training, Thomas should be expected to understand and to observe court procedures that we might otherwise be willing to excuse if neglected by typical *pro se* claimants.") "The leniency this Court sometimes accords to *pro se* litigants in making pleading determinations is not warranted here, since plaintiff, though appearing *pro se*, was once a

**Conclusion**

Caranchini's claims should be stricken under the anti-SLAPP statute.[10]  Caranchini framed her Complaint like a long venting chapter from her screenplay of her version of the movie *Fatal Attraction*.  Caranchini believes the federal court system provides her a forum to facilitate a "rescue mission" to snatch Rick Peck from the cult-of-one named Lola Peck.  Caranchini makes no apologies for her attempt to obtain relief for a relationship-breakup.  She emphasizes how Lola Peck has orchestrated Caranchini's breakup.  The Complaint rambles on about how good her sex was with Rick Peck and how bad it must have been with Lola Peck – all spurious and demeaning statements which have no place in a federal lawsuit.  She meanders about claiming "false statements in the paperwork" or statements to police (Kansas) and other minutia (removing guns from their home; speculation about condoms and Lola Peck purportedly accessing Rick Peck emails or ghostwriting).  None of these things have any relevance to anything other than allowing Caranchini to publicly hurt Lola Peck and to vent and to show Rick Peck that she sees how Lola Peck has captured Rick Peck against his true desire.  The court system should not be treated like a note from a junior high student or supermarket tabloid rag.

---

lawyer." *Walker v. Gormley*, 1993 WL 453864, at *2 (S.D.N.Y. Nov. 4, 1993); *Godlove v. Bamberger*, 903 F.2d 1145, 1148 (7th Cir.1990)(same).

[10] Caranchini drafted her federal complaint which was considered by Judge Trigg in the Kansas Protection from Stalking Hearing. On pages 96-98 of the February 9, 2017, transcript, and after telling Caranchini that the relationship with Peck was over and that she would "have to live with it," stated "there is no legal grounds that I can fathom for you to file a lawsuit against him.  I read the petitions and the drafts.  There is no cause of action for which relief can be granted in any of those documents…. if you choose to file a lawsuit against him and it does not have a basis in law for any stated claim of action for which you can be granted relief, and I'm telling you right now, what you've prepared does not, then you will find yourself also subject to attorneys fees and damages from a court in Johnson County."

Caranchini has long been disbarred as a licensed attorney with apparently a skewed perception of that legal training.  But she was legally trained.  She appears to be blissfully comfortable with invoking the court system as her own virtual fantasy whereby she role plays as an attorney.  Neither the Court nor the parties are required to play bit parts in Caranchini's made-for-tabloid-lost-love script.  Caranchini literally seeks to have this Court *order* that the Pecks be separated and her romance with Rick Peck be rekindled. Caranchini's improper purposes in bringing this suit are demonstrated, not merely from her own Complaint, but from emails exchanged between the Pecks' counsel and Caranchini. Those emails unmistakably show that Caranchini filed her lawsuit against the Pecks to win Rick Peck back and to forever sever the relationship between Lola and Rick Peck.  The emails explicitly show that Caranchini filed each lawsuit so that, either through a deposition or mediation, Caranchini can hear Rick Peck declare his undying love for Caranchini.  This, according to Caranchini, will re-unite Caranchini and Rick Peck in their prior romantic bliss.  According to Caranchini, suing Rick and Lola Peck to get the truth from Rick Peck will provide her a therapeutic closure on the relationship if she can't get Rick Peck back: all improper purposes.

**WHEREFORE** the defendants Rick and Lola Peck specially move that this Court stay all discovery, strike the claims made against them in the plaintiff's Complaint pursuant to K.S.A. 60-5320, and to award costs of litigation and reasonable attorney fees.

By  /s/ Linus L. Baker                              
Linus L. Baker  KS 18197
6732 West 185th Terrace
Stilwell, KS  66085-8922
Telephone:   913.486.3913
Fax:             913.232.8734
E-Mail: linusbaker@prodigy.net
Attorney for Rick and Lola Peck
Defendants

Certificate of Service

The undersigned hereby certifies that this document was filed electronically with the United States District Court for the District of Kansas, with notice of case activity to be generated and sent electronically by the Clerk of the Court to all designated persons, and that on May 15, 2018, I mailed the foregoing first class mail postage prepaid addressed to:

Gwen G. Caranchini
1203 West 62nd Street
Kansas City, Missouri 64113
/s/Linus L. Baker