**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

GWENDOLYN G. CARANCHINI,

    **Plaintiff,**

    v.

LOLA PECK, et al.,

    **Defendants.**

Case No. 18-2249-CM-TJJ

## MEMORANDUM AND ORDER

Pro se plaintiff Gwendolyn G. Caranchini filed the present action against Lola and Rick Peck, Johnson County Sheriff Calvin Hayden, and individuals from the Johnson County Court and District Attorney's Office. The matter is currently before the court on Rick and Lola Peck's Motion to Strike the Claims Against the Pecks Pursuant to K.S.A. 2016 Supp. 60-5320, Enforce the 30-Day Hearing Requirement and Stay of Discovery (Doc. 3). For the following reasons, the court grants the motion in part and denies it in part.

### I. Background

Plaintiff filed a 147-page complaint on May 14, 2018. The court will highly summarize the facts relevant to the present motion. Plaintiff, a former attorney[1], and defendant Rick Peck were involved in an extra-marital affair. At some point Rick and his wife, defendant Lola Peck, filed for a Temporary Restraining Order ("TRO") against plaintiff. At the time the TRO was filed, defendants were divorced but apparently still living together.

---

[1] Plaintiff admits she has been disbarred by the State of Missouri, the United States District Court for the Western District of Missouri, the United States District Court for the District of Kansas, the Eighth Circuit Court of Appeals, the United States Supreme Court, and possibly the Tenth Circuit Court of Appeals. She does not have an active license in any jurisdiction. She claims however, that she was advised that she could still appear in front of the Merit Systems Protection Board and the Equal Employment Opportunity Commission and could "hold herself out as an attorney." (Doc. 85, at 2–3.)

-1-

On February 9, 2017, plaintiff appeared in front of a Johnson County District Court magistrate judge for a hearing on the TRO. At the conclusion of the hearing, deputies from the Johnson County Sheriff's Department arrived to arrest plaintiff on telephone harassment charges. These charges involved defendants. Plaintiff was taken to the Johnson County Jail, where she was held until she was released the following evening on bond. She was incarcerated for approximately 36 hours. The telephone harassment charges were eventually dismissed.

Defendants are listed in Counts I, II, II, IV, and V of the complaint. In her complaint and response to the motion to strike, plaintiff summarizes the claims against defendants as follows:

- Count I – Libel/slander against Rick and Lola Peck for the false filing of the TRO and false testimony by Rick Peck during the TRO hearing,
- Count II – Libel/slander against Lola Peck for filing false paperwork on the telephone harassment charge and for making false statements to Assistant District Attorneys John Fritz and Michael McElhinney,
- Count III – Harassment/threat of bodily harm against Lola Peck,
- Count IV – Conspiracy to incarcerate against Lola Peck,
- Count V – Libel/slander against Lola Peck for claiming plaintiff was "in need of a mental examination" in documents filed in the telephone harassment case.

Plaintiff seeks injunctive and monetary relief from defendants.

**II. Analysis**

Defendants moved to strike the claims against them pursuant to K.S.A. § 60-5320, the Public Speech Protection Act ("the Act"). Defendants argue that plaintiff's claims against them arise from the class of privileged communications defined by and protected by the Act.

*a. Kansas's Public Speech Protection Act, K.S.A. § 60-5320*

Enacted in 2016, the Act—also known as an "anti-SLAPP" statute—was passed to protect against "meritless lawsuits that chill free speech," known as SLAPPs, or "strategic lawsuits against public participation." *See* Eric Weslander, *The First Amendment Slapps Back: An Overview of the Free-Speech Protections of Kansas' New Anti-SLAPP Statute*, J. Kan. B. Ass'n, January 2018, at 30, 31. The

stated purpose of the statute is to "encourage and safeguard the constitutional rights of a person to petition, and speak freely and associate freely, in connection with a public issue or issues of public interest . . . while, at the same time, protecting the rights of a person to file meritorious lawsuits for demonstrable injury." K.S.A. § 60-5320(b). Under the Act, a party may bring a motion to strike the claim if it is "based on, relates to or is in response to a party's exercise of the right of free speech, right to petition or right of association." K.S.A. § 60-5320(d). The motion to strike may be brought early in the litigation—within 60 days of service of the complaint—and the court must hold a hearing on the motion not more than 30 days after service of the motion. *Id.* The statute also directs a court to stay all discovery until entry of the order on the motion to strike. K.S.A. § 60-5320(g).

To invoke the protections of the Act, the party bringing the motion to strike must first make a prima facie case "showing the claim against which the motion is based concerns a party's exercise of free speech, right to petition or right of association." K.S.A. § 60-5320(d). If the moving party meets this burden, the burden shifts to the responding party who must then "establish a likelihood of prevailing on the claim by presenting substantial competent evidence to support a prima facie case." *Id.* The court must deny the motion to strike if the responding party meets this burden. *Id.* When deciding whether either party has met its burden, the court must consider the pleadings and any affidavits "stating the facts upon which the liability or defense is based." *Id.*

Defendants argue that plaintiff's claims against them are based on, relate to, or are in response to their exercise of the right of free speech, the right to petition, and the right of association. The Act defines the "exercise of the right of free speech" as "a communication made in connection with a public issue or issue of public interest." K.S.A. § 60-5320(c)(1). A public issue or issue of public interest is an issue related to: (A) health or safety; (B) environmental, economic or community well-being; (C) the

government; (D) a public official or public figure; or (E) a good, product, or service in the marketplace.

K.S.A. § 60-5320(c)(7). The "exercise of the right to petition" means any communication pertaining to:

- A judicial proceeding;
- An official proceeding, other than a judicial proceeding, to administer the law;
- An executive or other proceeding before a department of the state, federal government, or other political subdivision of the state;
- A legislative proceeding, including a proceeding of a legislative committee;
- A proceeding before an entity that requires by rule that public notice be given before proceedings of such entity;
- A proceeding in or before a managing board of an educational institution supported directly or indirectly from public revenue;
- A proceeding of the governing body of any political subdivision of this state;
- A report of or debate and statements made in a proceeding described by subsection (c)(5)(A)(iii), (iv), (v), (vi) or (vii); or
- A public meeting dealing with a public purpose, including statements and discussions at the meeting or other public issues or issues of public interest occurring at the meeting.

K.S.A. § 60-5320(c)(5)(A). The right to petition also includes:

- A communication in connection with an issue under consideration or review by a legislative, executive, judicial or other governmental or official proceeding;
- A communication that is reasonably likely to encourage consideration or review of an issue by a legislative, executive, judicial or other governmental or official proceeding;
- A communication reasonably likely to enlist public participation in an effort to effect consideration of an issue by a legislative, executive, judicial or other governmental or official proceeding;
- Any other communication or conduct that falls within the protection of the right to petition the government under the constitution of the United States or the constitution of the state of Kansas.

K.S.A. § 60-5320(c)(5)(B)-(E). The "exercise of the right of association" under the Act means "a communication between individuals who join together to collectively express, promote, pursue or defend common interests." K.S.A. § 60-5320(c)(3).

   b. *Application of K.S.A. § 60-5320 in Federal Diversity Actions*

Before deciding the merits of the motion to strike, the court must first determine whether it can apply the Act in this federal diversity action. Plaintiff does not address this issue in her response.

It is well-settled that under the *Erie* doctrine, "federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. For Humanities, Inc*., 518 U.S. 415, 427 (1996). In a federal diversity action, courts must apply state substantive law, or "those rights and remedies that bear upon the outcome of the suit," and federal procedural law, or "the processes or modes for enforcing those substantive rights." *Los Lobos Renewable Power, LLC v. Americulture, Inc*., 885 F.3d 659, 668 (10th Cir. 2018) (citing *Sibbach v. Wilson & Co*., 312 U.S. 1, 14 (1941)). Deciding whether a law is substantive or procedural for *Erie* purposes "is sometimes a challenging endeavor." *Gasperini*, 518 U.S. at 427; *see also Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co*., 559 U.S. 393, 419 (2010) (Stevens, J., concurring) (noting that "the line between procedural and substantive law is hazy."). In some situations, "procedure and substance are so interwoven that rational separation become well-nigh impossible." *Shady Grove*, 559 U.S. at 419. And if a state chooses to use a "traditionally procedural vehicle as a means of defining the scope of substantive rights or remedies, federal courts must recognize and respect that choice." *Id.* Defining the law as procedural or substantive is not the "overriding consideration" in deciding whether to apply a state law in a federal diversity action; rather it is whether "in a suit for the enforcement of state created rights the outcome would be 'substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a state court.'" *Berger v. State Farm Mut. Auto. Ins. Co*., 291 F.2d 666, 668 (10th Cir. 1961) (citing *Guaranty Trust Co. v. York*, 326 U.S. 99, 109 (1945)).

The Tenth Circuit recently held that a New Mexico "anti-SLAPP" statute was entirely procedural in nature and did not apply in federal diversity actions. *See Los Lobos*, 885 F.3d at 673. The Tenth Circuit's decision concerned only New Mexico's anti-SLAPP statute which, the court noted, was unlike many other states' anti-SLAPP statutes. *Id*. at 670. The court's holding is therefore not binding on

whether this court can apply the Kansas Act in a federal diversity action. The question is a matter of first impression.

Because it took effect in 2016, there has been little opportunity for litigants to apply the Act and for courts to interpret its provisions and operation. The plain language of the Act suggests the purpose of the law is substantive—to encourage and safeguard an individual's First Amendment rights. According to the Kansas Court of Appeals, however, the "heart" of the Act "provides a *procedural* remedy early in the litigation for those parties claiming to be harassed by a SLAPP lawsuit." *T & T Fin. of Kansas City, LLC v. Taylor*, No. 117,624, 2017 WL 6546634, at * 4 (Kan. Ct. App. Dec. 22, 2017) (emphasis added). The Act, therefore, seems to govern both substance and procedure. Because there is little precedential guidance, the court will look to other jurisdictions who have interpreted similar anti-SLAPP statutes.

Many other states have enacted similar anti-SLAPP statutes to "try to decrease the 'chilling effect' of certain kinds of libel litigation and other speech-restrictive litigation," by "making it easier to dismiss defamation suits at an early stage of the litigation." *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328, 1332 (DC. Cir. 2015). Courts deciding whether these anti-SLAPP statutes apply in federal court agree that the issue falls into the "special category concerning the relationship between the Federal Rules of Civil Procedure and a state statute that governs both procedures and substance in the state courts," which is not the "classic *Erie* question." *Godin v. Schencks*, 629 F.3d 79, 86 (1st Cir. 2010). The Supreme Court has held that a federal court exercising diversity jurisdiction should not apply a state law or rule if "(1) a Federal Rule of Civil Procedure 'answer[s] the same question' as the state law or rule and (2) the Federal Rule does not violate the Rules Enabling Act." *Abbas*, 783 F.3d at 1334 (citing *Shady Grove*, 559 U.S. at 398 –99).

-6-

In *Abbas*, the District of Columbia Circuit was tasked with deciding whether the District of Columbia's anti-SLAPP statute was applicable in federal diversity actions. The D.C. anti-SLAPP Act is similar to the Kansas Act. A defendant filing a special motion to dismiss first must make a prima facie case showing the claim arose from an act in furtherance of the "right of advocacy on issues of public interest." *Id.* at 1332. Upon making a prima facie case, the burden shifts to the plaintiff to show the claim is likely to succeed on the merits. *Id.* The D.C. Circuit found that Rules 12 and 56 of the Federal Rules of Civil Procedure "establish the standards for granting pre-trial judgment to defendants in cases in federal court," and that a federal court sitting in diversity jurisdiction must apply those federal rules rather than the anti-SLAPP's special motion to dismiss provision. *Id.* at 1333. The court noted that the D.C. anti-SLAPP Act essentially "establishes the circumstances under which a court must dismiss a plaintiff's claim before trial," or, requires the court to conclude whether a plaintiff's claim "does not have a likelihood of success on the merits." *Id.* This directly contradicts with Rules 12 and 56 which "do not require a plaintiff to show a likelihood of success on the merits." *Id.* at 1334. The court concluded the D.C. anti-SLAPP Act's "likelihood of success standard is different from and more difficult for plaintiffs to meet than the standards imposed by Federal Rules 12 and 56." *Id.* at 1335.

The First Circuit, however, found that Rules 12 and 56 do not "attempt to answer the same question" as Maine's similar anti-SLAPP statute. *Godin*, 629 F.3d at 88. The Maine anti-SLAPP statute provides a defendant the right to file an expedited "special motion to dismiss," which the court must grant unless "the party against whom the special motion is made shows that the moving party's exercise of its right of petition was devoid of any reasonable factual support or any arguable basis in law . . . ." Me. Rev. Stat. tit. 14, § 556. The First Circuit noted that when "getting at the potential rub in the relationship between a Federal Rule of Procedure and the state law," the first question to ask is whether the federal rule "is sufficiently broad to control the issue before the court." *Id.* at 86 (citing *Shady Grove*,

559 U.S. at 421.). If the Federal Rule is "sufficiently broad," it must be given effect even if it competes with the state law. *Id.* In other words, the court must determine whether state law and the Federal Rules can co-exist without conflicting with each other, or, whether there evidence that the Federal Rule at issue was intended to "occupy the field." *Id*. at 91. If the Federal Rule was intended to "occupy the field," it must be applied over the state law.

The First Circuit held that neither Rule 12 or Rule 56 were so broad as to cover the issue raised in Maine's anti-SLAPP statute. *Id*. at 88. The anti-SLAPP statute, unlike Rules 12 and 56, did not address "general federal procedures governing all categories of cases," rather, it addressed only "special procedures for state claims based on a defendant's petitioning activity." *Id.* The statute was not intended as a "substitute" to the Federal Rules, but instead "created a supplemental and substantive rule to provide added protections . . . to defendants who are named as parties because of constitutional petitioning activities." *Id.* The court also mentioned that neither Rule 12 or 56 determine which parties bear the burden of proof in a state-law cause of action, but the anti-SLAPP statute created a substantive burden shifting provision. *Id*. at 89 (noting "[a]nd it is long settled that the allocation of burden of proof is substantive in nature and controlled by state law."). The court found that, as Justice Stevens mentioned in his *Shady Grove* concurrence, the anti-SLAPP statute was "so intertwined with a state right or remedy that it functions to define the scope of the state created right," and cannot be displaced by Rule 12 or 56. *Id*. The court also was persuaded by the fact that, for example, in passing the Private Securities Litigation Reform Act of 1995—which created a higher standard for pleading scienter in any §10(b) private action—Congress indicated it did not intend for Rules 12 and 56 to "occupy the field with respect to pretrial procedures aimed at weeding out meritless claims." *Id*. at 91.

The court also held that declining to apply Maine's anti-SLAPP statute in federal court would "result in an inequitable administration of justice between a defense asserted in state court and the same

defense asserted in federal court." *Id.* at 92. Not applying the anti-SLAPP statute would frustrate the *Erie* doctrine's goal to discourage forum shopping because "electing to bring state-law claims in federal as opposed to state court would allow a plaintiff to avoid [the anti-SLAPP statute's] burden-shifting framework, rely upon the common law's per se damages rule, and circumvents any liability for a defendant's attorney's fees or costs." *Id.*

Some circuit courts have followed the First Circuit's holding that anti-SLAPP statutes are applicable in federal court. *See e.g.*, *Henry v. Lake Charles Am. Press, L.L.C.*, 566 F.3d 164, 169 (5th Cir. 2009) (holding, without discussion, that Louisiana's anti-SLAPP statutes applied in a federal diversity case); *Adelson v. Harris*, 774 F.3d 803, 809 (2nd Cir. 2014) (finding the application of the immunity and fee shifting provisions of Nevada's anti-SLAPP law was "unproblematic"); *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963, 973 (9th Cir. 1999) (holding the special motion to strike provision in California's anti-SLAPP statutes applied in federal diversity suits because it did not directly conflict with the Federal Rules of Civil Procedure and applying the statute helped achieve the *Erie* doctrine's goal to discourage forum shopping and avoid inequitable administration of the law.).

Other courts have followed the D.C. Circuit's logic that anti-SLAPP statutes are incompatible with the Federal Rules of Civil Procedure. *See e.g.*, *Carbone v. Cable News Network*, No. 1:16-CV-1720-ODE, 2017 WL 5244176, at * 5 (N.D.Ga. Feb. 15, 2017) (finding *Abbas* persuasive and holding Rule 12(b)(6) answers "the same question" as the Georgia anti-SLAPP statute); *Makaeff v. Trump Univ. LLC*, 715 F.3d 254, 273–74 (9th Cir. 2013) (Kozinski J., concurring.) (concluding that *Newsham* was decided incorrectly, and that the California anti-SLAPP statute "creates no substantive rights; it merely provides a procedural mechanism for vindicating existing rights.").

As mentioned above, the Tenth Circuit has weighed in only on the applicability of New Mexico's anti-SLAPP statute. *See Los Lobos*, 885 F.3d at 673. The court held that the New Mexico anti-SLAPP statute, N.M. Stat. Ann. § 38-2-9.1, was facially procedural, and that there was no need to further analyze whether it conflicted with the Federal Rules of Civil Procedure. *See id.* at 668–69. New Mexico's anti-SLAPP statute simply provided parties the opportunity to file a "special motion to dismiss" in any action "against a person for conduct or speech undertaken or made in connection with a public hearing or public meeting . . . ." *Id.* at 663. This, the court found, did not set forth any substantive rules, rather "it tells the trial court to hurry up and decide dispositive pretrial motions in lawsuits that movant claims fit the description of 'baseless'" as provided by the statute. *Id.* at 669. The court concluded New Mexico's anti-SLAPP statute was not designed to "influence the *outcome* of an alleged SLAPP suit but only the *timing* of that outcome," and was purely a procedural mechanism for enforcing First Amendment rights. *Id.* at 670, 673.

The court noted, however, that New Mexico's anti-SLAPP statute was "unlike many other states' anti-SLAPP statutes that shift substantive burdens or proof or alter substantive standards. . . ." *Id.* at 670. The New Mexico anti-SLAPP statute instead "alters only how the claims are processed," and not "the rules of decision by which a court will adjudicate the merits of the complaint." *Id.*

Here, the Kansas Act has similar burden shifting components as both the Maine and D.C. anti-SLAPP statutes. Yet, in interpreting these similar statutes, the First Circuit held the Maine statute was applicable in federal diversity actions and the D.C. circuit held the D.C. statute was not. This court is more persuaded by the First Circuit's more detailed analysis, particularly in regard to the practical effects of not applying the Act in federal court. The First Circuit discussed how the application of the anti-SLAPP statute in federal diversity actions would "best serve the 'twin aims for the *Erie* rule: discouragement of forum shopping and inequitable administration of the laws.'" *Godin*, 629 F.3d at 91.

This court agrees. In passing the Act, the Kansas Legislature promulgated additional rules for parties bringing lawsuits under Kansas defamation law. In Kansas courts, the Act would require both parties to meet, essentially, heightened pleading standards. If this court declined to apply the Act, it would be ignoring the Kansas Legislature's desire to protect individuals against defamation lawsuits that infringe on First Amendment rights. And the Kansas Legislature has the authority to create additional rules that govern its laws and causes of action. If this court declined to apply the Act, it would encourage forum shopping and would result in inequitable application of the law, the two goals of the *Erie* doctrine. A plaintiff could, and would, choose to file her defamation suit in federal court—so long as diversity exists—in order to avoid the heightened standards set forth by the Act in state court. Defendants would then only have the traditional means provided by the Federal Rules of Civil Procedure to dismiss the case—even if it truly was an infringement on First Amendment rights. The court would be applying Kansas defamation laws without the additional protections the Kansas legislature chose to enact.

The court does find the D.C. Circuit's reasoning persuasive. The Act—and other anti-SLAPP statutes with similar provisions—are very procedural in nature. The Act creates a mechanism for a defendant to resolve the case pre-trial, much like Rules 12 and 56. The Act, however, seems to fit Justice Stevens's characterization of some "procedural" state laws—"a state procedural rule, though undeniably procedural in the ordinary sense of the term, may exist to influence substantive outcomes, and may in some instances become so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy." *Shady Grove*, 559 U.S. at 419–20. And although the D.C. Circuit's analysis of the procedural nature of the anti-SLAPP statute is persuasive, the D.C. Circuit did not discuss the practical effects of not applying these statutes in federal court. And this court finds that applying the Act in federal court is the result that is most consistent with the purposes of the *Erie* doctrine.

The court also believes the Tenth Circuit would agree with this outcome based on its dicta in *Los Lobos*. The Tenth Circuit noted that other anti-SLAPP statutes—such as California's anti-SLAPP statute—"that shift substantive burdens of proof or alter substantive standards," are unlike the New Mexico statute, which has no bearing on the suit's merits determination and is strictly procedural. *See Los Lobos*, 885 F.3d at 670. Therefore, statutes that shifts burdens of proof—like the Kansas Act—are more substantive in nature than the New Mexico statute, and are more likely to apply in a federal diversity action.

The court therefore finds that the Act, although procedural in nature, applies in federal diversity actions because it "exist[s] to influence substantive outcomes, and . . . is so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy." Much like the First Circuit found in *Godin*, the Act does not substitute Rules 12 and 56, it merely supplements them for a narrow category of cases. And application of the Act in federal court is consistent with the *Erie* doctrine's purposes. The court would briefly note, however, that it is not convinced that the requirement that a court hold a hearing within 30 days and the mandatory discovery stay provisions of the Act are applicable in federal diversity actions, as those provisions are strictly procedural in nature and do not affect the outcome of the case. *See Metabolife Intern., Inc. v. Wornick*, 264 F.3d 832, 845–46 (9th Cir. 2001) (finding the discovery limits in California's anti-SLAPP statute are not to be applied federally because they conflict with discovery-permitting aspects of Rule 56). Because the parties did not raise any challenges to these provisions, the court does not need to render any conclusions at this time. The court, however, declines to grant plaintiff and defendants' motions for a hearing on the motion to strike. The court does not believe any oral argument or evidence is necessary for the resolution of the motion.

    *c. Defendants' Motion to Strike*

Because the court finds the Act applies in federal diversity cases, it will therefore consider the merits of defendants' motion to strike. Defendants argue that this court should strike plaintiff's complaint because plaintiff's defamation claims involve defendants' First Amendment rights as defined by the Act.

As mentioned above, plaintiff brings the follow claims against defendants:

- Count I – Libel/slander against Rick and Lola Peck for the false filing of the TRO and false testimony by Rick Peck during the TRO hearing,
- Count II – Libel/slander against Lola Peck for filing false paperwork on the telephone harassment charge and for making false statements to Assistant District Attorneys John Fritz and Michael McElhinney,
- Count III – Harassment/threat of bodily harm against Lola Peck,
- Count IV – Conspiracy to incarcerate plaintiff against Lola Peck,
- Count V – Libel/slander against Lola Peck for claiming plaintiff was "in need of a mental examination" in documents filed in the telephone harassment case.

The court therefore must first determine whether defendants have made a prima facie case, pursuant to the Act, showing these claims concern their exercise of their right to free speech, right to petition, or right of association. Prima facie evidence is defined in Kansas as "evidence sufficient to sustain a verdict in favor of the issue it supports, even though it may be contradicted by other evidence." *Becker v. Knoll*, 239 P.3d 830, 833 (Kan. 2010).

The Kansas Legislature expressed its intent that the Act "shall be applied and construed liberally to effectuate its general purposes." K.S.A. § 60-5320(k). Again, the general purpose of the Act is to "encourage and safeguard the constitutional rights of a person to petition, and speak freely and associate freely, in connection with a public issue or issue of public interest . . . while at the same time, protecting the rights of a person to file meritorious lawsuits for demonstrable injury." K.S.A. § 60-5320(a).

Counts I, II, and V against defendants are for libel and slander allegedly committed during the TRO filing and hearing, and during the commencement of the telephone harassment case. Specifically, plaintiff claims defendants made false statements when filing the TRO and during the TRO hearing, and

-13-

defendant Lola Peck made false statements when filing paperwork for the telephone harassment case, and made false statements to ADA John Fritz involving the telephone harassment case.

The Act defines the right of free speech as "a communication made in connection with a public issue or issue of public interest." K.S.A. § 60-5320(c)(4). A public issue or issue of public interest are issues related to, *inter alia*, health or safety, and environmental, economic, or community well-being. K.S.A. § 60-5320(c)(7)(A). The right to petition means, *inter alia*, any communication in or pertaining to, "a judicial proceeding," and "an official proceeding, other than a judicial proceeding, to administer the law." K.S.A. § 60-5320(c)(5)(A)(i)-(ii). Communication is defined by the Act as "the making or submitting of a statement or document in any form or medium, including oral, visual, written, or electronic." K.S.A. § 60-5320(c)(2). The right to petition also means "any other communication or conduct that falls within the protection of the right to petition the government under the constitution of the United States or the constitution of the state of Kansas." K.S.A. § 60-5320(c)(5)(E).

The court finds that the allegations in Counts I, II, and V all relate to defendants' right to free speech and right to petition. Plaintiff alleges that defendants committed libel and slander while they were communicating in judicial proceedings (the TRO proceeding), or when they were petitioning the government (the District Attorney) regarding issues related to their safety (the filing of the TRO and the communications made during the commencement of the telephone harassment case).

The Act was intended to protect against lawsuits aimed at chilling speech such as this. Citizens should feel free to petition their government without fear of retribution. This includes sharing information with a prosecutor or filing a TRO. This does not mean that false accusations are protected by the First Amendment. Kansas law punishes those who are untruthful in their accusations prior to and during criminal proceedings. *See* K.S.A. § 21-5904 Interference with law enforcement; K.S.A. § 21-5905 Interference with the judicial process; K.S.A. § 21-5903 Perjury. But the stated purpose of the Act

-14-

is to protect individuals against civil litigation who are merely exercising their constitutional rights to free speech and the right to petition. Even without applying the Act, these communications would be privileged and defendants would be entitled to immunity because in Kansas, "[j]udicial proceedings are absolutely privileged communications, and statements in the course of litigation otherwise constituting an action for slander, libel, or one of the invasion of privacy torts involving publication, are immune from such actions." *Froelich v. Adair*, 516 P.2d 993, 997 (Kan. 1973). For this reason, the court finds that defendants have made a prima facie case showing Counts I, II, and V involve defendants' rights to free speech and right to petition.

The burden then shifts to plaintiff to establish a "likelihood of prevailing on the claim" by showing "substantial competent evidence to support a prima facie case." K.S.A. § 60-5320(d). Substantial competent evidence, under Kansas law, is evidence that "possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved." *Griffin ex rel. Green v. Suzuki Motor Corp.*, 124 P.3d 57, 67 (Kan. 2005). In Kansas, the tort of defamation includes both libel and slander. *Luttrell v. United Tel. Sys., Inc.*, 683 P.2d 1292, 1293 (Kan. Ct. App. 1984). To succeed in a defamation claim, a plaintiff must show (1) false and defamatory words, (2) communicated to a third person, (3) which result in harm to the reputation of the person defamed. *Id.* In deciding whether plaintiff has met this burden, the court may consider the pleadings and any supporting or opposing affidavits. As there are no affidavits, the court will look to plaintiff's complaint to determine whether she has shown substantial competent evidence to support a prima facie case of defamation under Kansas law.

In reviewing the complaint, the court finds that plaintiff has failed to provide substantial competent evidence that would establish a likelihood that she would prevail on her defamation claims. In regard to the TRO petition and hearing, plaintiff alleges that the TRO claim was false and that

defendant Rick Peck lied during the TRO hearing. Plaintiff fails to specify what, if any, false statements were made, and importantly, that they damaged her reputation. And as for allegations made regarding the telephone harassment charges, the only specific false statement plaintiff mentions is that defendant Lola Peck told ADA John Fritz that plaintiff was "in need of a mental examination." But plaintiff has not provided any substantial competent evidence that this statement harmed her reputation. Based on the allegations in the complaint, it seems plaintiff feels these judicial proceedings were unjustified. But this belief alone does not give rise to a defamation claim. And even if plaintiff were able to provide substantial competent evidence, the court notes that these communications are privileged under Kansas law. It would be difficult, if not impossible, for plaintiff to overcome this barrier to show a likelihood of prevailing on her claims. For these reasons, the court finds plaintiff has not met her burden under the Act and the court grants defendants' motion to strike Counts I, II, and V.

The court, however, declines to strike Counts III and IV under the Act. Count III is for "harassment and threat of bodily harm" against defendant Lola Peck and Count IV is against Lola Peck for "conspiracy to incarcerate." In Count III, plaintiff alleges that Lola Peck physically threatened her and harassed her by driving up and down her street, by following her on the highway and to her doctor's office, by placing a condom on her car, by leaving beer bottles in her back yard, and by vandalizing her car. These allegations do not involve defendants' rights to free speech, petition and freedom of association as defined by the Act. The court therefore denies defendants' motion to strike as to Count III. Defendants did not file a motion under Rule 12(b)(6) for failure to state a claim for Count III. Count III therefore remains in this litigation.

And as for Count IV, plaintiff alleges that Lola Peck and ADA John Fritz committed conspiracy to incarcerate her. She claims Fritz told Lola Peck he could arrange to have plaintiff arrested and not given the right to post bond, and that Lola Peck, with the assistance of Fritz, ensured plaintiff's time in

jail was a "nightmare," and that Lola Peck paid money to Fritz to ensure plaintiff was arrested after the TRO hearing and incarcerated. Conspiracy is not a civil tort under Kansas law. But any allegations in this claim that involved Lola Peck's discussions with Fritz regarding the telephone harassment charges are protected by the Act and are therefore stricken. Allegations regarding the payment of money in return for criminal charges and incarceration, however, are not protected by the Act. Because defendants did not file a motion under Rule 12(b)(6) for failure to state a claim, the court finds any allegations regarding the payment of money in exchange for prosecution must remain in the case for now.

*d. Request for Fees and Sanctions*

Defendants ask this court to impose fees and sanctions pursuant to the Act. If a court finds the moving party has prevailed on its motion to strike, the court "shall award . . . (1) [c]osts of litigation and reasonable attorney fees; and (2) such additional relief, including sanctions upon the responding party and law firms, as the court determines necessary to deter repetition of the conduct by others similarly situated." K.S.A. § 60-5320(g). Because defendants' motion to strike does not resolve all of plaintiff's claims, the court is not prepared at this time to award any fees or sanctions. The court will entertain a later motion for fees and sanctions detailing the fees defendants allege they are entitled to for the claims that were disposed of via this motion to strike.

**IT IS THEREFORE ORDERED** that defendants Rick and Lola Peck's Motion to Strike (Doc. 3) is granted in part and denied in part. The court grants the motion as to Counts I, II, and V. The court denies the motion as to Count III. The court grants the motion as to allegations in count IV regarding communications between defendants and the District Attorney's office but denies the motion as to any allegations regarding the payment of money in exchange for prosecution.

**IT IS FURTHER ORDERED** that defendants' Joint Motion for Hearing Regarding the Motion to Strike Doc. 3 (Doc. 5) is denied as moot.

**IT IS FURTHER ORDERED** that plaintiff's Reply to Defendants Lola Peck and Rick Pecks' Opposition to Plaintiff's Motion Regarding Document 26 (Doc. 34), in which she requests a hearing on the anti-Slapp motion, is denied as moot.

Dated November 26, 2018, at Kansas City, Kansas.

                                        s/ Carlos Murguia
                                        **CARLOS MURGUIA**
                                        **United States District Judge**